Jerome Anthony Clay, Jr., Esq. (SBN: 327175)
LAW OFFICES OF JEROME A. CLAY
5250 Claremont Avenue, Suite 221
Stockton, CA 95207
Phone: (209) 603-9852
Fax: (510) 280-2841
jclay7@claylaw.net

*Attorney for Plaintiff*
TYRONE WISE

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **TYRONE WISE, II**, an individual,<br><br>*Plaintiff,*<br><br>*vs.*<br><br>**THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,** a public entity,<br><br>*Defendant.* | Case No: _____<br><br>**Plaintiff's Complaint for**:<br>1. Disparate Treatment in Violation of 42 U.S.C. § 2000e-2(a)<br>2. Racial Discrimination in Violation of 42 U.S.C. § 2000e-2(b)<br>3. Retaliation in Violation of 42 U.S.C. § 2000e-3<br>4. Racial Harassment/Hostile Work Environment in Violation of Title VII<br>5. Failure to Prevent Discrimination and Harassment in Violation of Title VII<br><br>[DEMAND FOR JURY TRIAL] |

LAW OFFICES OF JEROME A. CLAY

Complaint

1    Plaintiff, TYRONE WISE, II (hereinafter referred to as "Plaintiff" or "Mr. WISE") brings this

2    action against Defendant, THE REGENTS OF THE UNIVERSITY OF CALIFORNIA (hereinafter

3    referred to as "Defendant" or "REGENTS"), and in support thereof alleges as follows:

### INTRODUCTION

5    1.    The Plaintiff brings this action to seek justice for the racial discrimination endured, a

6    violation of fundamental principles of fairness and dignity.  This case is about more than just unlawful

7    treatment—it is about holding those in power accountable for conduct that has caused profound harm.

8    Despite Plaintiff's efforts to perform his job duties diligently, he was systematically treated less favorably

9    than his Caucasian peers, denied equal opportunities, and retaliated against for asserting his rights.

10    Defendants, acting with discriminatory intent, engaged in practices that not only marginalized Plaintiff

11    based on his race but also fostered a hostile work environment, depriving Plaintiff of equal treatment and

12    dignity in the workplace.  The Plaintiff has suffered injustice that cannot be ignored, and through this

13    action, seeks the Court's intervention to ensure that such discriminatory practices do not go unchecked.

### JURISDICTION AND VENUE

15    2.    This Court has original jurisdiction in this action pursuant to 28 U.S.C. §§ 1331 and 1343

16    in as much as the matter in controversy is brought pursuant to Title VII of the Civil Rights Act of 1964

17    ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq*.

18    3.    The venue is proper under 28 U.S.C. § 1391 because the substantial part of events or

19    omissions giving rise to the claim occurred in this judicial district.

### PARTIES

21    4.    Plaintiff Mr. WISE, at all times relevant hereto, is an individual, a resident of Solano

22    County, State of California.

5.     Defendant REGENTS, at all times relevant hereto, is a public entity organized and existing under Article IX, Section 9 of the California Constitution, which establishes the University of California as a public trust administered by the REGENTS.   The University has more than 500 employees.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

6.     Prior to the initiation of this lawsuit, Plaintiff exhausted his administrative remedies by filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

7.     On January 3, 2025, the EEOC issued the Notice of Right to Sue within 90 days.  A true and correct copy of the Notice is attached hereto as **Exhibit "A"** and is fully incorporated herein by reference.

8.     Plaintiff received the Notice of Right to Sue on January 3, 2025.  Accordingly, this action is within 90 days of the date the Plaintiff received the Right to file a civil action.

**FACTUAL ALLEGATIONS**

9.     Plaintiff is a 44-year-old African American and a member of the American Descendants of Slavery ("ADOS").

10.     Plaintiff has been employed with the Haas School of Business, University of Berkeley (hereinafter referred to as "University") since March 1, 2019.  Plaintiff previously served as Associate Director for Student Life and Leadership Development ("SL&LD") for the Full-Time MBA Program, reporting to Jennifer Bridge (hereinafter referred to as "Ms. Bridge"), a Caucasian Supervisor and Sr. Director of External Engagement.

11.     Throughout the year 2022, Ms. Bridge subjected Plaintiff to unwarranted negative performance evaluations and threatened disciplinary action despite Plaintiff's satisfactory job performance.  These adverse actions were motivated by Plaintiff's race.

LAW OFFICES OF JEROME A. CLAY

12.    The University utilizes the "Achieve Together" Form as a formal evaluation tool intended to foster collaboration between supervisors and employees by setting goals, documenting performance, and providing constructive feedback.  However, this system was weaponized against Plaintiff by Ms. Bridge to create a false pretext for disciplinary action.

13.    During the December 1, 2021 – March 31, 2022, evaluation period, Ms. Bridge had deliberately misrepresented Plaintiff's performance, rating him as 'below expectations' and claiming he 'needed improvement.'  She falsely alleged that Plaintiff lacked collaboration, failed to meet unit priorities, and struggled with communication and job mastery.  Ms. Bridge's comments mischaracterized Plaintiff's efforts and accomplishments, portraying him as an underperforming employee despite his consistent dedication and substantial contributions.

14.    Plaintiff's actual work history contradicted these allegations.  He successfully launched critical student engagement initiatives, restructured club registration processes, and implemented DEI-focused programs.  Rather than recognizing these efforts, Ms. Bridge selectively framed minor challenges as major deficiencies to justify adverse actions against Plaintiff.  This biased and inaccurate evaluation was part of a broader pattern of discriminatory treatment motivated by Plaintiff's race.  A true and correct copy of the Achieve Together Form for December 1, 2021 – March 31, 2022, is attached hereto as **Exhibit "B"** and is fully incorporated herein by reference.

15.    On February 14, 2022, Ms. Bridge unfairly imposed a 30-day deadline for Plaintiff to improve his problem-solving skills.  However, on February 25, 2022, Ms. Bridge praised Plaintiff's recommendation to streamline club registration and extend deadlines.  Recognizing the contradiction, on February 28, 2022, Plaintiff challenged the necessity of the imposed expectation, pointing out that the previous concerns Ms. Bridge raised had already been clarified and were based on misunderstandings—including issues with make-up commencement, COVID protocols, and re-registration processes that were

LAW
OFFICES OF
JEROME A.
CLAY

either resolved or unrelated to Plaintiff's actions.  On March 2, 2022, instead of acknowledging the inconsistency, Ms. Bridge admitted she had not even considered Plaintiff's valid points, further delayed resolution, and failed to provide any substantive response.  Her actions exposed her arbitrary and unjustified criticism of Plaintiff, lack of leadership, and unwillingness to engage in good-faith discussions about performance expectations.  A true and correct copy of the Email Trail is attached hereto as **Exhibit "C"** and is fully incorporated herein by reference.

16.    On May 21, 2022, a student contacted FTMBA Life, stating that she had completed 60 service hours but was not recognized as a Beyond Yourself Fellow despite logging her hours by the deadline.  Ms. Bridge acknowledged the discrepancy on May 23, 2022, but deferred responsibility, stating that project manager, Plaintiff, was unavailable.  On May 26, 2022, Jason Joyce (hereinafter referred to as "Mr. Joyce")(Caucasian), the Interim Director, whose failure to review key materials or exercise proper leadership directly contributed to any confusion, instructed Plaintiff to investigate and provide findings before authorizing a response to the student and report by June 2, 2022.  Plaintiff complied, confirming on May 31, 2022, that the April 20, 2022, report reflected that the student had recorded only 50 hours of service.  Despite this compliance, Mr. Joyce blamed Plaintiff for the delay, ignoring his directive requiring prior approval before responding to the student.  When questioned, Plaintiff clarified that he had been awaiting Mr. Joyce's authorization, as instructed.  A true and correct copy of the Email Trail is attached hereto as **Exhibit "D"** and is fully incorporated herein by reference.

17.    In Plaintiff's Performance Review for April–September 2022, Ms. Bridge falsely alleged that Plaintiff mishandled an international student kickoff webinar, causing admissions team concerns.  In reality, Plaintiff properly coordinated the event, consulting Erin Skelly, Associate Director of the Berkeley International Office ("BIO"), who confirmed that BIO followed the same practice of recording and distributing sessions.  Additionally, Mr. Joyce unfairly undermined Plaintiff's efforts.  Indeed, Eric

LAW OFFICES OF JEROME A. CLAY

Askins, Director of Admissions, specifically confirmed that any frustration regarding the event was directed at Joyce—not Plaintiff. Moreover, Plaintiff's role did not historically include collaboration with admissions for international student programming, aside from temporary adjustments made during COVID-related staffing shortages. The expectation that Plaintiff should have unilaterally coordinated with Admissions was entirely inconsistent with past practices. A true and correct copy of the Performance Review is attached hereto as **Exhibit "E"** is fully incorporated herein by reference.

18.     Ms. Bridge also falsely alleged that Plaintiff failed to complete required Lead Center training, despite knowing no finalized training was provided to staff. At the time of the evaluation, the training process remained incomplete. Since summer, Mr. Joyce had been finalizing it, and as of October 12, Plaintiff's team was informed that club pages were still in development, with training materials pending. Ms. Bridge deliberately omitted this context, creating the false impression that Plaintiff had neglected his duties—further exemplifying her pattern of misrepresenting his performance to justify unwarranted discipline. [See Exhibit "E"].

19.     The Performance Review further falsely accused of poor collaboration, citing complaints from the MBA Association ("MBAA") President and Vice President ("VP") without context or prior discussion. Ms. Bridge had acknowledged in emails that these students were "challenging" and that other staff faced similar issues, yet she omitted this to create a misleading narrative. Moreover, the alleged lack of support for student initiatives stemmed from the University's policies that Plaintiff was required to follow. Furthermore, when the MBAA VP Diversity, Equity, and Inclusion (DEI) bypassed funding rules, later causing administrative issues, Ms. Bridge unfairly blamed Plaintiff despite previously admitting the situation was beyond his control. [See Exhibit "E"].

20.     Plaintiff was never given an opportunity to respond to these student complaints before they were used against him in the Performance Review. This lack of due process—combined with the

omission of crucial context—demonstrates that the allegations were not a genuine reflection of Plaintiff's performance but rather a pretext to justify discriminatory treatment.

21.     Furthermore, Ms. Bridge relied on hearsay complaints from the Women in Leadership Club, alleging a student's disparaging remarks about Plaintiff's availability.  However, the University deliberately omitted key facts—namely, that Plaintiff had been on approved medical leave, including FMLA stress leave and COVID-related absences, limiting his campus presence.  Moreover, Plaintiff had also provided an out-of-office response directing students to the Program Office, yet Ms. Bridge unfairly criticized his availability based on an unverified complaint. [See Exhibit "E"].

22.     Ms. Bridge accused Plaintiff of mismanaging the FTMBA locker project and causing student frustration.  However, the University's records confirmed that the primary cause of the delay was Mr. Joyce's misplacement of the main locker keys.

23.     On September 9, 2022, Ms. Bridge asked Plaintiff about locker availability.  Plaintiff informed her that Facilities had been unable to locate the necessary key to verify that lockers were cleared.  When asked for a timeline, Plaintiff explained that there was no ETA, as Facilities was still searching for the key and a locksmith might be required.  A true and correct copy of the Image showing communication between Plaintiff and Ms. Bridge is attached hereto as **Exhibit "F"** and is fully incorporated herein by reference.

24.     Later that same day, Mr. Joyce emailed Plaintiff, stating that he had found the master key and placed it on Plaintiff's keyboard.  A true and correct copy of the Email dated September 9, 2022, is attached hereto as **Exhibit "G"** and is fully incorporated herein by reference.  Despite knowing this, Ms. Bridge still blamed Plaintiff for the delay, further highlighting her discriminatory intent. [See Exhibit "E"].

25.     Further, Ms. Bridge claimed she and Plaintiff identified a need for him to improve project planning in March.  She alleged that the International Orientation Project Plan ("IOPP") was never completed and that, during Plaintiff's medical leave (June 12-29), the team had no record of his work or clear direction on task redistribution.  Plaintiff rebutted this as inaccurate and misleading.  He stated he had no prior project planning experience beyond a 2020 COVID course and had never been trained.  He requested guidance but received none.  During meetings, Ms. Bridge and Mr. Joyce assured him his work was on track, and he was unaware of any gaps before taking work-induced stress leave.  Despite seeking support, he still received no training. [See Exhibit "E"].

26.     In June 2022, Plaintiff was informed that Mr. Joyce would be promoted to Director of SL&LD Department and would become Plaintiff's direct supervisor.  The Plaintiff was never given the opportunity to apply for this promotion despite having significantly more experience and stronger qualifications than Mr. Joyce.  This disparate treatment reflects a pattern of exclusion and inequitable advancement opportunities.

27.     On July 7, 2022, Plaintiff formally requested Mr. Joyce to be excused from a team meeting, citing an exhaustive IDI training schedule and the need for decompression before facilitating a DEI workshop.  The Plaintiff also proactively informed Mr. Joyce that due to these commitments, he would have limited updates for their Friday meeting and inquired whether it could be skipped.  Rather than acknowledging Plaintiff's valid reasoning and advanced communication, Mr. Joyce unfairly criticized Plaintiff's engagement and dependability, claiming that Plaintiff failed to communicate his absence despite it being approved before Mr. Joyce assumed his supervisory role.  Mr. Joyce unilaterally canceled the team meeting and then blamed Plaintiff for the impact on staff despite never requesting coverage or expressing concerns beforehand.  A true and correct copy of the Chain of Emails is attached hereto as **Exhibit "H"** and is fully incorporated herein by reference.

LAW OFFICES OF JEROME A. CLAY

28.    On July 8, 2022, Plaintiff refuted Mr. Joyce's claims, pointing out that he had verbally informed Mr. Joyce about the training during their prior touch base meeting and that there were no outstanding responsibilities requiring his presence.  Plaintiff further challenged Mr. Joyce's vague accusations about lack of commitment and alignment with team priorities, requesting specific examples to support these claims, which Mr. Joyce failed to provide. **[See Exhibit "H"]**.

29.    Mr. Joyce's shifting expectations, lack of clear communication, and unjustified criticism of Plaintiff's performance further demonstrate a pattern of managerial inconsistency and unfair scrutiny directed at Plaintiff.

30.    On August 3, 2022, Mr. Joyce emailed the team requesting their preferred in-office days, stating that all members should also plan to be in-person every day during Week Zero.  Plaintiff promptly responded, requesting Wednesday through Friday as in-office days.  However, on August 24, 2022, after Plaintiff highlighted a scheduling issue, Mr. Joyce dismissed the original agreement, calling it an "old email chain" and unilaterally altering Plaintiff's schedule without prior notice.  Mr. Joyce claimed changes were made due to new staff hires and team discussions yet failed to communicate these adjustments directly to Plaintiff or provide an opportunity for input.  A true and correct copy of the Email Trail is attached hereto as **Exhibit "I"** and is fully incorporated herein by reference.

31.    On August 26, 2022, HR Business Partner Allison Layton (hereinafter referred to as Ms. Layton") acknowledged Plaintiff's concerns and offered support with project planning and relationship-building.  Plaintiff reiterated his need for training and raised concerns about the one-sided nature of his performance review.  He also questioned Mr. Joyce's unilateral change to his in-office workdays, which conflicted with his work-from-home agreement.  On September 1, 2022, Plaintiff followed up with Ms. Layton to schedule a project planning meeting.  She agreed to meet the next day at noon and requested a Zoom link.  A true and correct copy of the Email Trail is attached hereto as **Exhibit "J"** and is fully

LAW OFFICES OF JEROME A. CLAY

incorporated herein by reference.  Plaintiff and Ms. Layton subsequently held the meeting as scheduled. A true and correct copy of the Image showing a meeting with Ms. Layton is attached hereto as **Exhibit "K"** and is incorporated herein by reference.

32.    This shows that Plaintiff actively sought training, received misleading assurances, and was unfairly criticized for lacking skills, which he was never given the opportunity to develop.

33.    Plaintiff was also targeted over his handling of the Sexual Violence and Sexual Harassment Prevention ("SVSHP") training, accused of being unprepared and reading from a script. However, this training was a state-mandated program that required facilitators to adhere strictly to approved materials, leaving little room for deviation.  After attending mandatory training, Plaintiff contracted COVID-19, disrupting final preparations.  Ms. Bridge ignored these extenuating circumstances and falsely portrayed him as incompetent. [See Exhibit "E"].

34.    Ms. Bridge criticized Plaintiff's execution of the Consortium Welcome event, alleging that he failed to secure student panelists and Q&A questions.  However, Plaintiff had initiated event planning well in advance, but due to his work-induced stress leave, critical planning responsibilities were reassigned to Mr. Joyce and other administrators, who failed to take action.  Plaintiff was held accountable for these failures despite being on leave. [See Exhibit "E"].

35.    The Performance Review authored by Ms. Bridge contains numerous additional statements that lack merit, misrepresent the facts, and were directly rebutted by Plaintiff.  These statements, when viewed collectively, reveal a consistent pattern of discriminatory treatment by Ms. Bridge against Plaintiff.  Instead of providing an objective assessment of Plaintiff's performance, Ms. Bridge selectively framed events in a manner designed to portray Plaintiff in a negative light, ignored key context, and omitted evidence that supported Plaintiff's success.  Plaintiff's rebuttals expose the extent to which Ms. Bridge deliberately distorted the truth to justify her unfair treatment, further

LAW OFFICES OF JEROME A. CLAY

1    demonstrating a broader pattern of racial discrimination.  These baseless claims have caused significant

2    harm to Plaintiff's professional reputation and standing within the organization. [See Exhibit "E"].

3         36.    In stark contrast to Ms. Bridge's negative and misleading evaluation, the Achieve

4    Together Form for the period of August 1, 2022, to November 30, 2022, authored by Katrina Koski

5    (hereinafter referred to as "Ms. Koski"), provides an objective and positive assessment of Plaintiff's

6    performance.    Ms. Koski acknowledged Plaintiff's invaluable contributions to Diversity, Equity,

7    Inclusion, Justice, and Belonging ("DEIJB") efforts, emphasizing that he represented the Full-Time MBA

8    ("FTMBA") program exceptionally well and was a cornerstone of the cross-functional DEIJB Liaison

9    team.  She praised Plaintiff's leadership, advanced knowledge of student affairs, and ability to maintain

10   composure despite managing a high-profile and demanding portfolio.  Ms. Koski further recognized

11   Plaintiff's success in launching Haas's first-ever Native American and Indigenous Business Association,

12   a milestone achievement that strengthened student perceptions of the FTMBA program, increased

13   visibility for underrepresented student populations, and aligned with the University's broader DEIJB

14   initiatives.  A true and correct copy of the Achieve Together Form from August 1, 2022, to November

15   30, 2022, is attached hereto as **Exhibit "L"** and is fully incorporated herein by reference.

16        37.    Ms. Koski's evaluation further highlighted systemic issues that contributed to Plaintiff's

17   workload and performance challenges—factors entirely ignored by Ms. Bridge.  Ms. Koski recognized

18   that Plaintiff was carrying an undue burden, both as the sole Black staff member in the Program Office

19   and as the de facto DEI lead, making him the primary representative for underrepresented students in the

20   FTMBA program.  Ms. Koski noted that Plaintiff's responsibilities in DEIJB initiatives were directly

21   aligned with Haas's strategic priorities and suggested that he should be given additional time for

22   Consortium-related activities rather than being assigned routine administrative tasks that arose due to

LAW
OFFICES OF
JEROME A.
CLAY

1    staffing shortages. [See Exhibit "L"].  Instead of acknowledging this reality, Ms. Bridge penalized

2    Plaintiff for circumstances beyond his control.

3        38.    Additionally, Ms. Koski recommended institutional support to address the undue

4    emotional workload placed on Plaintiff, suggesting that Marco Lindsey from the Haas DEIJB office

5    facilitate sessions to enhance psychological safety for the FTMBA Program Office.    This

6    recommendation further confirms that Plaintiff was placed in an inequitable position that imposed

7    additional stress and responsibilities not expected of other employees. [See Exhibit "L"].

8        39.    Ms. Koski's evaluation demonstrates that Plaintiff was not only meeting expectations but

9    was excelling in his role.  Ms. Bridge's evaluation failed to account for the institutional barriers Plaintiff

10    faced, reinforcing her discriminatory pattern of holding Plaintiff to an unfair standard compared to his

11    colleagues.

12        40.    Notwithstanding, on October 13, 2022, Plaintiff was placed on a Performance

13    Improvement Plan ("PIP") with a 60-day timeframe ending on December 12, 2022 (later extended to

14    December 22, 2022) due to vague and subjective concerns, including alleged deficiencies in job mastery,

15    trust-building with students, collaboration, and innovation, despite the lack of documented prior warnings

16    or support.  The PIP imposed excessive and arbitrary expectations, requiring Plaintiff to complete

17    multiple readings, training, and project plans while already managing an understaffed department as the

18    sole Student Life staff member.  Many of the performance concerns were based on one-sided input and

19    lacked necessary context, as reflected in the flawed evaluation that failed to allow Plaintiff an opportunity

20    to address or correct alleged deficiencies.  A true and correct copy of the PIP for October 13, 2022, is

21    attached hereto as **Exhibit "M"** and is fully incorporated herein by reference.

22        41.    Nevertheless, throughout the PIP, Plaintiff complied with assignments, completing the

23    IOPP and Locker Cleanout Plan, yet was repeatedly criticized for failing to meet unrealistic expectations.

LAW
OFFICES OF
JEROME A.
CLAY

42.     The PIP also incorporated inaccurate or misleading information, which Plaintiff challenged in a November 22, 2022, email to Ms. Bridge, referencing their prior discussion on rebuilding student trust and emphasizing urgency in response times to student inquiries.  Plaintiff responded by addressing concerns about leadership's lack of communication, its impact on trust, and his ability to perform effectively.  He noted that his Achieve Together evaluation lacked context, prevented him from addressing concerns, and contributed to his PIP assignments based on one-sided input.  Plaintiff also highlighted his efforts to support an understaffed team amid personal challenges.  He reminded Ms. Bridge that she had acknowledged the validity of his concerns and had intended to follow up on the issues raised, particularly those related to his PIP.  He specifically asked whether inaccurate or misleading items—including responsibilities for the DEI Workshop, the Consortium event, and comments from Drew and Arohi—had been removed.  A true and correct copy of the Email Trail is attached hereto as **Exhibit "N"** and is fully incorporated herein by reference.

43.     Ms. Bridge replied, confirming that she had amended the two documents as requested and instructing HR to update the Achieve dashboard.  She admitted that in the transition following Mr. Joyce's departure and her reassumption of leadership over the SL&LD team, she had neglected to send the amended documents to him but assured him that she would do so separately.  She acknowledged the significant transitions within the department since March and the resulting communication challenges, which she claimed to be actively addressing. [See Exhibit "N"].

44.     On December 13, 2022, Plaintiff emailed Ms Bridge, highlighting inconsistent expectations, unfair treatment, and procedural failures.  The IOPP was completed and approved, yet Ms. Bridge retroactively imposed changes after orientation dates were moved.  She also arbitrarily added a Listening Session project plan with a two-day deadline, despite the Plaintiff's heavy workload as the sole Student Life staff member.  Plaintiff further raised concerns about inaccuracies in the Achieve Together

LAW OFFICES OF JEROME A. CLAY

1    process, where Ms. Bridge copied and pasted a flawed "Letter of Concern" into the review without

2    discussion.  Despite acknowledging leadership's failure to gather proper context, Ms. Bridge continued

3    issuing misleading write-ups.  Moreover, Plaintiff highlighted the disparate treatment between him and

4    other employees, such as Mr. Joyce, who was afforded an opportunity to address negative feedback

5    directly, while Plaintiff was never granted such a discussion before receiving formal write-ups.  A true

6    and correct copy of the Email dated December 13, 2022, is attached hereto as **Exhibit "O"** and is fully

7    incorporated herein by reference.

8           45.     The Plaintiff emphasized the emotional and physical toll of unfair treatment, work-

9    induced personal emergencies, and its impact on mental health.  Despite multiple attempts to address

10   these issues, Ms. Bridge and leadership failed to ensure fair and consistent treatment, creating a hostile

11   and inequitable work environment.

12          46.     On December 22, 2022, Plaintiff emailed Ms. Bridge, criticizing the PIP as ineffective,

13   misleading, and lacking substantive value.  Plaintiff stated that the only useful aspect was the delayed

14   walkthrough of the IOPP, which finally provided clarity that should have been offered from the start.

15   Prior to that, Plaintiff was left without guidance despite repeatedly seeking assistance.  A true and correct

16   copy of the Email dated December 22, 2022, is attached hereto as **Exhibit "P"** and is fully incorporated

17   herein by reference.

18          47.     Plaintiff further condemned the PIP's arbitrary and trivial assignments, noting that the

19   assigned readings were redundant, failed to address actual challenges, and contributed nothing to

20   professional development.  The expectations for collaboration and innovation were baseless, as Plaintiff

21   had already led successful programs and implemented new processes.  Plaintiff also highlighted the

22   chaotic and ever-changing work environment, pointing to constant leadership transitions, evolving

23   policies, and structural instability, which made innovation impossible when basic processes were still

LAW
OFFICES OF
JEROME A.
CLAY

untested. [See Exhibit "P"].  Ms. Bridge's failure to provide meaningful support and her imposition of unrealistic, misguided expectations exposed the PIP as a pretextual and unjustified measure against Plaintiff.

48.    Notwithstanding, on January 18, 2023, Ms. Bridge issued a baseless Letter of Warning (hereinafter referred to as "Letter") to Plaintiff, falsely alleging failure to meet acceptable work performance standards despite Plaintiff's documented efforts and prior clarifications.  The Letter relied on misleading and incomplete information, mischaracterizing Plaintiff's performance and failing to acknowledge Plaintiff's compliance with deadlines, workload challenges due to an understaffed team, and leadership's failure to provide proper support.  A true and correct copy of the Letter of Warning is attached hereto as **Exhibit "Q"** and is fully incorporated herein by reference.

49.    On January 20, 2023, Plaintiff formally rebutted the Letter in an email to Ms. Bridge and multiple senior administrators, providing clear evidence refuting the accusations.  Plaintiff specifically challenged the claim that he failed to cover Slack on assigned days, submitting proof of team agreements, email records, and a calendar confirming his availability and obligations on the disputed dates.  The Plaintiff also documented his efforts to support the team despite personal hardships, including working remotely on October 26, 2022, after his father-in-law suffered a heart attack and later experienced work-induced trauma requiring an ER visit on October 27, 2022.  A true and correct copy of the Email dated January 20, 2023, and evidence is attached hereto as **Exhibit "R"** and is fully incorporated herein by reference.

50.    Plaintiff further exposed Ms. Bridge's ongoing pattern of misrepresentation and targeting, noting that critical issues were never addressed in real time but instead used retroactively to justify disciplinary action.  He also pointed out disparate treatment, highlighting how other team members were afforded flexibility and grace while he was singled out for reprimand. [See Exhibit "R"].  This Letter was

LAW
OFFICES OF
JEROME A.
CLAY

yet another example of Ms. Bridge's bad-faith management, retaliatory actions, and gaslighting tactics, reinforcing a pattern of unfair scrutiny, shifting expectations, and a lack of due process in performance evaluations.

51.    On January 24, 2023, despite Plaintiff's previously documented compliance and evidence-based rebuttals to unfounded allegations, Ms. Bridge placed Plaintiff on yet another PIP for a 45-day period, further demonstrating a pattern of targeted and retaliatory management.  A true and correct copy of the PIP dated January 24, 2023, is attached hereto as **Exhibit "S"** and is fully incorporated by reference.  On February 8, 2023, an amended PIP extending until March 28, 2023, was filed.  A true and correct copy of the PIP dated is attached hereto as **Exhibit "T"** and is fully incorporated by reference.

52.    On February 15, 2023, Assistant Director of Outreach and Culture Kristian Dawson (hereinafter referred to as "Ms. Dawson") condemned the workplace mischaracterization and mistreatment of Plaintiff, highlighting his significant leadership, collaboration, and contributions to the various communities.  Ms. Dawson acknowledged that Plaintiff's work and impact had been unfairly maligned.  Ms. Dawson detailed Plaintiff's instrumental leadership within the Black Staff & Faculty Organization ("BSFO"), where he spearheaded the majority of programming from 2020-2022, fostering community engagement and institutional partnerships during a critical time.  Despite personal hardships and systemic challenges, Plaintiff remained steadfast in his commitment to uplifting Black staff and faculty at the University.  Ms. Dawson further emphasized Plaintiff's widely recognized impact as a community builder, citing multiple institutional acknowledgments, including recognition in Berkeley News, the Center for Understanding in Conflict, and the Black Lives at Cal initiative.  Ms. Dawson's unequivocal endorsement of Plaintiff's character, contributions, and leadership serves as compelling evidence of Plaintiff's integrity, dedication, and unjust treatment within the workplace.  A true and correct

LAW OFFICES OF JEROME A. CLAY

1    copy of the Email dated February 15, 2023, and supporting documents is attached hereto as **Exhibit "U"**

2    and is fully incorporated herein by reference.

3    53.    On March 13, 2023, Plaintiff formally challenged the legitimacy of the PIP process in an

4    email to the Human Resources (HR) Head, Therese Madden (hereinafter referred to as "Ms. Madden"),

5    emphasizing that the expectations were unmanageable, built on inaccurate information, and a direct result

6    of defamation of his character and performance.  The Plaintiff highlighted leadership's failure to

7    acknowledge the staffing crisis, disregard for the actual scope of assigned work, and lack of transparency

8    in the PIP's creation.  Plaintiff explained how the imposed deadlines were wholly unrealistic, citing tight

9    turnaround times, conflicting responsibilities, and leadership's lack of understanding of the projects

10   assigned.    Despite  Plaintiff's  multiple  efforts  to  clarify  expectations  and  seek  reasonable

11   accommodations, leadership continued to impose unattainable performance standards, reinforcing a

12   deliberate pattern of bad-faith management designed to set Plaintiff up for failure.  Plaintiff also raised

13   these issues before; however, they were disregarded, forcing him to reiterate these to her.  A true and

14   correct copy of the Email Trail is attached hereto as **Exhibit "V"** and is fully incorporated herein by

15   reference.

16   54.    Consequently, after months of targeted scrutiny, unrealistic performance expectations,

17   and retaliatory disciplinary actions, Ms. Madden and Assistant Dean Jamie Breen (hereinafter referred to

18   as "Mr. Breen") ultimately acknowledged that the work imposed on Plaintiff was unmanageable and

19   designed to set him up for failure.  This admission directly contradicted the previous justifications for

20   placing Plaintiff on consecutive PIPs and confirmed that the disciplinary measures were unjustified and

21   excessive.

LAW
OFFICES OF
JEROME A.
CLAY

55.     As a result, on April 6, 2023, Ms. Madden internally transferred Plaintiff to a different department, removing him from his previous role within the Full-Time MBA Program Office and reassigning him as an Assistant Director for Boost at Berkeley Haas  (Boost@BerkeleyHaas).

56.     Despite Plaintiff's documented history of success, positive community impact, and leadership within the Black Staff & Faculty Organization, he was subjected to persistent gaslighting, unfair scrutiny, and manufactured performance deficiencies that were not imposed on his non-Black colleagues.  Rather than addressing the systemic bias and discriminatory treatment Plaintiff endured, leadership chose to remove him from the department, further reinforcing the inequities he faced due to his race.

57.     The University Staff Ombuds Office's Biennial Report for 2020-2022 (hereinafter referred to as "University Report") highlights concerns related to racial discrimination, particularly among African American/Black employees.  A true and correct copy of the University Report is attached hereto as **Exhibit "W"** and is fully incorporated herein by reference.  The University Report states that:

   a)  35% of Black/African American visitors to the Staff Ombuds Office reported concerns about discrimination, which is significantly higher than the 22% average for other groups.

   b)  55% of Black/African American visitors expressed concerns about a lack of trust in their workplace, 18% higher than the average for other ethnic groups.

   c)  77% of African American/Black visitors raised issues related to Diversity, Equity, Inclusion, and Belonging (DEIB), which was 8% higher than the overall average.

   d)  Some Black, Indigenous, and People of Color (BIPOC) visitors noted that remote work helped reduce their experiences of microaggressions.

   e)  Others felt "gaslit or racelit" when attempting to address discrimination concerns with their supervisors, meaning they were met with responses that denied the presence of racial bias.

LAW
OFFICES OF
JEROME A.
CLAY

58.     These findings indicate ongoing challenges in workplace equity and inclusion, particularly for African American/Black employees, and reinforce the need for systemic changes to address discrimination and improve trust in the University.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**(Disparate Treatment in Violation of 42 U.S.C. § 2000e-2(a))**
**(Against Defendant REGENTS)**

59.     Plaintiff repeats, re-alleges, and incorporates by reference paragraphs 1–58 with the same force and effect as though fully set forth herein.

60.     42 U.S.C. § 2000e-2(a) states that it shall be an unlawful employment practice for an employer: "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or" (2) "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

61.     A disparate treatment claim is a claim that an employer has treated a particular person less favorably than others because of the plaintiff's race, sex, or other protected category.

62.     Plaintiff is an African American and a member of the ADOS.  Therefore, Plaintiff is a member of a protected class under Title VII.

63.     Plaintiff not only met but often exceeded the qualifications for his role, as demonstrated by his extensive experience and consistently positive performance reviews prior to the alleged discriminatory treatment.  Plaintiff was assigned complex, high-responsibility projects, indicating trust in his capabilities from leadership.  His contributions were further recognized through departmental

LAW OFFICES OF JEROME A. CLAY

achievements before he engaged in protected activity.  Moreover, his performance metrics were comparable to those of non-Black colleagues who were not subjected to adverse actions, underscoring the disparate treatment he endured.

64.    Despite meeting performance expectations, Plaintiff was subjected to multiple adverse employment actions that undermined his professional standing and career advancement.  He was subjected to heightened scrutiny and marginalization and placed on a PIP without legitimate cause.  Unlike non-Black employees, Plaintiff was not given an opportunity to address or correct any alleged performance issues before going into his official evaluations and being placed on a formal PIP.  Additionally, Plaintiff was issued a Letter of Warning shortly after challenging the fairness of the PIP.  Moreover, rather than being given a fair opportunity to succeed within his SL&LD Department, Plaintiff was involuntarily transferred, which stripped him of key responsibilities he had previously held and diminished his chances for promotion and career advancement within the SL&LD Department.

65.    Furthermore, Plaintiff, despite possessing the necessary qualifications and experience for a supervisory role, was denied the opportunity to apply for a promotion.  In contrast, Mr. Joyce, a Caucasian employee with less experience, was promoted to a supervisory position.

66.    Pursuant to 42 U.S.C. § 1981a(b)(3)(D), Plaintiff is entitled to the maximum statutory compensatory damages available, up to $300,000, due to Defendant's willful and egregious violation of Title VII.

67.    As a further direct and proximate result of Defendant's wrongful conduct, Plaintiff has been compelled to retain legal counsel to vindicate his rights.  Under 42 U.S.C. § 2000e-5(k), Plaintiff is entitled to recover all reasonable attorney's fees and litigation costs incurred in pursuing this action, in an amount to be determined at trial.

1
2
3

**SECOND CAUSE OF ACTION**
**(Racial Discrimination in Violation of 42 U.S.C. § 2000e-2(b))**
**(Against Defendant REGENTS)**

4       68.    Plaintiff repeats, re-alleges, and incorporates by reference paragraphs 1–58 with the same

5    force and effect as though fully set forth herein.

6       69.    42 U.S.C. § 2000e-2(b) states, "It shall be an unlawful employment practice for an

7    employer employment agency to fail or refuse to refer for employment, or otherwise to discriminate

8    against, any individual because of his race, color, religion, sex, or national origin, or to classify or refer

9    for employment any individual on the basis of his race, color, religion, sex, or national origin."

10      70.    Plaintiff is an African American and a member of the ADOS.  Therefore, Plaintiff is a

11   member of a protected class under Title VII.

12      71.    Plaintiff was highly qualified for his position, possessed the necessary skills and

13   experience, and performed his job duties satisfactorily.

14      72.    Defendant has been practicing unlawful reprisal, harassment, intimidation, and

15   discrimination based on race against Plaintiff in violation of Title VII.  As such, Ms. Bridge highly favors

16   privileged Caucasians, whereas Plaintiff was targeted for the never-ending, unfounded, and pretext write-

17   ups, bogus performance reviews, unreasonable PIPs, deadlines, and unrealistic workloads.

18      73.    Plaintiff received a Letter of Warning despite providing documented evidence refuting

19   allegations of performance deficiencies.  Contrarily, non-Black employees, including Mr. Joyce, were

20   given opportunities to respond to performance concerns without disciplinary measures and were treated

21   more favorably.

22      74.    The pattern of conduct against Plaintiff demonstrates discriminatory intent, as non-Black

23   employees under similar circumstances were not subjected to the same level of scrutiny or disciplinary

24   measures.

LAW OFFICES OF JEROME A. CLAY

75.    After reporting the discrimination and retaliation, Plaintiff was forcibly transferred out of his department, effectively amounting to a constructive demotion.  The transfer resulted in a loss of leadership responsibilities and diminished career advancement opportunities.

76.    The University Report confirmed that African American employees faced disparate treatment, heightened scrutiny, and systemic bias within the institution.

77.    The University deliberately created a work environment that was unbearable, unpleasant, and vicious for the Plaintiff.  The Plaintiff faced growing hostility in their work environment.

78.    As a direct and proximate result of Defendant's action and/or omissions, Plaintiff has suffered and continues to suffer mental pain, including distress, anxiety, anguish, humiliation, embarrassment, and indignity, all to his damages in an amount to be determined at trial.

79.    Pursuant to 42 U.S.C. § 1981a(b)(3)(D), Plaintiff is entitled to the maximum statutory compensatory damages available, up to $300,000, due to Defendant's willful and egregious violation of Title VII.

80.    As a further direct and proximate result of Defendant's wrongful conduct, Plaintiff has been compelled to retain legal counsel to vindicate his rights.  Under 42 U.S.C. § 2000e-5(k), Plaintiff is entitled to recover all reasonable attorney's fees and litigation costs incurred in pursuing this action, in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**(Retaliation in Violation of 42 U.S.C. § 2000e-3)**
**(Against Defendant)**

81.    Plaintiff repeats, re-alleges, and incorporates by reference paragraphs 1–58 with the same force and effect as though fully set forth herein.

82.    42 U.S.C. § 2000e-3(a) states, "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . , because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or

LAW
OFFICES OF
JEROME A.
CLAY

1    participated in any manner in an investigation, proceeding, or hearing under this subchapter." [42 USCS

2    §§ 2000e–2000e-17].

3        83.    Plaintiff engaged in multiple forms of protected activity, including challenging the PIPs

4    process through rebuttals that identified procedural inconsistencies and unfair application.  Plaintiff also

5    raised concerns regarding racial disparities in performance evaluations, disciplinary actions, and the

6    overall mistreatment against him within the SL&LD Department.    Additionally, Plaintiff filed a

7    complaint detailing instances of biased disciplinary actions and inconsistent enforcement of performance

8    standards with HR.

9        84.    These actions constituted protected opposition to discriminatory workplace practices

10   under Title VII.

11       85.    In direct retaliation for Plaintiff's engagement in protected activity, the University and its

12   leadership took a series of adverse employment actions designed to undermine Plaintiff's professional

13   standing and career trajectory.  Shortly after Plaintiff formally contested the PIP and submitted a detailed

14   rebuttal, he was issued an unwarranted Letter of Warning despite presenting clear evidence refuting the

15   cited performance concerns.    Rather than addressing the procedural issues raised by Plaintiff, the

16   University escalated its retaliatory conduct by subjecting him to a second Performance Improvement

17   Plan.  Moreover, instead of providing Plaintiff with a fair opportunity to address alleged deficiencies

18   within his SL&LD Department, the University forcibly transferred him to another department, amounting

19   to a constructive demotion.  This transfer stripped Plaintiff of leadership responsibilities, diminished his

20   professional stature, and resulted in significant career stagnation by depriving him of meaningful

21   opportunities for advancement.

22       86.    A causal link exists between the protected activity and the University's adverse actions

23   against Plaintiff.  University's acts constitute illegal retaliation prohibited by federal statutes.

LAW
OFFICES OF
JEROME A.
CLAY

87.    Defendant has a legal obligation, pursuant to federal statutes and its policies, to provide Plaintiff with a workplace free from unlawful discrimination and retaliation.  However, Defendant failed to protect Plaintiff from Ms. Bridge's continued discrimination and retaliation.

88.    As a direct and proximate result of Defendant's action and/or omissions, Plaintiff has suffered and continues to suffer mental pain, including distress, anxiety, anguish, humiliation, embarrassment, and indignity, all to his damages in an amount to be determined at trial.

89.    Pursuant to 42 U.S.C. § 1981a(b)(3)(D), Plaintiff is entitled to the maximum statutory compensatory damages available, up to $300,000, due to the Defendant's willful and egregious violation of Title VII.

90.    As a further direct and proximate result of Defendant's wrongful conduct and illegal discrimination in the form of retaliation, Plaintiff had to secure the services of attorneys to pursue this action.  Under 42 U.S.C. § 2000e-5(k), Plaintiff is entitled to recover all reasonable attorney's fees and litigation costs incurred in pursuing this action, in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
### (Racial Harassment/Hostile Work Environment in Violation of Title VII)
### (Against Defendant REGENTS)

91.    Plaintiff repeats, re-alleges, and incorporates by reference paragraphs 1–58 with the same force and effect as though fully set forth herein.

92.    Harassment of an employee based on his race creates a hostile work environment that violates Title VII.

93.    Plaintiff is a member of a protected class as an African American employee and, as such, is protected under Title VII from race-based discrimination and harassment at the workplace.

94.    Defendant deliberately created a work environment that was unbearable, unpleasant, and vicious for the Plaintiff.  The Plaintiff faced growing hostility in their work environment.

LAW OFFICES OF JEROME A. CLAY

95.    The hostile work environment was severe and pervasive, altering the conditions of Plaintiff's employment and creating an abusive working atmosphere.  Defendant's actions were included but not limited to the following:

a)  Unlike non-Black colleagues, Plaintiff was subjected to excessive scrutiny, frequent micromanagement, and unwarranted criticisms regarding performance, fostering a climate of intimidation.

b)  Plaintiff was denied opportunities to address negative feedback, whereas similarly situated non-Black employees, including Mr. Joyce, were afforded such opportunities before receiving formal write-ups.

c)  Plaintiff was placed on multiple PIPs based on inaccurate and misleading information, with unrealistic expectations designed to set the Plaintiff up for failure.

d)  Plaintiff received a baseless Letter of Warning despite documented compliance with assigned responsibilities, and Plaintiff's legitimate concerns were ignored or dismissed by leadership.

e)  Plaintiff's concerns about leadership's failure to provide proper guidance and support were acknowledged but never rectified.  Instead, it continued to impose shifting expectations, creating a climate of uncertainty and stress.

96.    Due to the workplace hostility, the Plaintiff suffered work-induced trauma, requiring an emergency room visit, and experienced significant mental and emotional distress.

97.    Assistant Mr. Breen and HR Head Ms. Madden ultimately admitted that the expectations imposed on Plaintiff were unmanageable and designed to lead to failure, further confirming the pretextual nature of the PIPs and disciplinary actions.

LAW OFFICES OF JEROME A. CLAY

98.    The University Report highlighted racial disparities, including a disproportionately high percentage of Black/African American employees reporting discrimination, lack of trust, and systemic bias, further demonstrating the hostile work environment Plaintiff endured.

99.    The hostility and pervasive abuse became so intolerable that Plaintiff was forcibly transferred to a different department by management.  Rather than addressing the discriminatory conduct, Defendant chose to remove Plaintiff from his existing role, implicitly conceding that the environment was too toxic for him to continue working in his assigned department.

100.    As a direct and proximate result of Defendant's action and/or omissions, Plaintiff has suffered and continues to suffer mental pain, including distress, anxiety, anguish, humiliation, embarrassment, and indignity, all to his damages in an amount to be determined at trial.

101.    Pursuant to 42 U.S.C. § 1981a(b)(3)(D), Plaintiff is entitled to the maximum statutory compensatory damages available, up to $300,000, due to the Defendant's willful and egregious violation of Title VII.

102.    As a further direct and proximate result of Defendant's wrongful conduct, Plaintiff has been compelled to retain legal counsel to vindicate his rights.  Under 42 U.S.C. § 2000e-5(k), Plaintiff is entitled to recover all reasonable attorney's fees and litigation costs incurred in pursuing this action, in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**(Failure to Prevent Discrimination and Harassment in Violation of Title VII)**
**(Against Defendant REGENT)**

103.    Plaintiff repeats, re-alleges, and incorporates by reference paragraphs 1–58 with the same force and effect as though fully set forth herein.

104.    An employer has the responsibility under Title VII to ensure a workplace free from unlawful discrimination, including the affirmative duty to investigate evidence of a hostile environment.

LAW OFFICES OF JEROME A. CLAY

105.    Defendant is an employer within the meaning of Title VII and subjected to its provisions. Plaintiff is the Defendant's employee and is entitled to the protections afforded by Title VII.

106.    Defendant had actual and constructive knowledge of the discriminatory and harassing conduct endured by Plaintiff, including but not limited to the following:

a)  The racially hostile work environment perpetuated by Ms. Bridge, including unwarranted PIPs, retaliatory disciplinary actions, and excessive scrutiny not applied to similarly situated non-Black employees.

b)  Despite Plaintiff's multiple formal rebuttals against unwarranted criticisms regarding his performance, disparate treatment, and unjustified disciplinary actions, no actions were taken.

c)  Despite the University Report identifying widespread racial disparities and systemic bias affecting Black/African American employees, no actions were taken to prevent discrimination and harassment.

d)  The forced transfer of Plaintiff to a different department, not as a corrective measure but as an implicit acknowledgment by management that the workplace had become intolerably hostile.  Instead of addressing the underlying issues, Defendant elected to remove Plaintiff from his position, effectively punishing him for the discriminatory conduct of others.

107.    Despite this knowledge, Defendant failed to take reasonable steps to prevent, investigate, and remedy the ongoing discrimination and harassment, thereby allowing the hostile work environment to persist.

108.    Defendant's failure to act constitutes a violation of Title VII, as it failed to uphold its statutory duty to prevent discrimination and harassment in the workplace.

109.    Pursuant to 42 U.S.C. § 1981a(b)(3)(D), Plaintiff is entitled to the maximum statutory compensatory damages available, up to $300,000, due to the Defendant's willful and egregious violation

LAW
OFFICES OF
JEROME A.
CLAY

of Title VII.

110.   As a further direct and proximate result of Defendant's wrongful conduct, Plaintiff has been compelled to retain legal counsel to vindicate his rights.  Under 42 U.S.C. § 2000e-5(k), Plaintiff is entitled to recover all reasonable attorney's fees and litigation costs incurred in pursuing this action, in an amount to be determined at trial.

<strong>DEMAND FOR JURY TRIAL</strong>

111.   The Plaintiff hereby demands a trial by the jury in this action.

<strong>PRAYER FOR RELIEF</strong>

WHEREFORE, Plaintiff respectfully prays for relief against Defendant as follows:

(i)    For an award of compensatory damages in an amount to be determined at the time of trial, including but not limited to $300,000;

(ii)   For an award of reasonable attorney's fees and costs of suit herein;

(iii)  For pre-judgment and post-judgment interest, at the legal rate; and

(iv)   For such other and further relief as the Court deems just and proper.


March 31, 2025                                  Respectfully submitted,

                                                **LAW OFFICES OF JEROME A. CLAY**

                                                /s/ Jerome A Clay
                                                _____
                                                JEROME A. CLAY, JR., ESQ.
                                                *Attorney for Plaintiff*
                                                TYRONE WISE

LAW
OFFICES OF
JEROME A.
CLAY

**Exhibit "A"**
(EEOC Notice of Right to Sue)

U.S. Department of Justice

Civil Rights Division

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

VIA EMAIL

*150 M Street, N.E.*
*Karen Ferguson , EMP, 4CON, Room 9.514*
*Washington, DC 20530*

January 03, 2025

Mr. Tyrone E. Wise, II
2419 Royal Court
Fairfield, CA  94534

Re:  EEOC Charge Against University of Berkeley, Haas School of Business, et al.
   No. 555202300103

Dear Mr. Wise, II:

   Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

   If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.  If you cannot afford or are unable to retain an attorney to represent you, the Court may, at its discretion, assist you in obtaining an attorney.  If you plan to ask the Court to help you find an attorney, you must make this request of the Court in the form and manner it requires.  Your request to the Court should be made well before the end of the time period mentioned above.  A request for representation does not relieve you of the obligation to file suit within this 90-day period.

   The investigative file pertaining to your case is located in the EEOC Oakland Local Office, Oakland, CA.

   This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

            Sincerely,

            Kristen Clarke
            Assistant Attorney General
            Civil Rights Division

    by     /s/ Karen L. Ferguson
            Karen L. Ferguson
            Supervisory Civil Rights Analyst
            Employment Litigation Section

cc: Oakland Local Office, EEOC

University of Berkeley, Haas School of Business, et al.

**Exhibit "B"**
(Achieve Together Form for December 1, 2021 – March 31, 2022)

(/announcements?announcement_id=10)The Achieve Together Online Dashboard is now OPEN!
Supervisors, start a new Online Form for all your direct reports to review the period April 1, 2022 - July
31, 2022. Supervisors and Direct Reports: Be sure to add your content and Finalize the Online Form
by the Due Date of September 15, 2022.                                                          ✕

 **Form created and shared**   ▶    **Form opened for edits**   ▶   ③ **Form completed**



# Achieve Together: December 1, 2021 to March 31, 2022

Form ID: 41506

This form is a space for supervisors and employees to collaborate on employee goals and record
comments and notes for a specific Conversation Period.

## Employee

**Employee Name**

Tyrone Wise

**Job Title**

STDT LIFE DEV SPEC 3

**Department**

BAHSB

**School, College, or Division**

HAAS3

# Conversation

Document your conversation notes here (2 paragraphs or less). Notes are shared and visible to both supervisor and employee.

**Supervisors:** The check-in questions below are guided starters to get your conversations going and help you discuss each of the five Achievement Criteria. Use the questions to share, discover, and plan for future work. As you discuss the questions, think about your employee's Performance Level in each of the Achievement Criteria. You can use the Achievement Criteria Full Set (https://hr.berkeley.edu/performance/achieve-together/achieve-together-achievement-criteria) to see example behaviors for each Achievement Criteria at each Performance Level. During the conversation and in your notes, detail successes, areas that are on track, and opportunities for improvement.

**Employees:** The check-in questions below have been designed to help you discuss your work with your manager/supervisor, as it relates to each of the five Achievement Criteria. Use the questions to prepare for your conversation, so that you are ready to share, discover, and plan for future work with your manager/supervisor. As you discuss the questions, you can use the Achievement Criteria Quick Guide and the Achieve Criteria Full Set (https://hr.berkeley.edu/performance/achieve-together/achieve-together-achievement-criteria) to see example behaviors for each Achievement Criteria at each Performance Level. During the conversation and in your notes, detail successes, areas where you need assistance, and how your manager can better support your success.

*Check-In Questions:*
  1. *What goals did you accomplish this period? In what ways does your work connect to our overall strategy and/or mission? (Goal Accomplishment & Job Mastery)*
  2. *What do you like best about your work? (Goal Accomplishment & Job Mastery)*
  3. *How have you supported others work and/or collaborated with others on your work this period? (Collaboration)*
  4. *How have you innovated to seek efficiencies or improve work outcomes? (Innovation)*
  5. *How have you fostered diversity, equity, inclusion and/or belonging on our team and campus? (Inclusion & Belonging)*
  6. *What can I do as your supervisor to better support your success? What additional knowledge, resources, or tools are needed to successfully do your job? (Development Planning & Manager*

*Support)*

## Conversation Period

December 1, 2021 to March 31, 2022                                                ⌄

## Date Conversation Held

05/31/2022     ▦

### Supervisor Notes

Collaboration Performance Level *
Enhances individual work by soliciting contributions from others and enhances others' work by contributing to their success to more effectively meet unit goals.
- While Tyrone was involved in many projects both internally and with students this is one area where Tyrone could make greater impact with improved job mastery. As it relates to the Campus Group club registration process, more team collaboration could have unsurfaced some of the unintended consequences that occurred when we launched the process and all the clubs got locked out of their CG pages (those with upcoming events were most impacted because they could not access their reservations pages). I do believe that Tyrone collaborates successfully on some projects like standing up the new sponsorship process, but that is inconsistent, as shown when he went to develop the sponsorship guide and didn't seek CMG feedback early in the process about format and editing and just attempted to deliver a final product. Unfortunately, the book was laden with errors, and if there had been more collaboration earlier in the process those likely would have been prevented. Tyrone needs to spend more quality time collaborating with his peers and asking the right questions to enhance both his work and theirs.

Goal Accomplishment Performance Level *
Achieves individual goals that contribute to unit priorities.
- Tyrone does not actively achieve his goals that contribute to unit priorities. Our unit priorities were to Rebuild Student Trust in the Program Office, Rebuild the Student Community and Rebuild the Student Experience. While he is well-intentioned, by not meeting his individual goals (job mastery, written/verbal communication) he is not building trust with the student leaders and contributing to rebuild the student experience. See more about goals below.

Inclusion & Belonging Performance Level *
Demonstrates respect for people and their differences, regardless of race, ethnicity, class, gender identity and expression, sexual orientation, socioeconomic status, ability, country of origin, cultural, political, religious, or other affiliations. Understands the benefits of a diverse workforce, is trusted and respected by others, includes and welcomes others, and works to understand the perspective of others.
- This is Tyrone's strength. His contributions to the anit-racism challenge, his passion for the affinity groups that he aligns with and his proactive approach to inform our team about

opportunities for inclusion stand out. For example, he proactively pulled together a monthly calendar of religious holidays that Sarah uses each month to inform our newsletter content. He thinks about all of his work through an inclusion and belonging lens. An opportunity here for him is to layer in our business goals with this lens to make the team even stronger.

Innovation Performance Level *
Uses knowledge, skills, and professional experience to seek efficiencies and improve work outcomes.
- Tyrone attempts to innovate with some success on the team but those tend to be smaller projects with little risk like removing approvals in the case competition fund reimbursement process. The main project he was tasked with this season was launching a re-registration process for clubs. He wanted to run the process in Campus Groups which we did. He partnered with CG to develop the process, beta tested the process with the VP clubs and yet there were still substantial problems in the registration process that led to pushing back the deadline for clubs. Students were confused if their registration went through and in some cases entered faulty information just to get through the process. This was an opportunity to rebuild trust and credibility with the students and for student club leaders this process was confusing and frustrating.

Job Mastery Performance Level *
Demonstrates the knowledge, skills, and abilities that result in high performance and contributions within the scope of the employee's job description.
- Tyrone is not meeting expectations on this performance level. For an Associate Director role on the Student Experience team he is not demonstrating competency in his communication skills (written emails to students/new admits, and sharing with his team members what work needs to get done- see example from Avni below), knowledge of our event management process (recent referral to roomres/eventres of an UG needing help which is outside our team scope), or in his dependability to get his work accomplished (seating chart development for commencement-email from Avni, DLP & BY certificate project). This has eroded trust within the team, our outside business partners and student leaders (MBAA VPs).

## Employee Notes

What goals did you accomplish this period? In what ways does your work connect to our overall strategy and/or mission? (Goal Accomplishment & Job Mastery)
~ This quarter I was able to complete some of my goals such as completing the club re-registration process in the Campus Groups club management platform, along with finalizing/creating the Campus Groups Program Office club page to provide resources and support to the new incoming club leaders. This fit our teams goal of building trust with the student community by being a partner in their leadership development. Unfortunately due to my roles and responsibilities increased workload in January (working with 4 MBAA VP's who

all had robust program planning needs, all community clubs and orgs (26), sponsorship revamp and book creation, PO commencement lead, etc...), I was not able to meet other goals as outlined in November.

What do you like best about your work? (Goal Accomplishment & Job Mastery)
~ I enjoy the opportunities to work directly with and converse with the students. In doing so I am able to get a true pulse on how students are navigating their Haas experience and what may be some pain points that we can address in our team. From these conversations and collaborating with the various club leaders, MBAA VP's and students at large we have re-vamped our case competition program, provided access to a prayer room for students, formulated guidance on club management, and created funding for affinity and international clubs to support in their programming. Provided a consent workshop for the MBA classes. Reimaged a International Orientation program series to prepare the international students on arriving to Haas. All of which I have work intimately with in planning and executing, and continues to build trust with the MBA community and sets them up for success.

How have you supported others work and/or collaborated with others on your work this period? (Collaboration)
~ During this quarter I collaborated with my colleagues on various initiatives such as the new club leader registration where I worked with fellow Associate DIrector Jason Joyce on process and flow of execution in creating this new platform in our club management platform, along with a representative of Campus Groups to aid in troubleshooting and planning. A process that uncovered application voids in the Campus Groups formatting that resulted in Campus Groups adding new process steps to address some of the issues we encountered (such as registration access to students to complete their form). I also collaborated with multiple members of MBAA leadership on various programmings such as Mindfullness Week, the Consent Workshop and International Orientation (a multiple day programming that I had to reimagine, due to lack of any framework or historical knowledge due to consistent turnover), to name a few. I also worked with other departments within Haas and the greater UC Berkeley campus to restructure our club sponsorship program that was required due to UC Berkeley campus policy changes. A process that required various connection to key stakeholders within and outside Haas for finding funds that were misplaced and routing monies received, along with working with internal partners to provide clear guidance for the Student Experience Team and full-time MBA students. Lastly my work with as a creator and facilitator in the Haas Anti-Racism Challenge (ARC) Team, which is made up of various staff at Haas who lead a workshop dedicated to creating an Anti-Racist Haas campus.

How have you innovated to seek efficiencies or improve work outcomes? (Innovation)
~ I improved work outcomes by reimagining our Case Competition process that works in tandem with various MBAA VP leadership by removing barriers that precluded students from receiving funds to attend conferences and case competitions. Also creating the Campus Groups Program Office page which allows students and club leaders to have a central repository of information that sets them up for success, along with the club re-registration page that allows clubs to re-register as an active club with the Student Experience team.

How have you fostered diversity, equity, inclusion and/or belonging on our team and campus? (Inclusion & Belonging)
~ I believe I have fostered diversity, equity, inclusion and belonging through my creating and facilitating the Haas Anti-Racism Challenge, a program that was created by me and fellow colleagues to create an Anti-Racist campus. Also collaborating with VP DEI to create a DEIL fund to help support affinity clubs.

What can I do as your supervisor to better support your success? What additional knowledge, resources, or tools are needed to successfully do your job? (Development Planning & Manager Support)
~ I have appreciated the collaboration and training provided on program management and project planning look forward to more insight on this process. I also ask for grace and understanding of my personal life as I try to navigate a life of family loss (47 people between my wife and I, to date), along with family challenges of adapting to a newborn baby. In addition to the civil unrest and attacks in my community. Taking time to see that I am not able to function at my normal level, due to circumstances out of my control while still trying to show up and focus on work. Taking time to ask questions rather than assume or take action without understanding context and being willing to leave space/time for situations to evolve so that we, as a team, can have a better understanding of situations and provide an action plan for them. I would like to point out the many of the comments pertaining to my work are not necessarily accurate. As mentioned earlier, I was working with the Campus Groups Rep to build out the re-registration program. In working with the rep we ran a test using a test club that was created and worked great. Unknowingly this process would not capture the challenges students experienced due to access that students had relative to the access of the test club. This caused us to push out the deadline for registration to allow time for students to complete their registration, aside from some other technical issues that we had to address that resulted in Campus Groups changing some of their process for re registration found by their IT team through troubleshooting.

# Goals

Below you will find the Current Goals section and the Goals Moving Forward section. **For Current Goals**, review the work on your goals in the last 4 months and enter your comments in the Comments on Current Goals text boxes. **For the Goals Moving Forward**, update this content to reflect your goals moving forward into future periods. Note: Goals will be pre-populated if the supervisor selected Goals from prior periods. Otherwise, Supervisors can add Current Goals and supervisors and/or employees can add Goals Going Forward.

# Current Goals (December 1, 2021 to March 31, 2022)

The goals below were set during a previous Achieve Together conversation. For more information on goals and goal setting, please visit the Achieve Together Goals page (https://hr.berkeley.edu/performance/achieve-together/achieve-together-goals).

**Goal #1**

Spring 2022

Building Community
Deliver an inaugural Cultural Social to help build community in underserved populations (Validate with Torrey and club leaders that this is still a priority) - on hold due to COVID, look for interest in a virtual component w/ new leadership
* S - build better experience for underserved populations (a common conversation for students of color, especially feeling like they have to carry the load as students). Connecting them with other UC Berkeley students who look like them across other schools (Law School, Engineering, etc), and collaborating with a staff representative in each school for continued partnership
* M - create campus surveys for student experience pre & post, engagement increases. Assess how to move forward with either one large event or smaller networking events
* A - It is doable, we have a venue and need. Was planned and had a huge draw from our students and the other schools we were collaborating
* BBSA, Latinx, Indigenous Mixer (not exclusive to these folks but hosted by them)
Have club leaders reach out to their equivalent across other schools to invite and build relationships
* R - it helps build our credibility with students of color (we have been taking a hit for a while), build reputation and relationships with other schools (invites to more cross campus student events)
* T - Spring 2022 - allows time to plan, promote and build excitement

**Goal #2**

Building trust with the community
Plan and host 4-5 Semester Listening sessions (takes time, but impactful) aka Focus Groups with first-year students to learn more about the student experience
* S - meeting with specific groups (CGSM, BBSA, LatinX, Veterans, Muslim, International) to gauge their student experience.
* M - provide a follow-up session the next semester to see if issues are reoccurring
* A - it is doable, we can hold the sessions Virtual, in-person or both
* R - gives us an understanding of our students experience, usually done over lunch/open time to allow greatest attendance and not impact student classes. Helps in building trust with the students

* T - during both Spring 2022 - Fall 2022 semesters, as both semesters provide a different experience for students

**Goal #3**

Improved Writing Skills
*S - Work to become more clear, concise and error free in messaging, while providing the right context according to the audience.
*M - Receive feedback from peers and students (if follow-up or someone has reached out needing more information for clarification).
*A - Yes, this is achievable and has been implemented
*R - Aligns with other team goals of building student trust by providing clear and concise information
*T - This goal is in action and is a continued stretch goal

**Goal #4**

Solutions Based Approach
*S - Work to provide problem solving solutions and how to proceed when faced with challenges, and know the audience that I am responding to so that the information is received in a appropriate manner
*M - I will provide multiple solutions to challenges
*A - Yes, it is achievable
*T - This goal is in action

# Comments on Current Goals

Please provide comments on goals for the current period.

**Supervisor Comments**

Tyrone continues to work on his writing and solutions-based approach goals. He is still not error-free in his communication internally or to students as I would expect at the Associate Director level. Nor am I seeing his proactivity to solve problems that come up or see him offering multiple ways forward as it relates to his goal of improving his solutions-based approach to the work. In some instances, his lack of clarity in written communication has impacted the team's credibility specifically as it relates to the club registration process messaging about the extended deadlines (VP clubs expressed this and said that clubs are asking why have deadlines if we keep pushing

them back). Recently there was also an email communication to new international students that Admissions is still trying to yield that had errors in it. The FTMBA admissions team was quite upset about jeopardizing these admits and was not sure they could trust us with a solution to correct the situation (Eric Askins). As I think about Tyrone's progress in coming up with solutions, we still have to prompt him to take that step, and in some cases prompt him to execute that new solution (following up with Danielle Dillon about the Beyond Yourself Fellow award) both of which I would expect him to do with fluency in the Associate Director role.

The first two goals were tabled due to lack of bandwidth.

**Employee Comments**

Working in tandem with Avni on the commencement ceremony we collaborated on creating routes for the ceremony. Unfortunately I had a death in the family (my uncle, number 47, and are memorializing him this Sat, June 4th ) and had to take some family time. I did reach out to Avni to let her know that I would still work on my taks but she let me know to take family time and she would take care of it, I did not drop the ball. In regards to completing Danielle Dhillon's issue. The messaging came out during my family leave. Upon my arrival I was able to provide a response to the team as requested and told to hold responding to the student until I got feedback from leadership which resulted in response delay ("Once we discuss with you, I will then give you the go-ahead to respond to the student." ~ Jason Joyce). I have been very vocal and have recognized a weakness in my writing and have sought out tools and assistance and continue to be a Student Always to grow in this skill.

# Goals Moving Forward

Enter the goals below for future periods. Items listed in the Current Goals section can be deleted, carried forward, modified and/or new goals can be added. Employees or Supervisors may add or modify goals, once they are discussed and agreed upon in the Achieve Together conversation. Goals should be actionable, measurable, and include an end date (using goal setting methods such as SMART or OKR). Please review the Achieve Together Goals page (https://hr.berkeley.edu/performance/achieve-together/achieve-together-goals) before setting or modifying goals.

**Next Period Goal #1**

See separate document for goals

**Next Period Goal #2**

**Next Period Goal #3**

**Next Period Goal #4**

**Next Period Goal #5**

# Training Checklist

**Supervisors:** Please use the checkboxes below to indicate completion of training/up-to-date on certifications for your employees.

**Employees:** You can check and confirm the status of your training by going to the UC Learning Center (https://uc.sumtotal.host/core/dash/home?domain=4) and review your Required Training.

☑ Ethical Values, Conduct and Compliance Briefing: University of California
   *General staff: General Compliance Briefing: UC Ethical Values and Conduct*
   *For Research staff: UC Ethics and Compliance Briefing for Researchers*

☑ UC Cyber Security Awareness Fundamentals
☑ Sexual Harassment Prevention Training
   *For Staff: UC Sexual Violence and Sexual Harassment Prevention for Staff*
   *For Supervisors/Managers/MSP/PPSM 4 and PPSM5: UC Sexual Harassment Prevention Training for Supervisors and Faculty*

☐ Other training that is necessary based on job type
*Examples:*
*Clery Act Training*
*CANRA Training for Mandated Reporters*
*FERPA: Privacy of Student Records*
*For Staff Supervisors: Berkeley People Management (BPM) Part 1: Grow Today*
*(https://hr.berkeley.edu/grow/grow-your-skills/development-leaders/berkeley-people-management-*
*bpm-series-certificate-2)*

# Performance Levels

**Supervisors:** Select a Performance Level for each of the 5 Achievement Criteria (https://hr.berkeley.edu/sites/default/files/achievement_criteria_full_set_1-14-20-1.pdf). Be sure to review the prior Online Forms for this employee so the Performance Levels reflect the entire annual period ending March 31.

**Employees:** Review the Performance Levels selected by your supervisor for the 5 Achievement Criteria.

---

**Collaboration Performance Level**                                    **Needs Attention**

Enhances individual work by soliciting contributions from others and enhances others' work by contributing to their success to more effectively meet unit goals.

**Goal Accomplishment Performance Level**                              **Needs Attention**

Achieves individual goals that contribute to unit priorities.

**Inclusion & Belonging Performance Level**                            **Well Done**

Demonstrates respect for people and their differences, regardless of race, ethnicity, class, gender identity and expression, sexual orientation, socioeconomic status, ability, country of origin, cultural, political, religious, or other affiliations. Understands the benefits of a diverse workforce, is trusted and respected by others, includes and welcomes others, and works to understand the perspective of others.

**Innovation Performance Level**                                       **Needs Attention**

Uses knowledge, skills, and professional experience to seek efficiencies and improve work outcomes.

Case 4:25-cv-02972-KAW      Document 1      Filed 03/31/25

**Job Mastery Performance Level**                                                                 **Needs Attention**

Demonstrates the knowledge, skills, and abilities that result in high
performance and contributions within the scope of the employee's job
description.

## Status

| Supervisor | Jennifer Bridge | All done! (June 03, 2022 at 10:49:26 AM PDT) |
|---|---|---|
| Employee | Tyrone Wise | All done! (June 03, 2022 at 02:44:59 PM PDT) |

Print Form     |     Return to
Top

**Exhibit "C"**
(Email Trail)

**bConnected**
powered by Google

**Tyrone Wise II MEd <tyronewise@berkeley.edu>**

## Recapping last week's touch-base

**Jennifer Bridge** <jenn_bridge@berkeley.edu>                    Wed, Mar 2, 2022 at 9:22 AM
To: Tyrone Wise II MEd <tyronewise@berkeley.edu>

Hi Tyrone-


I am just seeing this now after a couple of intense days. I think we should chat live and I hoped to do that in our TB next week as I haven't had time to give this any thought yet.


Let's plan to connect today and discuss what's on your plate.


Thanks,

Jenn


**From:** Tyrone Wise II MEd <tyronewise@berkeley.edu>
**Sent:** Monday, February 28, 2022 8:17 AM
**To:** Jennifer Bridge <jennb@haas.berkeley.edu>
**Subject:** Re: Recapping last week's touch-base


Jenn,


I wanted to follow-up on this conversation since our last touch base, which seemed to provide the context that was needed on the various scenarios that were mentioned in regards to my "problem solving skills". Is there still a need for the 30 day expectation of improvement, given in our conversation last week, the issues brought up regarding my lack of problem solving, lacked context and understanding of process perspective (the make-up commencement and the COVID protocols that were discussed during the facility tour, during my paternity leave, and the clarification Maddy from Campus Groups provided regarding our re registration process, and student submissions (the 50 that were not completed but saved that bogged the system)? I thank you for time and look forward to your response.


## Tyrone

Associate Director of Student Experience

Haas School of Business

Chairman - Black Staff and Faculty Organization

Co-Chairman - Veteran Staff Organization

University of California Berkeley

tyronewise@berkeley.edu

*"Success is to be measured not so much by the position that one has reached in life, but by the obstacles which they have overcome while trying to succeed"*

*~ Booker T. Washington*

**Berkeley**Haas

Question the Status Quo
Confidence Without Attitude
Students Always
Beyond Yourself

DEFINING LEADERSHIP PRINCIPLES

On Mon, Feb 14, 2022 at 10:54 AM Jennifer Bridge <jennb@haas.berkeley.edu> wrote:

> Tyrone-
>
> Thank you for the honest exchange last Wednesday in our weekly touch base.
>
> Per our conversation, I shared that I need to see greater improvement in your problem solving skills within 30 days. As I explained, these are skills I expect already from someone at your level and honing them is essential if you want to grow into roles with more responsibility.
>
> I look forward to discussing your ideas in our next touch base about how I can support you. I am invested in your success.
>
> Jenn Bridge
>
> Interim Director Student Experience | FTMBA Program Office
> Sr. Director External Engagement | MBA Career Management
>
> Haas School of Business
> University of California, Berkeley
> (510) 520-7658

Berkeley Mail - Redacted lowand/2.touch-Pase
Pronouns: She | Her | Hers



**Exhibit "D"**
(Email Trail)



Tyrone Wise II MEd <tyronewise@berkeley.edu>

---

## [mba23] Service Hours and Beyond Yourself Fellows

**Jason Joyce MBA** <jasonjoyce@berkeley.edu>                                   Fri, Jun 3, 2022 at 9:45 AM
To: Tyrone Wise II MEd <tyronewise@berkeley.edu>

Hi Tyrone,

Thanks for clarifying! Please go ahead and respond to this student today.

Thanks,
Jason

On Wed, Jun 1, 2022 at 4:48 PM Tyrone Wise II MEd <tyronewise@berkeley.edu> wrote:
> Jason,
>
> Per your direction I was awaiting the go ahead.
>   *"Once we discuss with you, I will then give you the go-ahead to respond to the student."*
>
> Tyrone
> Associate Director of Student Experience
> Haas School of Business
> Chairman - Black Staff and Faculty Organization
> Co-Chairman - Veteran Staff Organization
> University of California Berkeley
> tyronewise@berkeley.edu



> *"Success is to be measured not so much by the position that one has reached in life, but by the obstacles which they have overcome while trying to succeed"*
>                               ~ Booker T. Washington

**Berkeley Haas**

Question the Status Quo
Confidence Without Attitude
Students Always
Beyond Yourself

─── DEFINING LEADERSHIP PRINCIPLES



We recognize that Berkeley sits on the territory of Huichin, the ancestral and unceded land of the Chochenyo Ohlone, the successors of the historic and sovereign Verona Band of Alameda County. This land was and continues to be of great importance to the Ohlone people. We recognize that every member of the Berkeley community has, and continues to benefit from the use and occupation of this land, since the institution's founding in 1868. Consistent with our values of community and diversity, we have a responsibility to acknowledge and make visible the university's relationship to Native peoples. By offering this Land Acknowledgement, we affirm Indigenous sovereignty and will work to hold University of California Berkeley more accountable to the needs of American Indian and Indigenous peoples.

On Wed, Jun 1, 2022 at 4:18 PM Jason Joyce MBA <jasonjoyce@berkeley.edu> wrote:

> Hi Tyrone,
>
> That sounds like a good next step. Is there a reason you did not complete this step already?
>
> If I had not followed up with you about the previous email you sent stating the 50 service hours metric, what would have been your next step to close this project out, and when?
>
> Best,
> Jason
>
> **Jason Joyce, MBA** (he/him/his)
> Director of Student Experience (acting) | Full Time MBA Program
> Haas School of Business | University of California, Berkeley
>
> **Berkeley**Haas
>
> On Wed, Jun 1, 2022 at 1:11 PM Tyrone Wise II MEd <tyronewise@berkeley.edu> wrote:
>> Jason,

Simply reply letting her know that what was recorded in our system reflected 50 service hours and did not meet the criteria to be awarded a Beyond Yourself Fellow.

Tyrone
Associate Director of Student Experience
Haas School of Business
Chairman - Black Staff and Faculty Organization
Co-Chairman - Veteran Staff Organization
University of California Berkeley
tyronewise@berkeley.edu



*"Success is to be measured not so much by the position that one has reached in life, but by the obstacles which they have overcome while trying to succeed"*

*~ Booker T. Washington*

**Berkeley Haas**

Question the Status Quo
Confidence Without Attitude
Students Always
Beyond Yourself

DEFINING LEADERSHIP PRINCIPLES



We recognize that Berkeley sits on the territory of Huichin, the ancestral and unceded land of the Chochenyo Ohlone, the successors of the historic and sovereign Verona Band of Alameda County. This land was and continues to be of great importance to the Ohlone people. We recognize that every member of the Berkeley community has, and continues to benefit from the use and occupation of this land, since the institution's founding in 1868. Consistent with our values of community and diversity, we have a responsibility to acknowledge and make visible the university's relationship to Native peoples. By offering this Land Acknowledgement, we affirm Indigenous sovereignty and will work to hold University of California Berkeley more accountable to the needs of American Indian and Indigenous peoples.

On Wed, Jun 1, 2022 at 11:39 AM Jason Joyce MBA <jasonjoyce@berkeley.edu> wrote:

Hi Tyrone,

Thanks for checking on this and confirming the student was not eligible.

Based on Jenn's email to you about this, what is the next step you plan to take to close out this email inquiry from the student?

Best,
Jason

**Jason Joyce, MBA** (he/him/his)
Director of Student Experience (acting) | Full Time MBA Program
Haas School of Business | University of California, Berkeley

Berkeley**Haas**

On Tue, May 31, 2022 at 2:04 PM Tyrone Wise II MEd <tyronewise@berkeley.edu> wrote:

Jenn and Jason,

According to the report that was ran on April 20th, Danielle only had 50 service hours recorded.

## Tyrone

Associate Director of Student Experience
Haas School of Business
Chairman - Black Staff and Faculty Organization
Co-Chairman - Veteran Staff Organization
University of California Berkeley
tyronewise@berkeley.edu



*"Success is to be measured not so much by the position that one has reached in life, but by the obstacles which they have overcome while trying to succeed"*

*~ Booker T. Washington*

**Berkeley**Haas

Question the Status Quo
Confidence Without Attitude
Students Always
Beyond Yourself

DEFINING LEADERSHIP PRINCIPLES



We recognize that Berkeley sits on the territory of Huichin, the ancestral and unceded land of the Chochenyo Ohlone, the successors of the historic and sovereign Verona Band of Alameda County. This land was and continues to be of great importance to the Ohlone people. We recognize that every member of the Berkeley community has, and continues to benefit from the use and occupation of this land, since the institution's founding in 1868. Consistent with our values of community and diversity, we have a responsibility to acknowledge and make visible the university's relationship to Native peoples. By offering this Land Acknowledgement, we affirm Indigenous sovereignty and will work to hold University of California Berkeley more accountable to the needs of American Indian and Indigenous peoples.

On Thu, May 26, 2022 at 12:04 PM FTMBA Life <ftmbalife@haas.berkeley.edu> wrote:

Hi Tyrone,

Please review the below email thread and let me and Jenn know what happened with this specific student in an email.

Deadline to complete this step is Thursday, June 2 by 12pm.

Once we discuss with you, I will then give you the go-ahead to respond to the student.

Best,
Jason

**Jason, Jenn, Sarah and Tyrone**
Student Experience Team | Full Time MBA Program
**Berkeley Haas**

---------- Forwarded message ---------
From: **Jennifer Bridge** <jenn_bridge@berkeley.edu>
Date: Mon, May 23, 2022 at 9:48 AM
Subject: FW: [mba22] Service Hours and Beyond Yourself Fellows
To: <danielledhillon@berkeley.edu>
Cc: FTMBA Life <ftmbalife@haas.berkeley.edu>


Hey Danielle-


Great to celebrate with you on Saturday! I hope it was a joyous day for you and your family.


Thanks for bringing this to our attention. We need to go back and research the discrepancy. I just checked my master list for the
commencement program and you are not on the Beyond Yourself Fellows list. Tyrone manages this project and is out this week so he
will get back to you next week with more information. I'll make sure he picks this up when he returns.


Congrats on the role at DRK! Sounds perfect for your goals and interests. Best of luck there and can't wait to reconnect to hear how it's
going.


Best,


Jenn Bridge

Executive Director (acting) | FTMBA Program Office

Haas School of Business
University of California, Berkeley
(510) 520-7658

Pronouns: She | Her | Hers




---------- Forwarded message ---------
From: **Danielle Dhillon** <danielledhillon@berkeley.edu>
Date: Sat, May 21, 2022 at 9:05 PM
Subject: Re: [mba22] Service Hours and Beyond Yourself Fellows
To: FTMBA Life <ftmbalife@haas.berkeley.edu>


Hi FT MBA Student Experience Team,


I completed my 60 service hours but was not recognized as a Beyond Yourself Fellow. Can you please confirm what happened? I logged
all my hours on the service website by the deadline.


Best,

Danielle


On Mon, Nov 15, 2021 at 1:10 PM FTMBA Life <ftmbalife@haas.berkeley.edu> wrote:

　　Dear FTMBAs,

9/8/22, 3:23 PM                    UC Berkeley Mail - Reminder! Service Hours and Beyond Yourself Fellows

Case 4:25-cv-02972-KAW   Document 1   Filed 03/31/25   Page 57 of 184

Wanted to send out a reminder for logging your service hours and the potential to be a Beyond Yourself Fellow!

**Volunteer hours & Beyond Yourself Fellows Criteria**

The Beyond Yourself Fellow designation is awarded to graduating MBA students who have displayed a commitment to the "Beyond Yourself" defining leadership principle by completing 60 or more hours of community service during their time in the program.

**How to Submit Hours**

- Log in to submit your service hours here

**Criteria For Hours**

- **Unpaid service**: student cannot receive course credit or payment for their service
- **Beyond Haas**: service should have a direct impact on individuals or an organization outside the Haas community
- **Social impact**: the organization that receives the service must be either a nonprofit or social enterprise

**Examples of service that qualify:**

- Volunteering for a charitable organization
- Volunteering for a local food pantry, being a volunteer tutor at a local school or providing free consulting for a charitable organization
- Participating in Board Fellows

**Examples of service that do not qualify:**

- Planning Haas club events or conferences
- Volunteering at a Haas social event, case competition or conference
- Being a club or MBAA officer

*Please note that we recognize that internal Haas activities are very important volunteer opportunities that have a great impact on the school, but do not meet the criteria for Beyond Yourself Fellows because they do not directly impact the community outside of Haas.*

If you have any questions about the Beyond Yourself Fellows or what type of volunteer activities qualify, please contact the Student Experience Team.

--

**Danielle Dhillon**
(*she/her/hers*)
MBA Candidate, Class of 2022
Haas School of Business
University of California, Berkeley
(240) 328-9625

--

**Jason Joyce, MBA** (he/him/his)
Director of Student Experience (acting) | Full Time MBA Program
Haas School of Business | University of California, Berkeley



**Exhibit "E"**
(Performance Review)



FTMBA Program Office
**Performance Review**
**Tyrone Wise**

## April-September 2022 (originally timeframe April-July 2022)

## Collaboration Performance Level *

**Enhances individual work by soliciting contributions from others and enhances others' work by contributing to their success to more effectively meet unit goals.**

Tyrone is inconsistent in his collaboration, as shown when he went to develop the sponsorship guide and didn't seek CMG feedback early in the process about format/editing and just attempted to deliver a final product. Unfortunately, the book was laden with errors, and if there had been more collaboration earlier in the process those likely would have been prevented. Emails from Director of Recruiting.

In May I received feedback from our partner in event management that Tyrone had not vetted a student and sent them directly to the events team. It turns out the student was an UG, the event wasn't ours and the event partner was frustrated that Tyrone wasn't following our stated event management process.

On 5/12, Tyrone emailed that he had a personal situation and would be out and then working from home on Tuesday. He did not communicate that he needed help with any of his work nor does it appear he emailed any of his business peers that he had open work assignments with. Later that day I was cc'd on the following email from Avni: "I wanted to give you a heads up that I went ahead and created a better seat map that looks more like the one you had showed me on Tuesday and added in all the on stage needs as I needed to send it off to our Greek contact by today... You can find them here…" This work was Tyrone's responsibility.

On 5/31 Jason received an email from the head of admissions very concerned about an international student kickoff webinar that Tyrone was planning…" We've delivered them a message of inconsistent quality and invitation to attend an event that's poorly timed for the majority of the audience.  What steps are we taking to clarify the message and will you and your team consider addressing the timing.  Can we partner on some better messaging? Additionally, you are running registration directly into zoom which means we don't have visibility into candidate registration or attendance and thus cannot leverage that interaction to help manage and anticipate yield." Tyrone then had to go mitigate with the admissions team. If Tyrone had communicated more effectively with his business partners about the timing and content of the work this escalation would not have happened. At this point Jason and the head of admissions started strategizing about the international student experience and if the admissions team should take over part of the work. They were very concerned that some of these students might

melt because our messaging wasn't done well. The admissions team did not have confidence that our team could deliver this event at the standard they had set.

*This comment is lacking accurate information. In my follow up communications with Eric Askins, Director of Admissions, (as mentioned) I was told by him that the frustration was not with me, but Jason Joyce who was interim Director, and how he did not have confidence that Jason could lead the team and this was conveyed to both Jenn Bridge and Jamie Breen. This was partly due to his" lack of leadership and failure to either 1) look over the document as requested by me, or 2) his blatant disregard and wanting to produce a product that I could be blamed for". Furthermore, I did have a conversation with Erin Skelly who is the Associate Director for the Berkeley International Office (BIO) about the times they provided their workshops and seminars for the UC Berkeley incoming international students and she explained that they provided all their trainings during the same time as this training was slated and they would record and send out for the students to view at their leisure (which was what we were planning to do as well). I also explained this to Eric and he was not aware of Bio's timing and my vetting this with BIO beforehand, but personally felt the time should be moved. Moreover, our team has historically never collaborated with Admissions for the international community communications or programming, except during COVID to support our depleted Team as Amy Hornstein then Director for Student Experience was unable to support, and I had not bandwith given the portfolio I was overseeing as being the only staffer on the team. Even in my conversation with Eric he agreed that this was not normal but that they wanted to better track due to COVID. Even in my initial programming development when Jenn reached out to Cindy in admissions she said that they only put information in the New Admits webpage and that was it. This was further proven by a conversation that Jenn had with Pete Johnson, then Assistant Dean of the Full-Time MBA program that all communications were sent by Sarah Danziger our Program Coordinator.*

Tyrone needs to spend more quality time collaborating with his peers, communicating effectively and asking the right questions to enhance both his work and theirs.

## Goal Accomplishment Performance Level *

**Achieves individual goals that contribute to unit priorities.**

Tyrone does not actively achieve his goals that contribute to unit priorities. Our unit priorities were to Rebuild Student Trust in the Program Office, Rebuild the Student Community and Rebuild the Student Experience. While he is well-intentioned, by not meeting his individual goals he is not building trust with the student leaders and contributing to rebuild the student experience.

<u>Program Office Goal</u>
*1. Develop and execute an international student strategy to address the increased class size and needs of the students*
*2. Set students up for academic success and enhance the student experience at the beginning of the program by reimagining orientations*

**Tyrone's Goal:** Reimagining International Orientation
- S - Build and present an international orientation series for the incoming international students, by working with current international student leaders and department stakeholders, to provide community building, support, and resources for arrival of the incoming international class.
- M - Create a post survey for feedback on information and programming provided
- A - This is a doable goal with the resources currently available (google form)
- T - This goal will be accomplished completely in August as this programming is a 4 part series that is being built.

**Feedback:** This goal was partially met. While we hosted several events for this population, I do not have information indicating we surveyed them about their experience of these events. There was some frustration from the admissions team about the communications, timing and registration of the international kickoff meeting that eroded trust in our team's ability to host these pre-orientation events. See example under collaboration.

*For context, all international workshops were facilitated in collaboration with student leaders, and campus stakeholders on dates provided and communicated to students.*

**Program Office Goal**
***4. Embrace Slate as our new platform of record and learn both basic and advanced functionality to streamline the staff and student experience***

**Tyrone's Goal:** Slate Platform Trained
- S - Learn the Slate platform as our new platform of record in both basic and advanced functionality to streamline the staff and student experience
- M - Ease and use of functions
- A - This is doable as this is a department platform that is providing training
- T - This will be completed by end of July 2022

**Feedback:** Tyrone had some Slate experience prior to moving to Slate as our new platform of record. I do not have clarity if he has advanced knowledge and he has not explained how we might streamline the staff and student experience.

**Program Office Goal**
***5. Professional Development: Participate in cross-cultural training and integrate learnings into day to day interactions with students***

**Tyrone's Goal:** Cross-Functional Trainings
- S - Learn more intimately on the LEAD Center functions, and processes to gain more insight to answer simple questions clubs may have

- M - This is measurable by ability to answer common questions clubs may have regarding LEAD Center processes, and feedback from students
- R - This is relevant because it aligns with enhancing our club experience with more resources and support
- A - This is doable as the department is a campus partner and I have direct access to the trainings and staff for questions and clarity
- T - I will gain more insight on the LEAD Center process by end of August

**Feedback:** To my knowledge Tyrone has not gone through Lead Center training that our students will also have to complete.

*This is misleading and Jenn is well aware that we as a team have not had any trainings or insight on this transition because the process is not yet been finalized and Jason has been working on the process of completion since this summer. As of yesterday (12 October) we were just given an update that the club pages are almost done and the LEAD Center is looking to provide us with the necessary training information for our staff and students soon.*

**Student Feedback:**

In May, I received feedback from the MBAA President that the MBAA VP of Community did not feel that she had a partner in Tyrone. I also received feedback that the VP Diversity seeks support from others outside the team on her initiatives because she isn't getting what she needs from Tyrone.

*This feedback lacks context and insight, and this was never brought to my attention until this write-up. It is known by Jenn and even written in email by Jenn that she seen the two student leaders as "challenging" and this has been voiced by many other staff leaders at Haas. Part of the lack of support that is mentioned was that some of the student initiatives could not be supported by our team because of the policies that were in place (paying guest speakers), however VP DEI did go to another department who assisted in this programming and it ultimately resulted in our team having to provide financial support in collaboration with the department of the Dean of Haas, and it was said by Jenn, that this was not right and it caused a myriad of problems for our office to pay the guest speakers as it was not something our department had ever done and because it was directed by the Dean we had to "make it work" even at the result of breaking policy (paying speakers more than policy allows due to the contractual agreement set by the students to pay speakers who were not qualified and providing insurance).*

**8/30/22**
Drew from Women in Leadership club stopped by PO and shared critical/ frustrated feedback about trying to work with Tyrone and how his lack of response and availability has negatively impacted their club. In the midst of sharing her frustrations she made a couple statements

along the lines of: "Does this guy ever even come to work...?" My interactions with him have been completely unacceptable- I'm just trying to get some help and have been all summer."

*This comment also lacks context and I was never informed about this conversation for feedback until this write up. This summer I unfortunately only worked 27 days from May 31ˢᵗ – Aug 26ᵗʰ due to having to take planned FMLA leave (May 23ʳᵈ-27ᵗʰ & June 6ᵗʰ-17ᵗʰ) , and unplanned medical FMLA stress leave (July 12ᵗʰ-29ᵗʰ), along with unplanned leave due to contracting COVID (Aug 10ᵗʰ-19ᵗʰ) and spouse FMLA support leave (Aug 29ᵗʰ-31ˢᵗ). Moreover, I only had one email all summer from Drew Silverman on Aug 20ᵗʰ and she did receive a vacation notification to reach out to our team email for immediate support. I did respond to her email and handled her issue of giving SPA access to her club leaders (which she should have been able to do as club leader if she followed our club transition checklist, and any of our staff were able to do as well) when I returned to work.*

Tyrone was leading the FTMBA locker project. This project was assigned to him on June 23ʳᵈ. Jason provided him the documents he used to issue lockers last year at that time. Jason had set a deadline for locker clean out by September 8ᵗʰ and new lockers assigned by September 16th. On August 22 we started hearing from students inquiring about lockers. Around August 30ᵗʰ we sent out a newsletter with details about how to sign up for one. Tyrone then verified that the lockers never were cleaned out over the summer which was part of this project. On September 19ᵗʰ I emailed Tyrone and asked him to clean out the lockers on his next day in the office. Tyrone asked our workstudy student to do the work which lead to a two week delay because of his class schedule. There was some miscommunication with the workstudy that a locker for an existing student was cleaned out. Her items were thrown away and we are now reimbursing her for those items. In the meantime, students were walking in, Slacking and emailing about when they would be ready. Lockers were finally assigned on September 30.  Tyrone's lack of urgency to get these lockers assigned eroded the student experience.

*This situation is lacking major context and vital information. The main cause of the delay had nothing to do with the student worker or my "lack of urgency" but the real frustration was the wait time that occurred due to Jason Joyce failure to return the main keys to facilities and thus misplacing the main locker keys. Jason was able to issue locker with ease because there were no lockers issued on campus the previous year due to campus closure because of COVID. The inability to find the misplaced keys delayed the ability for our student worker to clean and inventory the lockers which initial conversation for this work started Aug 6ᵗʰ , and the keys were found by Jason on September 6ᵗʰ. I never said the lockers were not cleaned out, we gave instruction to the graduating class to have lockers cleaned out before the end of the year and we sending the student worker to verify the locker were in fact cleaned out and in a working condition. Once the keys were located on Friday September 6ᵗʰ, I informed our student worker who was waiting for the keys that they were on my desk. They lockers were cleaned and inventoried based on the locker roster that I gave him that had ONLY the lockers of the graduating class. The student worker inadvertently cleared out the locker of a student who was not on the roster the items that were cleared out were then placed in a storage room where one of*

*our staff instructed Facilities to have removed (not at my instruction and I found out later after the items were discarded). All this information was conveyed to Jenn Bridge in real time and conveniently is not mentioned in this report. The frustration was from the students having to wait over a month to have a locker issued and again the delay was the ability of not having the keys to verify, and inventory the lockers due to the misplacement of the main locker keys.*

All of these are examples of his work where he has not built student trust or credibility. They do not show a positive student experience.

## Inclusion & Belonging Performance Level *

**Demonstrates respect for people and their differences, regardless of race, ethnicity, class, gender identity and expression, sexual orientation, socioeconomic status, ability, country of origin, cultural, political, religious, or other affiliations. Understands the benefits of a diverse workforce, is trusted and respected by others, includes and welcomes others, and works to understand the perspective of others.**

Tyrone demonstrates this skill through his ARC and Cal affinity group work. It is his strength.

## Innovation Performance Level *

**Uses knowledge, skills, and professional experience to seek efficiencies and improve work outcomes.**

Tyrone does not demonstrate innovation or seek efficiencies with any consistency.

One main project Tyrone was responsible for was launching a re-registration process for clubs which started in January and continued through April (actually is still happening). He wanted to run the process in Campus Groups which we did. He partnered with CG to develop the process, beta tested the process with the VP clubs and yet there were still substantial problems in the registration process that led to pushing back the deadline for clubs. Students were confused if their registration went through and in some cases entered faulty information just to get through the process. This was an opportunity to rebuild trust and credibility with the students and for student club leaders this process was confusing and frustrating. In March, Tyrone posted in Slack to student club leaders that club registration was in early April. He then pushed the date back to April 15th without talking to the team or student leaders. The MBAA VP Clubs asked why the students should take deadlines seriously if we keep moving them.

The team is rebuilding and I don't see Tyrone actively thinking about how to innovate or improve process to help move the team forward.

*In regards to the club registration extension this was done after a conversation the Campus*

*Groups Rep to better understand the issues some club were having (which was the result of club leaders not following directions) that same day I had a conversation with Aron (MBAA VP Clubs, [student leadership]) who was looking to reach out (for the first time) to club leaders on March 31ˢᵗ with a deadline on April 1ˢᵗ. Given our poor response rate (partially due to the lack of communication to club leaders) at that time 15 of the 40+ clubs had submitted. With Aron looking to do more targeted outreach to complete registration. The Process was extended not because of Aron's targeted outreach but because it would lockout any future submissions/corrections and we needed to keep the process open for the clubs who were fixing discrepancies in their submissions. I only notified Aron as he was reaching out to those targeted clubs on the 31st. I did not notify any others and explained this to Aron that this was intended to help those who had already submitted and again the process was only intended for those with outstanding discrepancies, but since it was open and he was reaching out to them they could use it as a means to get more clubs re registered. I was looking to update my then colleague Jason Joyce in our morning 15 min touch base however he never showed nor gave any heads up that he would not be in attendance. Moreover it was discussed and decided by it in January and reiterated in March Jenn that Jason should lead all communications regarding club registration being he was the staffer in charge of Clubs, there was no targeted messaging given by Jason at any time during this process and advised Aron to send a message on the 31ˢᵗ after my conversation with Jason on the need to remind club leaders.*

## Job Mastery Performance Level *

**Demonstrates the knowledge, skills, and abilities that result in high performance and contributions within the scope of the employee's job description.**

In March, Tyrone and I identified that he needed to improve his project planning skills. Soon thereafter, we started a project plan for the international orientation on August 15ᵗʰ that was never completed. When he was out on leave (June 12-29) the team had no record of work that was complete or what needed to be redistributed to meet our deadlines. At that point Tyrone had been out for three weeks and we did not know when he was returning. We needed to understand that status of the project and had no clear direction.

*This is an inaccurate conversation and misleading. I voiced that I had no context of knowledge of how to create a project plan and that I had taken a course in 2020 during COVID and had no opportunity to implement or have guidance as this was not a expectation in our current team and had never been introduced until said meeting. I did voice need for training and guidance but was never given any after the initial meeting. During my 1:1 with both Jenn and Jason were told everything looked good and keep going so I did not know there were any gaps and then I ended up having to take work induced stress leave. Had I known what information was missing I would have gladly provided. Even to date I still have been given no training on what is needed or missing and have asked for assistance to better support the team.*

Tyrone was also responsible for the MBA student Sexual Harassment and Sexual Violence (SVSH) training scheduled for August 22-23 (4 sessions). He and three students went through training on August 4ᵗʰ to be able to co-lead these sessions. On August 15ᵗʰ we received an email from the

three student volunteers asking for the training dates, times and locations as they had not been communicated. It turns out that the student volunteers could only attend half of the sessions based on the scheduling. Additionally, because Tyrone was unfamiliar with the material, we asked EWMBA Associate Director Justine Rhodes to step in on Monday and run the first session so Tyrone could see it done. Tyrone then led the other sessions reading from the Grad Div materials provided.

SVSH Session Facilitator Observations from Jason Joyce:

I dropped by at 10:15 and Tyrone was on stage alone reading from the script. I looked for Justine from the back but can't confirm seeing her or not.

I stayed for about ten minutes and it was pretty arduous going... Tyrone was looking down reading from the script the whole time. As his sentences ran together and he backtracked on some of the info to correct himself, it was not always easy to determine where points of emphasis were being made. (Slides helped a bit with this.) The appearance was such that he was encountering this information for the first time and not prepared to facilitate the session with any depth or engagement.

The whole time I was in the room, at least 2/3 of the students were sitting there looking at their phones (or laptops) and seemed checked out.

*This comment is also lacking context and honesty (and the rebuttal provided is also copied from the letter of concern and have been edited to address new comments that were not mentioned in the previous write-up, and again feels like double jeopardy).*

*For the comments revolving around the Sexual Violence Sexual Harassment Prevention (SVSHP), this process was occurring during my absence due to catching COVID. A project plan was not created because I was not trained on the process to facilitate the annual SVSHP until the week prior to me catching COVID on Thursday Aug 4th. Because the SVSHP training is a State requirement there is a mandatory requirement that only those who attended the training are able to facilitate the training, and are required to "stick to the script, and any changes had to be vetted by Path to Care". As mentioned, I attended the mandatory train the trainer training on Thursday August 4th 9am-12pm (the first week back after my work induced stress leave). I caught COVID the following Wednesday Aug 10th and was unable to complete any of the necessary information. Moreover, the student co-facilitators mentioned were granted an opportunity to attend a special training that was created specifically for them on August 15th through our continued partnership with Path to Care (which was during my COVID absence), so I had no communication with the Path to Care team to get the information on who was qualified to co-present the material until after the date to get a roster of those who attended. Jenn contacted me on Monday to request a list and I was able to provide said list after the special training on Aug 15th . Also, had there been another team staff member that attended to training this issue could have been avoided. However there was not, so I advised Jenn that Justine Roades to be asked to fill in if I was not cleared from COVID in time. In the training on Aug 4th we were given the information on what is needed and how to conduct the training and given the state policies*

*change year to year, so to create a project plan would not be useful as one had to attend the training in order to know the process. Aside from my guidance to ask Justine to fill in (as she attended to training and presented this material to the Evening & Weekend program during their orientation), I also advised that we encourage the students to attend the training provided by Graduate Division who offered multiple trainings into late September to satisfy the mandatory requirement. It was decided to move forward with the programming with Justine to present. Jenn Bridge reached out to get a list of students that were qualified to present the week prior (during my absence due to COVID). I was not in charge of that communication and when I came back on Aug 22nd was told by Jenn that she reached out to the students and added them to the calendar invite. In regards to the comment that I asked Justine to fill in to "see how it was done" is partially correct, as I was not needing to see how it was done as I have conducted this training for the last 3 years, but to better understand the polling software that she used for the interactive part of the training, which had I had more lead time to connect with Justine as planned prior to catching COVID I would have had this information and guidance since the polling software used was a purchased platform that the Evening and Weekend Program uses. Also being that the information is required for us to "stick to the script" that is scripted to meet the hour requirement also being that the co-presenters were unable to attend the training Jason sat in on, I was required to do it on my own. Again, there was never any comments or questions asked for context and much of this is assumption, which again lacked context and clarity.*

Tyrone was the team lead on the summer DEI&B workshop series. He was unable to participate in a couple of the workshops because he was out. The team was locked out of the zoom link and had to ask the IT team to hack into the zoom account and reset it so the entire team could lead the session. This happened within 24-36 hours of the workshop.

*This situation was never brought to my attention and had it been brought to my attention, I would have been able to provide guidance, context, and insight by reminding team leadership that I did not make the reservation, and it was created using our team SPA account, which all PO staff had access to. This information of the SPA Zoom room reservation was provided by Sarah Danziger then PO Program Coordinator in an email and identified in our Google calendar to our team that the organizer was the FTMBA Life account, and had any team member leadership looked at the calendar invite they would have noticed that all that was needed was for a PO staffer to log into our Team SPA Zoom account to gain access. I was actually given insight of the calendar creation by Jason Joyce who forwarded the email from Sarah to me.*

Tyrone was the team lead on the Consortium Welcome event which he was unable to attend due to illness. Jamie Breen had to step in with no script and MC the event. Originally the event was supposed to have students panelists but those weren't secured and there were no Q&A questions created. We decided to move forward with the event at the last minute without this content.

Feedback from Bain & Co about the Consortium Welcome event:

There were some students that arrived who were not on the list, but that was easy enough to solve! Logistically, things were rushed as we neared the day of the event, specifically catering and attendance. I understand that emergencies happen, but timely communication would have helped us confirm everything earlier and have had greater confidence going into the event.

*(response copied form my letter of concern which also mentioned this event and feels like double jeopardy) ~ In regards to the Consortium event at Bain on Aug 12th, I initially started the communications with the Haas Relationship manager to reach out to Bain to possibly host our Consortium class as was done with BCG pre-COVID and was given the green light by Bain leadership in conjunction with Chris Gavin in CMG on July 11th. I then sent this updated information to my team in the Program Office and also Laura Benoit in CMG who is our Consortium community partner, and she sent soft holds to the Consortium Community. I then unfortunately, went on work induced stress leave the following day and was out for 3 weeks. During this time Jason Joyce attended to planning meeting and was provided all action items that were needed on July 20th. Upon my return from COVID leave I reached out to my Director Jason Joyce to pick up what was needed to close the loop on this event (RSVP list and catering). Upon my return on the week of Aug 1st-5th I learned that no actions were taken from the meeting on the 20th of July and that I needed to create and send the RSVP and logistics (catering and drinks) for the event. I then asked "what's our budget for ordering", to which Jason replied that he had not been given a budget on Aug 4th. We are exactly a week out from the event and we have no budget. I wasn't given an approved spending amount until Tuesday Aug 9th the week of the event. I am not sure how I am held accountable for the lack of timely communication when I was not in office during the window that timely communication and outreach could have been made, nor was I aware of the logistics until I returned to work the first week of August. If Laura had not sent soft holds to the Consortium community the first time they would have heard about this event was when I sent the RSVP on Aug 5th. Laura had offered to assist in this programming given our team being understaffed (myself being the only Associate Director, out on unplanned leave, and staff on the Program office besides the Director Jason Joyce who again attended the logistics meeting and Executive Director Jenn Bridge), but she was told that the Program Office would own this, and again no work was done until my return the first week (which was a week out from the event in August 12th).*

**Exhibit "F"**
(Image showing Locker Key Communication)



**Jenn Bridge** 9:35 AM
@Tyrone Did we run out of lockers?

**Tyrone** 9:40 AM
No, facilities can't find the key so that we can verify that they are cleared out from the graduating class.

I spoke with Gerardo and Phil and if they can't find them soon, they will need to order replacement key. Awaiting an update from them.

**Jenn Bridge** 9:41 AM
SO we can't issue any lockers?

**Tyrone** 9:44 AM
At the moment no. Not until we know they are cleared out...

**Jenn Bridge** 9:49 AM
Do we have an eta?

**Tyrone** 10:01 AM
At the moment no. Again, they are looking through their bank of keys, and if they are unable to find them, they will need to get a locksmith to create new main keys. If they find the keys, then we will be able to move quicker than if they don't and need to get a locksmith. Hope this helps....

**Jenn Bridge** 10:04 AM
🎶

September 9th, 2022 ∨

**Exhibit "G"**
(Email dated September 9, 2022)



**Tyrone E Wise <tyronewise@berkeley.edu>**

---

## Master Locker Key Located

---

**Jason Joyce MBA** <jasonjoyce@berkeley.edu>                Fri, Sep 9, 2022 at 3:15 PM
To: Tyrone Wise II MEd <tyronewise@berkeley.edu>

Hi Tyrone,

Good news! I found the master locker key and set it on your computer keyboard!

Best,
Jason

--
**Jason Joyce, MBA** (he/him/his)
Director of Student Life & Leadership Development (acting)
Full Time MBA Program | Haas School of Business
University of California, Berkeley

**Berkeley Haas**

**Exhibit "H"**
(Email Trail)


powered by **Google**

Tyrone Wise II MEd <tyronewise@berkeley.edu>

---

## Team Meeting Today

**Tyrone Wise II MEd <tyronewise@berkeley.edu>**                    Fri, Jul 8, 2022 at 5:50 PM
To: Jason Joyce MBA <jasonjoyce@berkeley.edu>

Jason,

Hope all is well. Thank you for the reply. I do have some questions for clarity. I am not quite sure what you are referring to when you mention that I had not made you aware of the IDI training? It was literally one of the bullet points in our touchbase meeting and I did verbally mention it to you that I was attending and in result needed to miss the Associate Director interviews that were taking place as well. At that time you did not mention anything relating to this topic and or any issues that you saw. I am not sure what coverage you are mentioning that was needed, per our touchbase the week prior, all my work was being moved to the next steps, and there was no mention of any responsibilities that needed my attention this week. Am I wrong in that understanding?

Also, I would like more context on your statement that "we do not see you *showing up* with reciprocal commitment to the team and our shared goals and projects". I am not sure what you are referring to. Can you clarify or give specific examples?

In regards to my statement that I "will not have much to discuss or share" about my work (for this week). I was making that statement in regards to full calendar of training's and onsite that took the majority of the days, and so I was sharing I did not have any updates. Yes, that OP conversation is one topic that we could discuss, and from my end I had no new updates, and looking at our google doc discussion topics, there were no other topics listed from your end at all. My request to move the meeting was simply that, a request. Also, if you could elaborate specifically on what projects you learned that I have been working on outside of our conversation, that would be great!

Answers to your questions to consider:

1. Is there a reason why you did not share further details during one of our previous weekly 1:1s about the IDI time commitment? I was not aware of the time commitment outside what I provided you (9:30-2pm), nor did I have further details to be able to share with you beforehand. I shared as much information with you that I received, and much of that information was provided to me (outside of the assigned times) were from a colleague that recently attended the workshop. I can not give you what I don't have. It wasn't until I attended the workshop did I realize the demand that was required work for the following day. We have only had **2**, 1:1 discussions and again, this training was mentioned in our second and most recent touch base, July 1st.
2. How you plan to address the work-time you are missing? I was not missing any work-time, this training is part of my work as DEI liaison and part of my approved professional development, and I will respond to all emails at my earliest convenience.
3. When you are out of the office, who answers your forwarded emails and keeps tasks moving on projects we should all be working on...? I have no forwarded emails to the FTMBALife eamil, I referred anyone to the FTMBALife email if they needed immediate assistance being I was unable to respond in a timely manner due to my training I was attending causing me to be Out Of Office. This has been a normal practice and per my response I would respond to the email and any issues pertaining to it at my earliest convenience. If that is not the correct practice please provide an example of how you would like this situation addressed moving forward. Thank you in advance.
4. What is your role in the DEI training that you need to prepare for? My role is to run the Zoom account and aid in conversation as needed. To prepare I needed to look over the conversation topics that were sent earlier this week (due to the curriculum not being finalized until late last week, and me receiving them early this week), familiarize myself with the format of the workshop, and understand what is needed from me (when we will need break out rooms, when the guest speaker will arrive and other logistical information for the 2 hour workshop). I had reached out to Om to gain insight the week prior (Jun 24th) on what would be needed on my end, but no final decision on the workshop had been made, so no insight could be given until early this week. And again, being that I was coming out of a workshop that demanded my full attention, I needed time to prepare and decompress from a 4.5hour (9:30-2pm) workshop with (2) 10min breaks only.
5. In your mind, what are the team's three biggest projects/ strategic priorities right now? Biggest projects/strategic priorities - International Orientation, Orientation, Newsletter for WZ.

Hope this answers your questions. Have a good weekend!

Sincerely,

Tyrone
Associate Director of Student Experience
Haas School of Business
Chairman - Black Staff and Faculty Organization
University of California Berkeley
tyronewise@berkeley.edu

 Hear my name

*"Success is to be measured not so much by the position that one has reached in life, but by the obstacles which they have overcome while trying to succeed"*

*~ Booker T. Washington*



**Berkeley**Haas

Question the Status Quo
Confidence Without Attitude
Students Always
Beyond Yourself

DEFINING LEADERSHIP PRINCIPLES

We recognize that Berkeley sits on the territory of Huichin, the ancestral and unceded land of the Chochenyo Ohlone, the successors of the historic and sovereign Verona Band of Alameda County. This land was and continues to be of great importance to the Ohlone people. We recognize that every member of the Berkeley community has, and continues to benefit from the use and occupation of this land, since the institution's founding in 1868. Consistent with our values of community and diversity, we have a responsibility to acknowledge and make visible the university's relationship to Native peoples. By offering this Land Acknowledgement, we affirm Indigenous sovereignty and will work to hold University of California Berkeley more accountable to the needs of American Indian and Indigenous peoples.

On Thu, Jul 7, 2022 at 12:50 PM Jason Joyce MBA <jasonjoyce@berkeley.edu> wrote:

Hi Tyrone,

I understand that this professional development opportunity was approved before I stepped into a supervisory role, and that the content could absolutely call for decompression time!

As a direct result of your absence, I have cancelled today's team meeting. Totally get needing some space to reset before showing up again for a long session.

Nonetheless, it is important that you recognize that is difficult for us to support you and your work when we are not made aware of key components in play. In this case, you and I could have devised a plan for coverage, adjusted our team meeting time, and implemented that last week so that other staff members were not effected by your absence. It is also hard for the team to support your work when we do not see you *showing up* with reciprocal commitment to the team and our shared goals and projects.

I would still like for us to meet tomorrow for our weekly touchbase. In addition to regular business to discuss, I would like to share my concerns around your engagement and dependability from this week and why you feel that you "will not have much to discuss or share" about your work. (The OP debrief meeting yesterday deserves further discussion on our part about steps forward, for one.) I am also concerned that I am only receiving partial information from you on most topics, as I continue to discover things you have been working on outside of what you share with me, and I want to understand more about why this is. The more context I have, the more I can help you with being effective and efficient in your outputs. There are a large number of critically outstanding projects for our team, and I want us to figure out how to start getting you on the same page as us too!

Some questions to consider for our meeting: Is there a reason why you did not share further details during one of our previous weekly 1:1s about the IDI time commitment, how you planned to address the work-time you are missing, and that you planned to direct your emails to the FTMBALIFE inbox...? When you are out of the office, who answers your forwarded emails and keeps tasks moving on projects we should all be working on...? What is your role in the DEI training that you need to prepare for? In your mind, what are the team's three biggest projects/ straetgic priorities right now?

My goal is to help you take steps forward in your work quality and professional development- I want to see you be successful and I have tools to offer you in this realm that will make a big difference! There are moments when I see you taking one step forward, and then one or more steps backwards pretty quickly thereafter, so I think it is important to meet tomorrow and look for a positive note to end on this week.

Please let me know if you would like to adjust the time for our meeting to better suit your schedule- I am happy to meet before IDI or push back the current time!

Best,
Jason

**Jason Joyce, MBA** (he/him/his)
Director of Student Life & Leadership Development (acting)
Full Time MBA Program | Haas School of Business
University of California, Berkeley



On Thu, Jul 7, 2022 at 9:14 AM Tyrone Wise II MEd <tyronewise@berkeley.edu> wrote:

Jason,

Morning, hope all is well. I wanted to request an absence from today's meeting . As mentioned, I am attending the IDI training and it is very exhaustive. WIth the Team meeting and the Diversity workshop today, I have back to back meetings/trainings and no space to breathe or decompress. Missing  our meeting will allow me to set up for the DEI Training and decompress from the IDI workshop. Thank you for understanding.

Also, for our Friday's touchbase, I will not have much to discuss or share from being in the IDI all week and our team onsite. Would it be possible to skip this meeting as well? Is there anything in particular you would like to discuss? I do not have anything, this week has been pretty full with trainings and workshops.

Thank you for your time and I look forward to your reply.

Respectfully,

Tyrone

Associate Director of Student Experience
Haas School of Business
Chairman - Black Staff and Faculty Organization
University of California Berkeley
tyronewise@berkeley.edu



*"Success is to be measured not so much by the position that one has reached in life, but by the obstacles which they have overcome while trying to succeed"*

*~ Booker T. Washington*



Question the Status Quo
Confidence Without Attitude
Students Always
Beyond Yourself

DEFINING LEADERSHIP PRINCIPLES

We recognize that Berkeley sits on the territory of Huichin, the ancestral and unceded land of the Chochenyo Ohlone, the successors of the historic and sovereign Verona Band of Alameda County. This land was and continues to be of great importance to the Ohlone people. We recognize that every member of the Berkeley community has, and continues to benefit from the use and occupation of this land, since the institution's founding in 1868. Consistent with our values of community and diversity, we have a responsibility to acknowledge and make visible the university's relationship to Native peoples. By offering this Land Acknowledgement, we affirm Indigenous sovereignty and will work to hold University of California Berkeley more accountable to the needs of American Indian and Indigenous peoples.

**Exhibit "I"**
(Email Trail)

bConnected
powered by Google                                                                    **Tyrone Wise II MEd <tyronewise@berkeley.edu>**

---

## August Staffing Schedule

**Jason Joyce MBA** <jasonjoyce@berkeley.edu>                                         Wed, Aug 24, 2022 at 5:51 PM
To: Tyrone Wise II MEd <tyronewise@berkeley.edu>

Thanks for highlighting.

The below is an old email chain that started the schedule process on August 3rd.

Since this email, the team has met multiple times and our office added two new staff members.

As a result, I shifted one virtual coverage day for you- other team members are covering multiple days- and I was able to assign 2/3 of your preferred in-office days.

The Student Life team agenda that we regularly use shows the most current schedule.

Let me know if you have any other questions ahead of our 1:1 tomorrow!


Best,
Jason

On Wed, Aug 24, 2022 at 5:38 PM Tyrone Wise II MEd <tyronewise@berkeley.edu> wrote:
> FYI…
>
> Tyrone
>
> On Wed, Aug 3, 2022 at 10:16 Tyrone Wise II MEd <tyronewise@berkeley.edu> wrote:
>> Jason,
>>
>> Please lock in Wed - Fri for me. Thank you!
>>
>> Tyrone Wise
>> Associate Director of Student Life & Leadership Development
>> Haas School of Business
>> University of California Berkeley
>> tyronewise@berkeley.edu
>>
>> 
>>
>> *"Success is to be measured not so much by the position that one has reached in life, but by the obstacles which they have overcome while trying to succeed"*
>>
>>                                                        ~ Booker T. Washington
>>
>> 
>>
>> Berkeley**Haas**
>>
>> Question the Status Quo
>> Confidence Without Attitude
>> Students Always
>> Beyond Yourself
>>
>> DEFINING LEADERSHIP PRINCIPLES



On Wed, Aug 3, 2022 at 10:09 AM Jason Joyce MBA <jasonjoyce@berkeley.edu> wrote:

Hi team,

Now that we are all back in the office we need to solidify our August in-office schedule.

Please reply to this email and let me know your preferred choices for two additional days in the office, based on what is already blocked below.
We will want to make sure at least 1 member of our team is in the office each day of the week.

| Name | Monday | Tuesday | Wednesday | Thursday | Friday |
|------|--------|---------|-----------|----------|--------|
| Jenn |  |  |  |  |  |
| Jason |  |  |  |  |  |
| Lucas |  |  |  |  |  |
| Thao |  |  |  |  |  |

| | | | | | |
|---|---|---|---|---|---|
| **Tyrone** | | | | | |
| **Sarah** | | | | | |
| **Sumaya** | | | | | |

Please also plan to be in-person everyday of the week during Week Zero.

Let me know if you have any questions!

Best,
Jason

**Jason Joyce, MBA** (he/him/his)
Director of Student Life & Leadership Development (acting)
Full Time MBA Program | Haas School of Business
University of California, Berkeley
**Berkeley**Haas

--

Associate Director of Student Experience
Haas School of Business
University of California Berkeley
tyronewise@berkeley.edu
Phone: (510) 642-0856

"Strive not to be be a success, but rather be of great value"
                    ~Albert Einstein

Sent from my iPhone, please excuse any typos...

--
**Jason Joyce, MBA** (he/him/his)
Director of Student Life & Leadership Development (acting)
Full Time MBA Program | Haas School of Business
University of California, Berkeley
**Berkeley**Haas

**Exhibit "J"**
(Email Trail)



**Tyrone E Wise <tyronewise@berkeley.edu>**

---

## Thank You!

**Allison Layton MA** <alaytonsantos@berkeley.edu>          Thu, Sep 1, 2022 at 12:19 PM
To: Tyrone Wise II MEd <tyronewise@berkeley.edu>

Yes! Please send a zoom invite.

Berkeley Regional Services

Allison Layton, MA
Human Resources Business Partner
University of California, Berkeley
Professional Schools Region
Berkeley, CA  94710-7600
(510) 508-7326 - Mobile
Website for ProS Region: https://pros.berkeley.edu/
**Upcoming Days Off**
**Sept. 6, 2022 - Sept. 9, 2022**
**Upcoming Holidays**
**Sept. 5, 2022 (Labor Day)**
Improved ticketing, faster service, and better visibility with HR Service Hub here.


On Thu, Sep 1, 2022 at 12:18 PM Tyrone Wise II MEd <tyronewise@berkeley.edu> wrote:

Great, does 11-12 work?

### Tyrone Wise

Associate Director of Student Life & Leadership Development
Haas School of Business
University of California Berkeley
tyronewise@berkeley.edu



*"Success is to be measured not so much by the position that one has reached in life, but by the obstacles which they have overcome while trying to succeed"*

*~ Booker T. Washington*

**Berkeley Haas**

Question the Status Quo
Confidence Without Attitude
Students Always
Beyond Yourself

DEFINING LEADERSHIP PRINCIPLES



We recognize that Berkeley sits on the territory of Huichin, the ancestral and unceded land of the Chochenyo Ohlone, the successors of the historic and sovereign Verona Band of Alameda County. This land was and continues to be of great importance to the Ohlone people. We recognize that every member of the Berkeley community has, and continues to benefit from the use and occupation of this land, since the institution's founding in 1868. Consistent with our values of community and diversity, we have a responsibility to acknowledge and make visible the university's relationship to Native peoples. By offering this Land Acknowledgement, we affirm Indigenous sovereignty and will work to hold University of California Berkeley more accountable to the needs of American Indian and Indigenous peoples.

On Thu, Sep 1, 2022 at 12:16 PM Allison Layton MA <alaytonsantos@berkeley.edu> wrote:
  Thanks for following up!  I have some time tomorrow before noon.

Berkeley Regional Services

Allison Layton, MA
Human Resources Business Partner
University of California, Berkeley
Professional Schools Region
Berkeley, CA  94710-7600
(510) 508-7326 - Mobile
Website for ProS Region: https://pros.berkeley.edu/
**Upcoming Days Off**
**Sept. 6, 2022 - Sept. 9, 2022**
**Upcoming Holidays**
**Sept. 5, 2022 (Labor Day)**
Improved ticketing, faster service, and better visibility with HR Service Hub here.

On Thu, Sep 1, 2022 at 10:24 AM Tyrone Wise II MEd <tyronewise@berkeley.edu> wrote:

Allison,

Good morning, I hope all is well. I wanted to follow-up and see what your availability is for us to go over project planning? I look forward to
hearing from you.

Sincerely,

Tyrone
Associate Director of Student Life & Leadership Development
Haas School of Business
University of California Berkeley
tyronewise@berkeley.edu



*"Success is to be measured not so much by the position that one has reached in life, but by the obstacles which they have overcome while trying to
succeed"*

*~ Booker T. Washington*

Berkeley**Haas**

Question the Status Quo
Confidence Without Attitude
Students Always
Beyond Yourself

DEFINING LEADERSHIP PRINCIPLES



We recognize that Berkeley sits on the territory of Huichin, the ancestral and unceded land of the Chochenyo Ohlone, the successors of the historic and sovereign Verona Band of Alameda County. This land was and continues to be of great importance to the Ohlone people. We recognize that every member of the Berkeley community has, and continues to benefit from the use and occupation of this land, since the institution's founding in 1868. Consistent with our values of community and diversity, we have a responsibility to acknowledge and make visible the university's relationship to Native peoples. By offering this Land Acknowledgement, we affirm Indigenous sovereignty and will work to hold University of California Berkeley more accountable to the needs of American Indian and Indigenous peoples.

On Fri, Aug 26, 2022 at 5:41 PM Tyrone Wise II MEd <tyronewise@berkeley.edu> wrote:
Thank you for your support and context setting. I would like to work with you to gain better insight on project planning.

I really felt the meeting was one sided and many causes that resulted in my letter were not addressed, taken into context, or accounted for.
Is there any way or opportunity to provide a response to the letter of concern?

Also, Jason arbitrarily changed my in-office work days and did not notify me, and ado not reflect the work from home agreement signed. What can I do to address this, and is that a common practice? Should I have been consulted or included in that change?

I really appreciate you being in the room. Is there anything that you feel I should have done differently?

I hope you and the family are doing well. Tell Joe I said hey!

Have a great weekend as well.

Tyrone

On Fri, Aug 26, 2022 at 17:30 Allison Layton MA <alaytonsantos@berkeley.edu> wrote:

Thank you for being honest today.  I'm happy to support you with project plans, and/or how to build trusting relationships, however, I can help.

Have a restful and relaxing weekend with your family.

Berkeley Regional Services

Allison Layton, MA
Human Resources Business Partner
University of California, Berkeley
Professional Schools Region
Berkeley, CA  94710-7600
(510) 508-7326 - Mobile
Website for ProS Region: https://pros.berkeley.edu/
**Upcoming Days Off**
**Sept. 6, 2022 - Sept. 9, 2022**
**Upcoming Holidays**
**Sept. 5, 2022 (Labor Day)**
Improved ticketing, faster service, and better visibility with HR Service Hub here.


--

Associate Director of Student Experience
Haas School of Business
University of California Berkeley
tyronewise@berkeley.edu
Phone: (510) 642-0856

"Strive not to be a success, but rather be of great value"
                              ~Albert Einstein

Sent from my iPhone, please excuse any typos...

**Exhibit "K"**
(Image showing Meeting with Ms. Layton)

Today  ‹  ›    January 31, 2022

MON
31

GMT-07

Prayer & Meditation Check

05:00

06:00

07:00

08:00

09:00

10:00    Tyrone Wise and Maddy Hauck, 10:00, https://us02web.zoom.us/j/84392121343?pwd=U3F1UWdidzIqNjFIQURFVWR1SVUvZz09

11:00

VP DEI Check-In
11:10, berkeley.zoom.us/j/91606210770

12:00    Lunch
12:00 – 13:00

13:00

14:00    Allison/Tyrone
14:00, berkeley.zoom.us/j/5332080502

15:00

16:00

VP Community Check-In
16:15, berkeley.zoom.us/j/99719519823

17:00    Trinity / Tyrone
17:00 – 18:00

18:00

**Exhibit "L"**
(Achieve Together Form August 1, 2022, to November 30, 2022)

(/announcements?announcement_id=14)The Achieve Together Online Dashboard is currently in
Read Only. The most recent check-in conversations, covering the period of August 1 through
November 30, 2022 are now closed. The Online Dashboard will be available for creating and editing
new Online Forms on April 1, 2023 to record check-in conversations for the period of December 1,
2022 through March 31, 2023. You can reach out for assistance at: achievetogether@berkeley.edu
(mailto:achievetogether@berkeley.edu)                                                            ✕

 **1**  **Form created and shared**  ▶   **2**  **Form opened for edits**  ▶  **3**  **Form completed**



# Achieve Together: August 1, 2022 to November 30, 2022

Form ID: 51741

This form is a space for supervisors and employees to collaborate on employee goals and record
comments and notes for a specific Conversation Period.

# Employee

**Employee Name**

Tyrone Wise

**Job Title**

STDT LIFE DEV SPEC 3

**Department**

BAHSB

**School, College, or Division**

# Conversation

Document your conversation notes here (2 paragraphs or less). Notes are shared and visible to both supervisor and employee.

**Supervisors:** The check-in questions below are guided starters to get your conversations going and help you discuss each of the five Achievement Criteria. Use the questions to share, discover, and plan for future work. As you discuss the questions, think about your employee's Performance Level in each of the Achievement Criteria. You can use the Achievement Criteria Full Set (https://hr.berkeley.edu/performance/achieve-together/achieve-together-achievement-criteria) to see example behaviors for each Achievement Criteria at each Performance Level. During the conversation and in your notes, detail successes, areas that are on track, and opportunities for improvement.

**Employees:** The check-in questions below have been designed to help you discuss your work with your manager/supervisor, as it relates to each of the five Achievement Criteria. Use the questions to prepare for your conversation, so that you are ready to share, discover, and plan for future work with your manager/supervisor. As you discuss the questions, you can use the Achievement Criteria Quick Guide and the Achieve Criteria Full Set (https://hr.berkeley.edu/performance/achieve-together/achieve-together-achievement-criteria) to see example behaviors for each Achievement Criteria at each Performance Level. During the conversation and in your notes, detail successes, areas where you need assistance, and how your manager can better support your success.

*Check-In Questions:*
1. *What goals did you accomplish this period? In what ways does your work connect to our overall strategy and/or mission? (Goal Accomplishment & Job Mastery)*
2. *What do you like best about your work? (Goal Accomplishment & Job Mastery)*
3. *How have you supported others work and/or collaborated with others on your work this period? (Collaboration)*
4. *How have you innovated to seek efficiencies or improve work outcomes? (Innovation)*
5. *How have you fostered diversity, equity, inclusion and/or belonging on our team and campus? (Inclusion & Belonging)*

6. *What can I do as your supervisor to better support your success? What additional knowledge, resources, or tools are needed to successfully do your job? (Development Planning & Manager Support)*

**Conversation Period**

August 1, 2022 to November 30, 2022 ⌄

**Date Conversation Held**

01/19/2023

**Supervisor Notes**

From Katrina Koski:

Throughout this review period, Tyrone Wise has not only made thoughtful and valuable contributions to DEIJB Liaison meetings, during which he represented the FTMBA program exceptionally well – his membership is a cornerstone of our cross-functional team and has consistently prompted a greater sense of community, depth, and student-centeredness. Tyrone's commitment to the Haas student and staff community, as evident in his work with The Consortium and the FTMBA program's underrepresented student communities, consistently demonstrates his embodiment of the Haas Defining Leadership Principles. Tyrone displays an advanced knowledge of student affairs, critical thinking skills, and interpersonal effectiveness to maintain a sense of calm despite the significant volume, and often relentless and high-profile nature, of his portfolio. Of the many accomplishments this review period, Tyrone successfully advised and supported the launching of Haas' first-ever Native American and Indigenous Business Association in close collaboration with FTMBA student leaders, the MBAA, Haas DEIJB, EGAL, Events & Space Management, and the central campus Lead Center. His leadership and support of this student DEI initiative strengthened students' perceptions of the FTMBA program office, lent meaningful visibility to a minoritized population (native and indigenous students), and enhanced the program's readiness to serve indigenous students given the new UC Native Opportunity Program slated to bolster recruitment pipelines. To get to the next level, Tyrone could benefit from additional time being allocated to Consortium-related activities – perhaps in lieu of some of the more routine administrative tasks he took on in the absence of complete program office staffing – given Consortium's direct relevance to Haas' strategic priorities around DEIJB. Tyrone is the sole Black staff member within the program office, which adds a unique complexity to serving as the DEI lead for his team and the 'face' of the program to underrepresented students. In an effort to reduce the undue emotional workload on Tyrone, Marco Lindsey from the Haas DEIJB office could facilitate sessions for the FTMBA program office to proactively enhance psychological safety.

Tyrone struggled to meet expectations in his role this period.

**Employee Notes**

# Goals

Below you will find the Current Goals section and the Goals Moving Forward section. **For Current Goals**, review the work on your goals in the last 4 months and enter your comments in the Comments on Current Goals text boxes. **For the Goals Moving Forward**, update this content to reflect your goals moving forward into future periods. Note: Goals will be pre-populated if the supervisor selected Goals from prior periods. Otherwise, Supervisors can add Current Goals and supervisors and/or employees can add Goals Going Forward.

## Current Goals (August 1, 2022 to November 30, 2022)

The goals below were set during a previous Achieve Together conversation. For more information on goals and goal setting, please visit the Achieve Together Goals page (https://hr.berkeley.edu/performance/achieve-together/achieve-together-goals).

**Goal #1**

See separate document for goals

**Goal #2**

**Goal #3**

## Comments on Current Goals

Please provide comments on goals for the current period.

**Supervisor Comments**

> Tyrone's goals for this period are referenced in his PIP from October-December. Please reference that document.

**Employee Comments**

# Goals Moving Forward

Enter the goals below for future periods. Items listed in the Current Goals section can be deleted, carried forward, modified and/or new goals can be added. Employees or Supervisors may add or modify goals, once they are discussed and agreed upon in the Achieve Together conversation. Goals should be actionable, measurable, and include an end date (using goal setting methods such as SMART or OKR). Please review the Achieve Together Goals page (https://hr.berkeley.edu/performance/achieve-together/achieve-together-goals) before setting or modifying goals.

**Next Period Goal #1**

> See new PIP

**Next Period Goal #2**

**Next Period Goal #3**

**Next Period Goal #4**

**Next Period Goal #5**

# Training Checklist

**Supervisors:** Please use the checkboxes below to indicate completion of training/up-to-date on certifications for your employees.

**Employees:** You can check and confirm the status of your training by going to the UC Learning Center (https://uc.sumtotal.host/core/dash/home?domain=4) and review your Required Training.

☐ Ethical Values, Conduct and Compliance Briefing: University of California
*General staff: General Compliance Briefing: UC Ethical Values and Conduct*
*For Research staff: UC Ethics and Compliance Briefing for Researchers*

☐ UC Cyber Security Awareness Fundamentals

☐ Sexual Harassment Prevention Training
*For Staff: UC Sexual Violence and Sexual Harassment Prevention for Staff*
*For Supervisors/Managers/MSP/PPSM 4 and PPSM5: UC Sexual Harassment Prevention Training for Supervisors and Faculty*

☐ Other training that is necessary based on job type
*Examples:*
*Clery Act Training*
*CANRA Training for Mandated Reporters*
*FERPA: Privacy of Student Records*
*For Staff Supervisors: Berkeley People Management (BPM) Part 1: Grow Today (https://hr.berkeley.edu/grow/grow-your-skills/development-leaders/berkeley-people-management-bpm-series-certificate-2)*

## Status

| Supervisor | Jennifer Bridge | All done! (January 19, 2023 at 04:52:47 PM PST) |
|---|---|---|
| Employee | Tyrone Wise | Still working |

**Exhibit "M"**
(PIP for October 13, 2022)

## Performance Improvement Plan (PIP) for Non-Represented Staff at UC Berkeley

Note: managers/supervisors, must use the guidelines on the last page of this document, and work with your HR Partner using this process-map for PIP consultation steps

| Department | FTMBA Program Office |
|---|---|
| Employee Name | Tyrone Wise |
| Supervisor Name | Jennifer Bridge |
| Date of Last Performance Check-in Conversation | 5/31/22, 10/13/22 |
| Date of Last PIP (if applicable) | N/A |
| Job Title | Associate Director, Student Life & Leadership Development |
| Begin date | 10/13/22 |
| End date (30 day minimum, 90 day maximum) | 60 days from discussion of plan 12/13/22. 12/12 Extended plan to 12/22 due to days out of the office. |

## Performance Improvement Plan (PIP)

To help write the PIP, review the Achievement Criteria for examples of expected performance and behavioral indicators

| # | Area of Performance | Performance Concern[1] | Expected Outcomes[2] | Agreed Improvement Actions[3] | Support[4] | Due Date to Achieve Outcomes | Date of Completion | Notes |
|---|---|---|---|---|---|---|---|---|
| 1 | Job Mastery | Tyrone is not demonstrating competency in his communication skills both written and verbal, knowledge of our event management process, or in his dependability to get his work accomplished. | He will respond to email and slack inquiries within our SLA: Slack and Email SLA<br><br>• Email: 24-48 hours in email to acknowledge a request, provide an answer or | - Tyrone will create work plans for each of his projects, include those in the shared google drive and provide detailed updates on progress to me in our 1:1s<br>- He will read the articles included here and others he will source on his own and integrate new learnings into his work. We will | Read the following: - https://www.wrike.com/blog/foolproof-project-plan/<br><br>You May Hate Planning, But You Should Do It Anyway<br><br>Why is project planning important? | Assigned Reading complete by: 11/1/22<br><br>Tyrone's suggestions for reading due: 10/24/22<br><br>Integrating into work by 12/13/22<br><br>International Project Plan due 11/7/22 | Readings: 11/21/22<br><br>Tyrone did not suggest any reading<br><br>He completed the internat | 11/21/22 Tyrone said he completed the readings a couple of weeks ago but didn't tell me. |

---

[1] Describe specific duties/responsibilities in which performance standards have not been met and opportunities for improvement, citing specific operational or behavioral skills (for example: employee job description, UC Berkeley Achievement Criteria. Specifics around the desired competency, examples of the gap, and required improvements are helpful).

[2] Describe expectations for the employee, metrics, or other success indicators for improvement. How will we know sustained improvement has been attained?

[3] Describe the actions, timelines, activities, training, etc. that will facilitate improvement in each area.

[4] Detail what has been agreed in terms of employee support (additional coaching and/or training) to achieve expected outcomes

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | work on a solution<br>● Slack: 0-24 hours to acknowledge and provide a response<br>● There will be no student emails or slack posts about work he is responsible that is incomplete<br>- If he is out of the office when something is due he will communicate to me what is outstanding and when it will be complete and if time sensitive a viable recommendation on how to complete the work in his absence.<br>- He will cc stakeholders on any incomplete work when he | - have a conversation about his learnings in our 1:1s.<br>- He will retroactively build a workplan for international orientation and the locker project that the team can use for next year<br>- He will spend time learning the details of our event management process and include that learning into his advising with conference and student leaders.<br>- He will complete his work by the due date. | Review project plans from Week Zero and Commencement for the level of detail to incorporate into your plans<br><br>11 Reasons Why Effective Communication Is Important<br><br>Review<br>- Event Planning playbook<br><br>**Tyrone's suggestions:** | Locker Project Plan due 11/14/22<br><span style="color:red">Reviewing Event Planning Playbook 10/17/22</span> | ional project plan and shared it on 12/19/22<br><br>He shared the Locker Cleanout project plan on 12/15/22 | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | is out of the office and provide a recommendation how to complete the work so they are aware.<br>- Tyrone will drive the agenda for our touch base meetings. He will send Jenn an update of his work on Thursdays and come prepared to discuss all of the projects he is working on for our Monday meetings<br>-<br>- Student club and conference leaders including the Mobility Summit leaders will feel supported and able to move their work forward with the information Tyrone provides them related to our event management | | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | process and their mission and goals. Tyrone will provide a list to Jenn of all the students he's met with for Jenn to survey | | | | |
| 2 | Goal Accomplishment | Team Goals: Rebuild Student Trust in the Program Office, Rebuild the Student Community and Rebuild the Student Experience. Tyrone has not developed trust with students which directly impacts rebuilding the student experience. | - Tyrone will adopt a customer service mindset related to student inquiries of all kinds. <br> - He will demonstrate it by providing 6-9 examples during the 60 day period that exhibit a customer service mindset | - Tyrone will take a Customer Service class and incorporate his learnings into his work. He will share his learnings with Jenn in our weekly 1:1s <br> - Tyrone will find 3 journal-type or blog articles on building trust to read and share learnings with Jenn. He will incorporate his learnings into his work and be able to provide 5-6 examples of building trust with students during this period | Required: UC Learning- - <br> - STARS 1 CUSTOME R SERVICE TRAINING : THE FOUNDATI ON FOR EXCEPTIO NAL SERVICE <br><br> **Tyrone's suggestions:** | Required training due: 11/4/22 <br><br> Tyrone's suggestions due 11/4/22 <br><br> Completion of Tyrone's suggestions: 11/30/22 | Training not availabl e <br><br> Tyrone did not suggest any reading | Tyrone explained that he did not understand why I included customer service training and articles because they weren't relevant. I explained that all of our transactional conversations are customer service based and while we don't call our students customers that is still the nature of the work. |
| 3 | Inclusion & Belonging | N/A | | | | | | |
| 4 | Innovation | Tyrone does not actively look for areas to innovate or seek efficiencies to improve work outcomes. In circumstances when he has tried | Tyrone will seek opportunities to improve our work through innovation and efficiencies regularly in his work. | - Tyrone will identify two areas within his work to innovate or seek efficiencies. He will present those to the SL&LD team for feedback and | Required Reading: <br> **Types of Innovation: What Are They, And How Do You Apply Them** | Required Reading due: 11/10/22 <br><br> Present ideas to team 12/1/22 <br><br> Finalize work 12/12/22 | | Tyrone also expressed that he didn't understand why I included innovation reading since we weren't innovating but trying to get processes in place for much of our work. |

| | | | | integrate that back into his work. | **In Your Business?** **Six Ways Listening Improves The Customer Experience** | | He felt the articles weren't directly related to our work and therefore not helpful. He doesn't see the need for additional reading so has not suggested any new items even though that was a deliverable in Tyrone proposed we improve the visa letter process by providing a template to students so they could create their own letters speeding up the process. This was a good innovation. |
| 5 | Collaboration | Tyrone needs to spend more quality time collaborating with his peers and asking the right questions to enhance both his work and theirs. | - Tyrone's work quality on projects will improve<br>- Tyrone's credibility that he is dependable and responsive will improve as indicated through student and staff feedback | - Tyrone will actively bring other team members or students into his work to gain a broader perspective<br>- He will practice active listening skills, reflect on the content and incorporate his learnings from his conversations into his work<br>- He will create a checklist of questions to ask towards the project goal for each meeting<br>- He will complete work within deadlines while he collaborates with his peers | **Read and be prepared to discuss these articles:**<br>- Top 4 Characteristics That Make Individual Contributors Indispensable<br>- How to Collaborate Successfully<br>- Active Listening<br>**Tyrone's suggestions:** | Required reading due 10/20/22<br><br>Suggestions due: 10/25/22<br><br>Suggestions read/complete: 10/31/22 | |

| | | | | - He will identify 2 articles to read on the subject | | | | |
|---|---|---|---|---|---|---|---|---|
| 6 | Other | | | | | | | |

Supervisor signature _____    Date _____

The above Performance Improvement Plan has been explained to me and I understand the expectations of the plan and my job responsibilities.

Employee signature _____    Date _____


## Weekly Check-ins

| # | Discussion Date | Persons Present | Area(s) of Performance Discussed[5] | Weekly Performance Level | Activities for Continued Improvement |
|---|---|---|---|---|---|
| 1 | 10/17/22 | Tyrone, Jenn | Review content of upcoming deadlines and agreed to meet off cycle if Tyrone had time to review the articles and draft the intl project plan | ☐ Needs Attention<br>☐ Well Done<br>☐ Stand Out | |
| 2 | 10/24/22 | Tyrone, Jenn | Tyrone came prepared with status on his projects and provided a detailed agenda in advance. We discussed next steps towards building out the intl project plan. | ☐ Needs Attention<br>xx☐ Well Done<br>☐ Stand Out | Job Mastery/Meeting SLAs: FTMBA Life received an email from Bill Rindfuss on 10/18 that he needed to be added back to CG and for some reason lost access. Jason emailed Tyrone and asked him to take care of adding Bill back in. As of 1:45 pm on 10/20 Bill had not been emailed by Tyrone to learn more. This doesn't meet expectations based on our SLA for email acknowledgments within 24-48 hours. Jenn and Jason closed this matter out on 10/24 with repeated communication with Bill. |

---

[5] Identify by performance area ID# example: "1, 3, 5"

| 3 | 10/31/22 | Jenn | Tyrone did not send an agenda for our 1:1 meeting on/by Thursday or schedule a check-in this week 10/31. He was out 2 days last week, but, worked the first three days of the week. We have also not discussed the following in our 1:1: Required reading for Collaboration, whether he has reviewed the How to Plan an Event Guide nor has he provided any additional suggestions of articles or video to watch related to collaboration. Tyrone did include in his email to me that he would be out sick today (10/31/22) in his email what work may need to be reviewed (locker requests, case competition fund and sponsorship updates from the tracker) which was helpful. He did not explain how to do any of this work, if it was time sensitive or look for help from Sumayyah. We are waiting on funds to hit our account to transfer to HHA ASAP for the Google Mental Health Case | xxx☐ Needs Attention<br>☐ Well Done<br>☐Stand Out | Tyrone needs to email his supervisors and team members when he is going to be out of the office so they understand he is not available. He needs to share in an email if he has any urgent deliverables that he needs support on while he is away or if he had any responsibilities like the email box/slack channel that need coverage. He should specifically ask for help in covering that work.<br><br>He also needs to be more on top of deadlines and meet them as outlined in this document. |

| | | | | | |
|---|---|---|---|---|---|
| | | | Competition which is urgent and he did not specifically mention whether he had been notified about the funds being available. | | |
| 4 (~30d) | 11/9/22 | Jenn, Tyrone | The following items are incomplete as of today: 11/4 Customer Service training due 11/4 Tyrone's suggested reading due 11/4 Tyrone has not added an agenda to our running TB document due every Thursday. The following items are not complete from the PIP<br>- Job Mastery suggested reading from Tyrone due 10/24<br>- Review How to Plan an Event doc due 10/17/22<br>- Effective Communications article due 11/1/22<br>- Collaboration required reading was due 10/20<br>- Collaboration suggested readings due 10/25<br>- Collaboration suggested reading due date 10/31 | xxx☐ Needs Attention<br>☐ Well Done<br>☐ Stand Out | Tyrone needs to focus on his deliverables across all of the areas addressed in the PIP. He asked where to find the customer service training and I explained it was in UC Learning and then added that detail to the pip.<br><br>12/1/22 We have since learned this resource is no longer available online. |
| 5 | 11/14/22 | Tyrone, Jenn, Sumayyah | Tyrone provided status on his current projects and goals. We did not | ☐ Needs Attention<br>☐ Well Done<br>☐ Stand Out | |

| | | | | | |
|---|---|---|---|---|---|
| | | | discuss PIP deliverables and he scheduled more time on 11/18 to discuss the project plan he is developing. Tyrone asked to clarify again where the customer service training could be found which was due on 11/4/22 | | |
| 6 | 11/18/22 | Jenn | We were supposed to meet today and review the international project plan that Tyrone is developing and Tyrone emailed in sick. He did not share the project plan with his updates for review as an option. Tyrone started filling out the agenda for Monday's meeting but the only item is Katrina coming to deliver DEI training, no other work updates. | xxx☐ Needs Attention<br>☐ Well Done<br>☐ Stand Out | Tyrone- If you can't meet a deadline we have agreed on for any reason, including illness, please either deliver what you have accomplished with a timeline for completing the rest or propose an alternative deadline.<br><br>Also, I need you to be more detailed in our agendas with any outstanding work. To date, you have not completed several deliverables for this plan and have not discussed it with me. Our last three conversations about the plan did not happen because you were not in and you didn't reschedule a time to discuss your progress. |
| 7 | 11/21/22 | Tyrone, Jenn | Tyrone and I met for our weekly TB. He added 1 item to the agenda. I added 5+ things that he was working on. Points we discussed: Tyrone explained that he did not understand why I included customer service training and articles because they weren't relevant. I | xxx☐ Needs Attention<br>☐ Well Done<br>☐ Stand Out | Tyrone needs to meet deadlines for his work. |

| | | | explained that all of our transactional conversations are customer service based and while we don't call our students customers that is still the nature of the work. Tyrone also expressed that he didn't understand why I included innovation reading since we weren't innovating but trying to get processes in place for much of our work. He felt the articles weren't directly related to our work and therefore not helpful. He didn't feel bringing new articles to the conversation would be helpful to him even though it was outlined in the PIP<br><br>He took me through the work he has done on the international orientation project plan that was due on 11/7. It was 70% complete and he agreed to go back and finish the work. | | |
|---|---|---|---|---|---|

| | | | He has not started the locker project plan that was due 11/14. | | |
|---|---|---|---|---|---|
| 8 | 11/30/22 | Jenn, Tyrone, Sumayyah | Met with Tyrone and Sumayyah to discuss project work. Tyrone added two things to the agenda and I added 5 that were ongoing projects. Tyrone did not have a project plan for listening sessions although we had not set a hard deadline...even though the events are today and tomorrow.<br><br>11/30 Email sent to Tyrone:<br>Tyrone-<br><br>Since the Listening Sessions are currently in progress I'd like to suggest you develop the plan now while it is fresh in your mind. If you could share that with us by end of day Friday, 12/2,  I would appreciate it. | xxx☐ Needs Attention<br>☐ Well Done<br>☐ Stand Out | |

| | | | | | |
|---|---|---|---|---|---|
| | | | Let's set a deadline for finishing the international project plan and locker plan for 12/6. | | |
| 9 | 12/5/22 | Jenn notes | Tyrone has not entered any agenda items into our shared agenda for our meeting on 12/5. They were due 12/1. Tyrone had a deliverable of a listening session project plan on Friday 12/2 and did not respond with the plan by the deadline or communicate he needed more time. He did complete two listening sessions this past week. He completed a draft project plan for the listening sessions but it does not reflect the 5+ sessions with dates only the initial tasks that need to be complete.<br><br>We only had 30 minutes in our last tb and I offered more time if it was helpful. He has not | xxx☐ Needs Attention<br>☐ Well Done<br>☐ Stand Out | |

| | | | | | |
|---|---|---|---|---|---|
| | | | sought additional time to meet.<br><br>Tyrone sent the project plan to me on 12/5 saying it had been done earlier but he had a busy week and hadn't sent it.<br><br>He was out sick today so we canceled our meeting. | | |
| 10 ~60d) | 12/12/22 | Tyrone, Jenn plus Sumuyyah for project status updates | Tyrone was out all of last week taking care of his son who was ill. Today was his first day back in the office.<br><br>Tyrone did not update the agenda with any topics for today's meeting. Sumayyah was unclear what projects Tyrone was working on so he shared that he was creating SOPs for about 7 projects. We then worked on getting clarity between SOPs v what he needs project plans for so that everyone is on the same page. The outcome was that his project is to create SOPs for several items on the list. Tyrone agreed to finalize the International Project Plan and Locker | xxx☐ Needs Attention<br>☐ Well Done<br>☐Stand Out | Tyrone needs to review the PIP for outstanding work. I extended the PIP to 12/22 to allow for the time he was away during these last two months. I asked him to create a short summary of his performance related to the PIP and share that with me by end of day on 12/20.<br><br>Tyrone needs to email his supervisors and team members when he is going to be out of the office so they understand he is not available. He needs to share in an email if he has any urgent deliverables that he needs support on while he is away or if he had any responsibilities like the email box/slack channel that need coverage. He should specifically ask for help in covering that work. |

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  |  |  | Project Plan by Friday, 12/16 but he's trying to balance catching up with his email, participating in meetings and doing this work. He expressed that sentiment as well for the week of November 28th.<br><br>Tyrone did email Sumayyah and I that he would be out. He needs to include Fredie on those emails going forward. |  |  |
| 11 |  |  |  | ☐ Needs Attention<br>☐ Well Done<br>☐ Stand Out |  |
| 12 | 12/19/22 | Tyrone, Sumayyah, Jenn | Tyrone had an agenda ready for the meeting and completed project plans for discussion. We talked through details for the international orientation so the team was fully informed about the plans and outstanding questions. | ☐ Needs Attention<br>xxxx☐ Well Done<br>☐ Stand Out | Nice job Tyrone. You proactively set the agenda and drove the conversation through the international project plans. That is what I expect from an Associate Director. |
| 13 (~90d) | 12/22 |  |  | ☐ Needs Attention<br>☐ Well Done<br>☐ Stand Out | Completion date for PIP |

**Performance Improvement Plan (PIP) was:** ☐ successfully completed    ☐ not successfully completed    ☐ extended until _____ (insert date)

Attachments: Job Description/PEM

<mark>Once the Performance Improvement Plan is agreed to and signed, managers/supervisors must email a copy to their HR Partner. Then again upon completion (or extension).</mark>

**Performance Improvement Plan (PIP) Guidelines**

**Please review prior to preparing PIP:**

-   Consult with your Regional HR Partner prior to issuing a Performance Improvement Plan (PIP). Use this step-by-step process map for considering the full range of activities for PIPs with your HR Partner.
-   A PIP can be an effective tool to monitor and measure performance behaviors, processes and work products that need improvement outside of Achieve Together check-in conversations.
-   Inform the employee that the PIP is being issued to assist them in raising their performance levels to meet acceptable standards, expectations and accountabilities.
-   Define the problem and the improvement that is required to meet performance standards.
-   Identify the changes that must be met and by when (define due dates whenever possible) and how the outcome will be measured.
-   Establish action plan, goals, resources (i.e. training to achieve desired outcome, if available) and timetables for meeting the standards.
-   Maintain communication and evaluate whether the standards have been met.
-   Involve the employee in resolution of the performance gaps. Coach the employee to commit to improvement. Make tangible and intangible resources available.
-   The clearer the expectations, the easier it will be for you to manage/monitor the situation.
-   PIPs are not "written warnings" and therefore are not disciplinary actions.
-   The PIP is a living document that is updated on a regular basis by both the employee and the supervisor.
-   It is recommended that you meet with the employee in a one-on-one meeting weekly to monitor progress and to maintain communication between the manager/supervisor and the employee.
-   Written confirmation of a counseling session is not grievable.

**Achieve Together Note**:

-   As part of the Achieve Together program, those who have an overall performance level of "needs attention," will begin a PIP (though the manager/supervisor will follow the same steps of consultation with their HR Partner).
-   While those with an overall "needs attention" performance level as identified after the close of the merit cycle (April 1-March 31) through performance calibration activities at the unit level, PIPs can commence at any time during the merit cycle when performance gaps are not resolved following verbal counseling and expectation setting.

**Tips:**

-   Give ongoing feedback to the employee and respond in writing whether or not there has been improvement on the subject of the counseling session.
-   If an employee shares with you any personal difficulties they are experiencing, refer the employee to the Employee Assistance Program. (The EAP language is typically good to include).

**Exhibit "N"**
(Email Trail)



Tyrone Wise II MEd <tyronewise@berkeley.edu>

---

## Following up from our meeting yesterday

**Jennifer Bridge** <jennb@haas.berkeley.edu>                                                  Tue, Nov 22, 2022 at 6:33 PM
Reply-To: jennb@haas.berkeley.edu
To: Tyrone Wise II MEd <tyronewise@berkeley.edu>

Tyrone-

Thanks for this summary.

I have amended the two documents you mentioned and requested that HR replace them in the Achieve dashboard. In the transition with Jason leaving and stepping back into leading the SL&LD team, I forgot to send those to you. I will do that under separate cover.

We have had an incredible amount of transition since March as you know. With that has come some communication challenges which I am actively addressing. I encourage you if you haven't already to directly connect with your student partners to learn if you are/were meeting their needs for your own information and development. I find our students are not good at giving direct feedback, a leadership development opportunity we can help with in the future. If you are open to a 360 feedback process with students and staff that could be something we look into for your development.

Lastly, I think there is an opportunity here for us to rebuild trust on both sides. I need to know that I can depend on you to deliver quality work, done on time and error free and that our students feel they have a thought partner to execute their community building events with a subject matter expert.

Reshaping the student experience and rebuilding this office is my top priority. The Dean is actively inquiring about how we plan to do that work and eager to review our recommendations for long term change. Expectations are the highest they've ever been. We are all stepping up in different ways to meet the challenge.

I look forward to connecting on Monday in our 1:1 with Sumayyah.

Jenn

On Tue, Nov 22, 2022 at 4:36 PM Tyrone Wise II MEd <tyronewise@berkeley.edu> wrote:
> Jenn,
>
> Thank you for your time and conversing with me yesterday. I think we ended the meeting discussing over the last year the culture of a lack of communication within team leadership, and the effects that it produces with lack of trust for me as a team member and my ability to show up and be productive along with the effects that it has produced in my mental health. This was brought up from the entries of my Achieve Together conversation that lacked context and awareness and the ability for me to give a staff voice to the challenges that were brought up, and resulted in my PIP assignments (the mention of Drew's, and Arohi's comments) from a one-sided conversation. In addition to my sharing intentions of working through family challenges as opposed to taking a sick day to better support an understaffed team, and the delay in completing deadlines on the PIP. You mentioned that you appreciated my candid and honest comments and you were going to process that among other topics discussed revolving around the PIP, and set some time for us to further discuss (today). I looked forward to that opportunity.
>
> Also, I would like to follow-up on the Achieve Together re-wite and would like to know if the amended write-up was sent in as I would like to provide my feedback. You mentioned wanting to update the Achieve Conversation and remove the items that lacked context, awareness or simply were included that I was not responsible for (DEI Workshop that Sarah created the invite and Zoom link for, the Consortium event that Jason dropped the ball on, along with the Drew, and Arohi's comments).
>
> Thank you for your time and I look forward to our follow-up conversation.
>
> **Tyrone Wise**
> Associate Director of Student Life & Leadership Development
> Haas School of Business
> University of California Berkeley
> tyronewise@berkeley.edu
>
> 
>
> *"Success is to be measured not so much by the position that one has reached in life, but by the obstacles which they have overcome while trying to succeed"*
>
>                 ~ *Booker T. Washington*



**Berkeley Haas**

Question the Status Quo
Confidence Without Attitude
Students Always
Beyond Yourself

DEFINING LEADERSHIP PRINCIPLES

We recognize that Berkeley sits on the territory of Huichin, the ancestral and unceded land of the Chochenyo Ohlone, the successors of the historic and sovereign Verona Band of Alameda County. This land was and continues to be of great importance to the Ohlone people. We recognize that every member of the Berkeley community has, and continues to benefit from the use and occupation of this land, since the institution's founding in 1868. Consistent with our values of community and diversity, we have a responsibility to acknowledge and make visible the university's relationship to Native peoples. By offering this Land Acknowledgement, we affirm Indigenous sovereignty and will work to hold University of California Berkeley more accountable to the needs of American Indian and Indigenous peoples.

On Tue, Nov 22, 2022 at 11:05 AM Jennifer Bridge <jennb@haas.berkeley.edu> wrote:

Hi Tyrone-

Sorry that we got cut off in our meeting yesterday.

I think we were talking about rebuilding student trust and I explained that we needed to have a sense of urgency with our response times and make sure that we are meeting their needs when they reach out to us.

Let me know if there is something you wanted to discuss related to this before we meet on Monday.

**Jenn Bridge**

Executive Director (Acting) | Full-Time MBA Program Office

Haas School of Business
University of California, Berkeley
cell: (510) 520-7658
(she/her/hers)
**https://www.name-coach.com/jenn-bridge**



--

**Jenn Bridge**

Executive Director (Acting) | Full-Time MBA Program Office

Haas School of Business
University of California, Berkeley
cell: (510) 520-7658
(she/her/hers)
**https://www.name-coach.com/jenn-bridge**

**Exhibit "O"**
(Email dated December 13, 2022)



Tyrone Wise II MEd <tyronewise@berkeley.edu>

---

## Performance Plan update

Tyrone Wise II MEd <tyronewise@berkeley.edu>                                          Tue, Dec 13, 2022 at 10:30 AM
To: jennb@haas.berkeley.edu

Jenn,

Good morning, I hope all is well. I wanted to follow up on your email. I find it challenging and unsettling how conversations and emails are not consistent. We just met yesterday and in our meeting it was discussed and agreed that the International Orientation project plan was indeed completed and only needed to be adjusted due to the recent changes that were made (unbeknownst to me) in which the dates for the International Orientation is being moved up (and actually the project plan is still complete as you made the changes to the plan in our last one-on-one, it's the "cover page colorings just needs to be changed to match the new dates). The International Orientation date change was made after the project plan was delivered and approved. Moreover, the Locker Clean was planned to be finished however I have been out for about half a month due to family illness, personal emergencies (that were work induced, again). In addition to the Locker Clean out Project plan you arbitrarily added a Listening Session project plan with expectation that it be completed within 2 days. Which required that I put all other items of work aside and focus on this newly assigned task, in addition to all the other programming and requirements I had to attend to that week (facilitating 2 listening sessions, multiple scheduled meetings, covering Slack and FTMBALife email, etc...). As you know, we have a severely depleted Student Life team, and I am the only staffer, so my time and bandwidth is very stretched with current planning and programming and serving student and club needs. As mentioned multiple times in our touch base on the need to be properly trained, I have just recently become clear on the expectation and process of creating a project plan after months of asking. This is a process that takes time for me to create as there are many moving parts and processes that need to be included for accurate directions, and again, is a new learning. I feel that the needle on your expectations continues to move as you see fit, which seems very unfair.

The last Achieve Together Conversation write up lacked conversation as a whole. When You, Jason and I met to discuss, none of what was discussed made it in the Achieve Together conversation write up at all, but rather you copy and pasted the "Letter of Concern" that continues to be filled with inaccuracies, events that happened outside the slated conversation timeline, and lacked any conversation with me before much of it was included. It was only after I had to go to the Employee Labor Relations Team that a change was made. Still unfortunately, after you re-wrote the Achieve Together document we failed to even have a conversation on it and it wasn't until I asked for an update on the status, you replied that you forgot to send it to me, and it was sent to me in email. When I asked for time in our one-on-one to converse on it, I was told we do not have time, and I should write my concerns/comment in email. This feels very unfair and misaligned with how the process of the Achieve Together "Conversation" is supposed to take place. Much like the past 2 Achieve Together conversations, because of inaccurate information that leadership failed to gain context on, I am held accountable for that misinformation, or items that lacked context, or blatantly false and when I bring those items to your attention, you agree every time that the information is indeed inaccurate or lacked context that changed how you saw the situation once that information was given, and in your apology said the write up would be changed and oftentimes if it is changed, new information is added that also was not discussed.

This continues to be an issue that feels very magnified especially given in our conversations you have told me that others are not given this same treatment on the team and are instead given an opportunity to have a conversation on items that are brought up regarding them. You told me how Jason Joyce for instance was given a chance to have a conversation with you in regards to the multiple negative comments that were made to you about him, and I have never been given that opportunity at any point of the past year but rather received notice of them in a write-up.

I hope there can be some consistency in leadership that aligns with the goals and values set as a team. It is hard to come to work and feel comfortable when I don't feel treated like everyone else, and I have to walk on eggshells. As mentioned multiple times this challenge continues to be both emotionally and physically draining, and continues to affect my mental health. Thank you for your time and I look forward to your reply.

Respectfully,

Tyrone Wise
Associate Director of Student Life & Leadership Development
Haas School of Business
University of California Berkeley
tyronewise@berkeley.edu



*"Success is to be measured not so much by the position that one has reached in life, but by the obstacles which they have overcome while trying to succeed"*

*~ Booker T. Washington*



**Berkeley Haas**

Question the Status Quo
Confidence Without Attitude
Students Always
Beyond Yourself

DEFINING LEADERSHIP PRINCIPLES

We recognize that Berkeley sits on the territory of Huichin, the ancestral and unceded land of the Chochenyo Ohlone, the successors of the historic and sovereign Verona Band of Alameda County. This land was and continues to be of great importance to the Ohlone people. We recognize that every member of the Berkeley community has, and continues to benefit from the use and occupation of this land, since the institution's founding in 1868. Consistent with our values of community and diversity, we have a responsibility to acknowledge and make visible the university's relationship to Native peoples. By offering this Land Acknowledgement, we affirm Indigenous sovereignty and will work to hold University of California Berkeley more accountable to the needs of American Indian and Indigenous peoples.

UC Berkeley Mail - Freshman Bio Update

[Quoted text hidden]

**Exhibit "P"**
(Email dated December 22, 2022)



Tyrone Wise II MEd <tyronewise@berkeley.edu>

---

## PIP Feedback

**Tyrone Wise II MEd** <tyronewise@berkeley.edu>            Thu, Dec 22, 2022 at 1:57 PM
To: Jennifer Bridge <jenn_bridge@berkeley.edu>

Jenn,

As requested you asked that I give you some feedback on my experience during my PIP before the end of this week. I feel that only item that was of substance was the walkthrough that was provided that allowed clarity on the process and expectation of a project plan. After receiving that information I was able to better understand how to create a Project Plan. Prior to the detailed walkthrough of the International Orientation Project Plan that was created I found myself lost and asking for clarity with no assistance. I was given readings that provided no value as they were not helpful in the creation but provided a fundamental learning that I had already. My challenge was implementing the learnings from the online training and implementing it to the work that I do which is much more simple.

Aside from the project plan, the other assignments seemed very trivial as collaboration and innovation were not challenges that I have. I have led various programs and created new processes of work with much success. To have readings that again were fundamental in focus was well below my knowledge and understanding. It is hard to innovate when the team (myself included) are still learning the new process and policy implementation. As mentioned in my one on one, I have not had a year that was consistent with the previous. I came onboard the then Student Experience Team in March of 2019. Then COVID hit so we transitioned everything to virtual for a year and a half. Then we went hybrid which brought a whole new complexity to our work on top of having a whole new team and leadership. We created new processes for clubs and found new challenges with a lack of transferred knowledge from clubs. It's impossible to innovate or change a process when we aren't even sure if the process is effective in the first place. We do not have a large flow of student traffic so creating a process for Slate is not helpful as we do not have student notes for our department to create.

I hope to continue this conversation and clarity with consistency in our team that provides feedback, honesty and seeking information rather than assuming. Thank you for your time.

*Tyrone*
Associate Director of Student Life & Leadership Development
Haas School of Business
University of California Berkeley
tyronewise@berkeley.edu



*"Success is to be measured not so much by the position that one has reached in life, but by the obstacles which they have overcome while trying to succeed"*

*~ Booker T. Washington*



**Berkeley Haas**

**Question the Status Quo**
**Confidence Without Attitude**
**Students Always**
**Beyond Yourself**

DEFINING LEADERSHIP PRINCIPLES

We recognize that Berkeley sits on the territory of Huichin, the ancestral and unceded land of the Chochenyo Ohlone, the successors of the historic and sovereign Verona Band of Alameda County. This land was and continues to be of great importance to the Ohlone people. We recognize that every member of the Berkeley community has, and continues to benefit from the use and occupation of this land, since the institution's founding in 1868. Consistent with our values of community and diversity, we have a responsibility to acknowledge and make visible the university's relationship to Native peoples. By offering this Land Acknowledgement, we affirm Indigenous sovereignty and will work to hold University of California Berkeley more accountable to the needs of American Indian and Indigenous peoples.



**Exhibit "Q"**
(Letter of Warning)



*__Delivered via Email__*

January 18, 2023

Tyrone Wise
Associate Director, FTMBA Program Office
Tyronewise@berkeley.edu

RE:  Letter of Warning - Failure to Meet Acceptable Work Performance Standards

Dear Tyrone,

In accordance with the Personnel Policies for Staff Members ("PPSM") 62: Corrective Action, this is a Letter of Warning.

This action is based on your failure to meet acceptable work performance standards. You are expected to achieve immediate and sustained improvement as outlined below and in a new Performance Improvement Plan ("PIP") beginning January 23, 2023.

## Performance Deficiencies

On October 13, 2022, you were issued a Performance Improvement Plan ("PIP") that addressed four areas of concern (Job Mastery, Goal Accomplishment, Innovation, and Collaboration) related to your performance, with specific actions and dates by which you needed to show improvement. The following documents each of those areas and the lack of progress made toward each.

1. **Performance Deficiency: Failure to Meet Acceptable Performance Standards - Job Mastery**

Employees are expected to consistently and proactively communicate about their business projects, meet our Service Level Agreements ("SLAs"), meet deadlines, and demonstrate dependability. On many separate and distinct occasions, you failed to meet the expectations in the areas described above.

- **Communication:** You are expected to update our meeting agenda on Thursdays in advance of our Monday 1:1 meetings, and, when you call in sick, to communicate consistently what work needs to be done in your absence, how to get that work completed, and/or request deadline extensions, if needed. The following are specific examples from my personal notes during this period in which you failed to meet expectations.
    - "10/31/22 - Tyrone did not send an agenda last week of things to cover in our weekly meeting
    - 11/4/22 - Tyrone has not added an agenda to our shared document due every Thursday. He has also not scheduled a weekly meeting for next week 11/7
    - 11/21/22 - Tyrone and I met for our weekly TB. He added 1 item to the agenda. I added 5+ things that he was working on and for which I needed updates.  He took me through

the work he has done on the international orientation project plan that was due on 11/7. It was 70% complete and he agreed to go back and finish the work.
  ○ 11/30/22 - Met with Tyrone and Sumayyah to discuss project work. Tyrone added two things to the agenda and I added 5 that he knew were ongoing projects and which should have been on the agenda he was responsible for creating
  ○ 12/12/22 - Tyrone did not update the agenda with any topics for today's meeting. I asked if he thought he could get the international and locker project plans completed by Friday and he said no. Similar to the week of 12/1 he said that he is too busy with emails and meetings to complete this important project."

- **Meeting SLAs:**  You are expected to be proactive and timely in responding to incoming inquiries. You are responsible for the FTMBA Life email box and Slack channel 2 days per week in addition to your personal email. If you are researching a student question, you need to state that in the channel so your team knows that you are working on a solution. The following are examples in which you failed to meet expectations regarding SLAs:
  ○ On 10/26/2022, a day you were expected to cover the Slack channel, a question was received; however, you did not respond to the student and instead I responded.
  ○ On 11/16/2022, a day you were expected to cover the Slack channel, a question was received; however, you did not respond to the student and instead a team member responded.
  ○ From 11/21/2022 through 12/12/22, there was no indication that you were receiving, reading, and responding to questions from students on the Slack channel.

- **Meeting Deadlines:** You are expected to meet set deadlines, or, where you know you may be unable to, communicate that to me proactively. When we met and discussed upcoming deadlines, you rarely expressed concern about the timelines. In each case where deadlines were missed, you failed to advise me of that in advance, nor did you propose changes. Below are examples in which you missed deadlines for assignments in your October-December 2022 PIP and deadlines for your projects**:**
  ○ "10/17/22 - Review How to Plan an Event doc reading due. Unclear if complete. Did not discuss.
  ○ 10/20/22 - Collaboration required reading was due. Unclear if complete. Did not discuss.
  ○ 10/24/22 - Job Mastery suggested reading from Tyrone due. Unclear if complete. Did not discuss.
  ○ 10/25/22 - Collaboration suggested readings identified by Tyrone due. Not complete. Did not discuss.
  ○ 10/31/22 - Collaboration suggested readings to be read and ready to discuss. Not complete. Did not discuss.
  ○ 11/1/22 - Effective Communications article reading due. Unclear if complete. Did not discuss.
  ○ 11/4/22 - Customer Service online training module due. 11/9 you asked to clarify again where the customer service training could be found. We then found out it wasn't offered anymore and did not come up with a replacement.
  ○ 11/4/22 - Customer Service suggested readings by Tyrone due. Not complete. Did not discuss.
  ○ 11/30/22 Email sent to Tyrone: Tyrone-Since the Listening Sessions are currently in progress I'd like to suggest you develop the plan now while it is fresh in your mind. If

    you could share that with us by end of day Friday, 12/2/22, I would appreciate it. As of
    12/1 only a template for the plan had been developed with no details about the 5
    sessions.
    ○ 12/12/22 Tyrone agreed to finalize the International Project Plan and Locker Project
      Plan by Friday, 12/16, but he's trying to balance catching up with his email, participating
      in meetings and doing this work. These two plans were originally due on 11/7/22 and
      11/14/22 respectively, and extended to 12/6/22. It appears it was finalized on 12/19/22.
    ○ 12/20/22 PIP feedback was due from Tyrone and he emailed it to me on 12/22/22."

- **Dependability**: You are expected to demonstrate dependability to your team and to our
  clientbase. Below is an example in which you failed to meet expectations:
    ○ A student submitted a reimbursement request for her locker items in mid-September. I
      approved that reimbursement on 9/22/2022 with instructions to you to submit the
      required forms; as of 12/12/2022, they were not yet submitted.

On previous occasions, we have discussed the concerns regarding your failure to meet acceptable job
performance standards. For example, this has been addressed in your 5/31/2022 and 10/13/2022
Performance Check-in Conversations and in your 10/13/2022 PIP in which I wrote that you are "not
demonstrating competency in your communication skills, or in your dependability to get your work
accomplished." However, you continue to not meet these expectations.

   2. **Performance Deficiency: Failure to Meet Acceptable Performance Standards - Customer
      Service**
Employees are expected to adopt a customer service mindset given that all of our transactional
conversations are customer service based. During this period, two examples in which you did not meet
expectations in this area are:
- Failing to reimburse a student for her locker items that were thrown away in September 2022
- Failing to take the lead with Consortium students as a conference planning partner given you
  are their primary Program Office contact for this student group
- Failure to demonstrate collaboration. When I asked you to assess your accomplishments
  toward this improvement plan, you expressed that the articles related to Customer Service I
  asked you to read were irrelevant. This was disappointing, not only because you ignored
  deadlines, but also because it showed a failure to engage collaboratively on a professional
  development opportunity and to meet clearly communicated performance expectations. Here
  examples of readings that you were to complete, identify on your own for your
  development and we were to discuss in our 1:1s.
    ○ "10/20/22 - Collaboration required reading was due. Unclear if complete. Did not
      discuss.
    ○ 10/25/22 - Collaboration suggested readings identified by Tyrone due. Not complete.
      Did not discuss.
    ○ 10/31/22 - Collaboration suggested readings to be read and ready to discuss. Not
      complete. Did not discuss.
    ○ 11/4/22 - Customer Service online training module due. 11/9 you asked to clarify again
      where the customer service training could be found. We then found out it wasn't
      offered anymore and did not come up with a replacement.

     ○  11/4/22 - Customer Service suggested readings by Tyrone due. Not complete. Did not discuss."

Expectations within the customer service area have been previously communicated to you, including but not limited to, in your 10/13/2022 PIP in which I asked you to provide 6-9 examples of times you provided customer service for discussion in our weekly meetings. I also asked you to find 3 articles on building trust and share your insights also in our weekly meetings. However, you continue to not meet these expectations.

**Impact**

Since 2018, FTMBA student satisfaction has been trending down and our Program Office has lost the trust of our students. To address this, improving the FTMBA student experience is one of four strategic priorities for the Haas School for the next 3-5 years. The school just completed a 5 month, cross-functional task force examining the FTMBA student experience and came up with nine workstreams of work that our entire team will contribute to in multiple ways over the next few years. To repair that vital relationship, the Program Office team goals are focused on rebuilding student trust, rebuilding the student community and rebuilding the student experience.

As a student services group, we are providing customer service to students, faculty and staff on a daily basis. Because trust has eroded with students these last few years, our goals are specifically targeted to improve their experience. To demonstrate this, we need to have a sense of urgency, follow through on our commitments, provide timely response and make the student or faculty feel heard (even when we can't give them what they want) towards their educational and leadership goals.

Your performance has had a direct impact on the department and the students. Your failure to perform has caused a breakdown of trust within the team because they have had to take on your work and, at times, conduct service recovery with students. I am concerned about assigning you projects for fear that they will not be completed on time and accurately. The team is actively trying to build back credibility with students and every instance with a student that doesn't go well reflects poorly on the entire team.

Thus, the areas of concern outlined directly correlate to our goals of rebuilding the student experience. It is essential that every member of our team work toward these goals; your immediate and sustained improvement as outlined is required for that effort.

**Additional Considerations - Prior History of Performance Deficiencies and Misconduct**

The following Achieve Conversations and Letter of Concern set the expectations regarding your performance and set expectations (attached):

- Performance Improvement Plan October 2022-December 2022
- Achieve Conversation December-March 2022
- Achieve Conversation April-September 2022
- Letter of Concern October 2022

**Expectations**

Below are the expectations/action steps needed to improve your performance in the area(s) listed above:

1. Create and share work plans
   a. Specifically, you will create work plans for each of your projects, include those in the shared Google Drive, and provide detailed progress updates during our 1:1s
2. Learn the details of our event management process
   a. Specifically, you will learn the details of our event management process, and new Registered Student Organization(RSO) requirements and complete RSO training. You will include that learning in your advising conversations with conference and student leaders.
3. Complete your work by the due date
4. Meet our SLAs
5. Proactively step up for projects, drive them to completion, and take initiative in all areas of your role
6. Collaborate more effectively with our business partners by proactively sharing what you are working on, asking for their feedback on your projects and brainstorming processes where there is room for innovation

**Support**
The department very much wants you to succeed in this role. To this end, we commit to setting clear expectations, to meeting with you weekly, to being open to discussing changes in deadlines as reasonable, and to supporting your professional growth with any activities that will improve the areas outlined here and in your PIP.

**Opportunity to Respond**
In accordance with the provisions of PPSM-62: Corrective action, you may have an opportunity to respond to this Letter of Warning.

It is your responsibility to ensure that you correct the concern(s) listed above. Failure to meet these expectations may result in further disciplinary action, up to and including termination. If you have any questions about this communication and the expectations going forward, immediately reach out to me.

Sincerely,

Jennifer Bridge
Executive Director

CC:    Department Personnel File
       Jamie Breen
       Therese Madden
       Rose Rouille

Attachments:
       Proof of Service
       October-December 2022 Performance Improvement Plan

Letter of Concern October 2022
Achieve Conversation December-March 2022
Achieve Conversation April-September 2022

**Exhibit "R"**
(Email dated January 20, 2023)



Tyrone Wise II MEd <tyronewise@berkeley.edu>

---

## Letter of Warning | Performance Improvement Plan 2023

---

**Tyrone Wise II MEd** <tyronewise@berkeley.edu>                                    Fri, Jan 20, 2023 at 9:49 AM
To: jennb@haas.berkeley.edu
Cc: Therese Madden <theresemadden@berkeley.edu>, Rose Rouille <roser@berkeley.edu>, Jamie Breen <jamiebreen@berkeley.edu>,
Jennifer Bridge <jennb@haas.berkeley.edu>
Bcc: Sumayyah Alsabri MEd <alsabri@berkeley.edu>

Jenn,

I hope all is well. I would like to follow up on our meeting yesterday. Looking over the letter of warning that you presented to me, I had
more time to look review it and similar to all other writings and achieve together "conversations" it is filled with misinformation and lacks
conversation and or follow-up. It continues to be exhausting to have to rebut articles in writing that will only go in my file and with no
resolution. However, you masterfully continue to paint a negative narrative in a one sided process.

For context I will only bring to light the section that references my lack of or inability to cover Slack during my days which are Tuesdays and
Wednesdays weekly. Per our team agreements regarding Slack coverage (enclosed), we have 0-24 hours to respond to a student inquiry on
the platform. In regards to the October 26th date, I have enclosed an email that was sent earlier that morning stating that my father-in-law
had a heart attack and that I would need to work remotely to support my family. I wanted to take the day off but I wanted to be a team
player and support our depleted Student Life and Leadership Development team and support the interview panel I was on for the CMG
team to not have an inconsistency as I was on previous candidates panel. Later that same week I myself had to go to the ER for work
induced trauma (email enclosed).  For the date of November 16th, I have enclosed a screenshot of my calendar to show my back to back
meetings from 9am - 4:15pm. I am not sure how I was supposed to answer anything on Slack at that time. There is a gap showing in
between my appointment with Laura Benoit from CMG and our Team meeting, however that meeting ran over so the calendar is not
accurately reflecting my availability. Lastly, I have enclosed screen shots of the time frames of November 22 - Dec 21 to show that there
were no student inquiries on my day's, and that our team covered multiple days of other members but as usual I am sure grace and
understanding is given to them (Dec 5th, which is a Monday for example). We have a team of 2 staff that are to cover the Full-Time MBA
Program. Moreover the first time that this issue was brought to my attention at any point was yesterday in our meeting which again
continues to lack communication/conversation with leadership if this was an issue, which has been the Status Quo.

I am not sure how it is my responsibility if others on my team have time to look into Slack and respond to a student's inquiry. Isn't that
what we are supposed to do? I know for a fact I have responded to students on days that I was not covering because I had time, that is what
a team is so I thought. Especially a team that is working as a skeleton crew as we have for 3 of the 4 years that I have been in the Full Time
MBA Team at Haas. Which is also why students have expressed frustration. We have not had a full team to fully support the 600+ amazing
students! As I have mentioned time and time again, this is further proof of the targeting and gaslighting that continues to go unaddressed. I
am sure the rebuttal that I write for the three Achieve Together "Conversations" that I have received in the last month (2 that had to be
rewritten due to inaccuracies, and the one received yesterday) will just go in my file and the narrative that is painted with will be confirmed
by your write ups. As mentioned previously you have been trying to write me up since December 2021 for "Problem Solving" that lacked
any proof. If you look long enough you will find something or just make it up, or better yet, mischaracterize it. This continues to be
exhausting having to react to situations in this form, but I will not be silenced. Thank you for your time.

My Slack Coverage Dates for context from Nov 22 - Dec 21

- Nov - 22 & 23, 29 & 30,
- Dec 6 & 7, 13 & 14, 20 & 21

Respectfully,

Tyrone Wise
Associate Director of Student Life & Leadership Development
Haas School of Business
University of California Berkeley
tyronewise@berkeley.edu



*"Success is to be measured not so much by the position that one has reached in life, but by the obstacles which they have overcome while trying to
succeed"*

*~ Booker T. Washington*



Berkeley**Haas**

**Question the Status Quo**
**Confidence Without Attitude**
**Students Always**
**Beyond Yourself**

**DEFINING LEADERSHIP PRINCIPLES**

We recognize that Berkeley sits on the territory of Huichin, the ancestral and unceded land of the Chochenyo Ohlone, the successors of the historic and sovereign Verona Band of Alameda County. This land was and continues to be of great importance to the Ohlone people. We recognize that every member of the Berkeley community has, and continues to benefit from the use and occupation of this land, since the institution's founding in 1868. Consistent with our values of community and diversity, we have a responsibility to acknowledge and make visible the university's relationship to Native peoples. By offering this Land Acknowledgement, we affirm Indigenous sovereignty and will work to hold University of California Berkeley more accountable to the needs of American Indian and Indigenous peoples.

[Quoted text hidden]

**10 attachments**



**Dec 7-13.JPG**
109K

**Nov 23-29.JPG**
129K

**DEc 1.JPG**
77K

**Dec 5-7.JPG**
129K

**Nov 22-23.JPG**
178K

**Nov 21-22.JPG**
104K

**Slack Hours.JPG**
86K

**Nov 16 Slack.JPG**
69K

**UC Berkeley Mail - Family Emergency (Remote Work) 10.26.pdf**
109K

UC Berkeley Mail - Headed to ER.pdf
109K

# ask-ftmbalife ∨

**510-642-0434**                                   December 7th, 2022 ∨

> 1 reply   1 month ago

**Sumayyah (she/her)**  12:07 PM
📢 Request: Report Emergency Evacuation Assistance 📢

Greetings Haas Community-

In case of an emergency it is important that we plan for the safety and evacuation of all members of the Haas community. If you might require assistance exiting the building in the case of an emergency, we invite you to proactively know your needs. All shared information will be kept confidential. Please respond to me directly if you would like further information regarding assistance.

Thank you for your consideration and here's to never actually having to put our safety procedures in place.

Best-

Nate Laskin
Haas School of Business II Facilities Director
(c) 510-672-0848
(e) natelaskin@berkeley.edu

**Jenn Bridge**  9:27 PM
📢 FTMBA OUT FOR END OF SEMESTER CELEBRATION 🍾

FYI the Program Office will be closed on Thursday, December 8th
From 12noon on so the team can rest and revel in the end of the Fall term. All posts here and in the academics Slack channels will get responded to on Friday. Thanks for your patience! (edited)

December 13th, 2022 ∨

**Hannah Schlacter**  8:52 AM
Is there a mailbox on the Haas campus anywhere?

> 4 replies   Last reply 1 month ago





# ask-ftmbalife ⌄

🔖 9 Pinned    ＋ Add a bookmark

**Sumayyah (she/her)**   9:00 AM                                    November 23rd, 2022 ⌄

🔥 FTMBA Program Office Hours Over Thanksgiving Break

To give the team some well-deserved time with family and friends, the Program Office is working remotely and is reachable until mid-day today, Wednesday, November 23. We will then close to celebrate the Thanksgiving holiday and will not respond to any after-hours Slack posts or emails when we return on Monday, November 28.

If you have an urgent matter, please email Executive Director Jenn Bridge at jennb@haas.berkeley.edu with "Urgent" in the subject line and she will get back to you shortly.

🎒 4    🎉 2    ☺️

November 27th, 2022 ⌄

**Math Williams**   9:12 AM

Hi team, the Haas buildings seem to be closed today - is it going to stay that way? The impression I had was that it would reopen for the weekend

2 replies   Last reply 2 months ago

November 29th, 2022 ⌄

**Sumayyah (she/her)**   9:43 AM

SOCCER FANS!

Join the Haas community in viewing the USA vs. Iran World Cup match today in the BofA Forum. The match starts at 11AM. See you there!

**Jenn Bridge**   10:10 AM

🔥FINANCIAL AID UPDATE \ REPOSTING EMAIL FROM AMBER HARROLD/FINAID DEPARTMENTAL 🔥

All students who wish to apply for residency for the purposes of tuition should submit the Statement of Legal Residence (SLR) **by Thursday, December 1**.

**Residency Requirements: Graduate Students**
-Eligible Immigration Statuses
-Physical presence
-Intent to remain in California

⬇ Latest messages

# ask-ftmbalife ⌄

December 1st, 2022 ⌄

**Sumayyah (she/her)**  11:25 AM  👍 💯 😄

The Program Office invites you to stop by! We have bagels, cookies, vegan donuts and muffins, coffee, and juice!

IMG_2498 ⌄



❤️ 10    😀➕

**Fredie**  2:31 PM

Hello there!

If you have not checked out the POW (Newsletter), you can check it out here!

Make sure to go over list as there are event coming of this month that you do not want to miss!

🐻 1    😀➕

⬇ Latest messages



# ask-ftmbalife ⌄

December 5th, 2022 ⌄

**Sam Jazzo**   10:17 AM
For the dualies that are graduating this semester, where can we find the offboarding list of things we need to do?

❤️ 2   😀

💬 1 reply   2 months ago

**Neva Bowers (she/her)**   3:22 PM
This is belated and random, but just wanted to say thanks for getting a printer in the MBA lounge! It's so convenient 🙂 🖨️

🙏🙏🙏🙏🙏 55   👍 9   ❤️ 6   🍁 1   😀

💬 1 reply   1 month ago

December 7th, 2022 ⌄

**Sumayyah (she/her)**   10:10 AM
📣 Wifi Issues with Apple Devices 📣

Dear Haas Community,

Campus IT is reporting an escalating number of Wifi connectivity issues for Apple client devices for both eduroam and CalVisitor Wifi. The issues include the inability of the devices to connect or sustain connectivity with the ser[...], getting kicked off of them frequently. It appears to mostly be affecting newer model devices which may have recently received updates.

These issues have also been reported across peer institutions and Campus IT is working and consulting with Apple for resolution. In the meantime, they are encouraging users who are experiencing the issues to submit tickets to [...], itcshelp@berkeley.edu or report them by phone to 510-664-9000 (option 1). If possible, please include device details in your tickets, like the make/model, operating system version, processor, and MAC address of your Wifi card [...], these details in Settings > General > About).

Details and updates on this issue may be viewed on systemstatus.berkeley.edu.

Haas Technical Services Helpdesk
--------------------
510-642-0434

↓ Latest messages



# ask-ftmbalife ∨

+1 12    7 replies   Last reply 2 months ago

November 22nd, 2022 ∨

**Jenn Bridge**  3:46 PM
🧳 Domestic & International Travel SHIP info and Trek Tracker 🧳

As Thanksgiving and winter break approach, we know some of you may be traveling. Here is some helpful information about the Student Health Insurance Plan (SHIP). If you are planning a student trek, please fill out the Trek Roster below, and while we hope nothing happens, if an emergency arises please contact us immediately.

SHIP

- If you have not yet received your SHIP insurance card, be sure to download it now. Scroll down this SHIP FAQs page to the section called "How do I obtain an insurance card"?
- To learn how to access SHIP in other parts of the U.S. or outside the U.S., review this page and scroll down to the section called "If I am outside of the Bay Area, how do I obtain medical care?" For more information on using SHIP, please see this guide.
- For information on billing for services outside the area, please review this How to Use SHIP page and scroll down to the section called "Billing for services outside UHS."

If you have questions or need assistance, please contact SHIP at ship@berkeley.edu.

Student Treks

If you are looking to take part in a student lead trek, or are the leader of a trek, please fill out our TREK Tracker Form so we are aware of your location and plans. This information is only used for our reference should an emergency

Travel Emergencies

Finally, if you travel outside the area and are facing any one of the following situations, natural or man-made disaster, political turmoil, serious illness or accident, please contact **FTMBA Program Office Executive Director, Jenn Br** jennb@haas.berkeley.edu**, and use the word "Urgent" in the subject line**. She can then contact the University Risk Management Office and assist you in accessing University resources if needed.

Lastly, if you wish to arrange for a COVID test through the University upon your return, please use the eTang Portal to make an appointment.

November 23rd, 2022 ∨

🔖 Added to your saved items

**Sumayyah (she/her)**  9:00 AM
🧳 FTMBA Program Office Hours Over Thanksgiving Break

To give the team some well-deserved time with family and friends, the Program Office is working remotely [ ↓ Latest messages ] mid-day today, Wednesday, November 23. We will then close to celebrate the Thanksgiving holiday. respond to any after-hours Slack posts or emails when we return on Monday, November 28.

# ask-ftmbalife ⌄

November 21st, 2022 ⌄

❤️ 10   💜 6   💛 6   💚 5   💜 5   💜 6   😀

**Ximena Vega Hermosillo**   12:29 PM
Hello!
Who can we talk to to broadcast the soccer worldcup match in the MBA Lounge?

🎉 34   🎉 18   🎉 31   🎉 12   🎉 6   🎉 2   🎉 2   🎉 3   🎉 1   🎉 1   😀

6 replies   Last reply 2 months ago

**Tyrone**   3:32 PM
 FTMBA Listening Session 
We want to hear from you! We are inviting the Muslim community to join us for a listening session.  Join us **Dec 1**, **12:30pm - 1:30pm in S489**. Please RSVP for our team to have enough Cafe Think Gift Cards.

🙌 4   😀

November 22nd, 2022 ⌄

**Jenn Bridge**   1:47 PM
 Holiday Building Hours 
**Thursday, 11/24 – Thanksgiving Holiday:**
No scheduled classes or activities. All Haas areas will be closed to the public.  Buildings will be accessible by card key to staff, faculty and PhDs only.
**Friday, 11/25 - Administrative Holiday:**
No scheduled classes or activities. All Haas areas will be closed to the public.  Buildings will be accessible by card key to staff, faculty and PhDs only.
**Saturday, 11/26:**
Resume regular scheduled building hours.

**Stephen Caskey**   2:51 PM
Totally random and inconsequential question for the MBA team:
Chou Hall audibly 'rumbles' periodically throughout classes. Any idea why? Specifically the x70 classrooms.

- Stay present/Don't multitask
- Create a culture of gratitude/recognizing accomplishments
- Listen carefully and never interrupt
- Do your best to be informed about meeting agendas so we can have good discussions
- Collaborate v Cooperate aka share info

| In Office Days | | | | | |
|---|---|---|---|---|---|
| | Monday | Tuesday | Wednesday | Thursday | Friday |
| Tyrone | | Slack/FTMBALife Coverage | Slack/FTMBALife Coverage | | |
| Sumayyah | Slack/FTMBALife Coverage | | | Slack/FTMBALife Coverage | |
| Fredie | | | | | |
| Jenn | | | | | Slack/FTMBALife Coverage |

**Slack and Email SLA**

- Email: 24-48 hours in email to acknowledge a request, provide an answer or work on a solution
- Slack: 0-24 hours to acknowledge and provide a response





Tyrone Wise II MEd <tyronewise@berkeley.edu>

## Family Emergency (Remote Work)

**Jennifer Bridge** <jennb@haas.berkeley.edu>        Wed, Oct 26, 2022 at 7:18 AM
Reply-To: jennb@haas.berkeley.edu
To: Tyrone Wise II MEd <tyronewise@berkeley.edu>

I hope he is okay. Hang in there.

Jenn

On Wed, Oct 26, 2022 at 7:11 AM Tyrone Wise II MEd <tyronewise@berkeley.edu> wrote:

Jenn,

Last night Tia's dad had a heart attack and they had to put a stint in his heart. He is in recovery, Tia and family are a lil shaken up understandably. I will be working from home in anticipation of being able to visit as soon as he is cleared and support Tia. Thank you for understanding.

Tyrone

--

Associate Director of Student Experience
Haas School of Business
University of California Berkeley
tyronewise@berkeley.edu
Phone: (510) 642-0856

"Strive not to be be a success, but rather be of great value"
        ~Albert Einstein

Sent from my iPhone, please excuse any typos...

--

**Jenn Bridge**

Executive Director (Acting) | Full-Time MBA Program Office

Haas School of Business
University of California, Berkeley
cell: (510) 520-7658
(she/her/hers)
**https://www.name-coach.com/jenn-bridge**





**Tyrone Wise II MEd <tyronewise@berkeley.edu>**

___

# Headed to ER

**Jennifer Bridge** <jennb@haas.berkeley.edu>                                        Thu, Oct 27, 2022 at 9:15 AM
Reply-To: jennb@haas.berkeley.edu
To: Tyrone Wise II MEd <tyronewise@berkeley.edu>

Oh no. I hope everything is ok. Keep me posted.

Let me know if there is anything on your plate I need to take care of.

**Jenn Bridge**

Executive Director (Acting) | Full-Time MBA Program Office

Haas School of Business
University of California, Berkeley
cell: (510) 520-7658
(she/her/hers)
**https://www.name-coach.com/jenn-bridge**

**Berkeley**Haas

On Thu, Oct 27, 2022 at 8:52 AM Tyrone Wise II MEd <tyronewise@berkeley.edu> wrote:
Jenn,

I am currently headed to the ER. I hope all is well. I will update you as soon as I can.

Tyrone


--

Associate Director of Student Experience
Haas School of Business
University of California Berkeley
tyronewise@berkeley.edu
Phone: (510) 642-0856

"Strive not to be be a success, but rather be of great value"
                                        ~Albert Einstein

Sent from my iPhone, please excuse any typos...

**Exhibit "S"**
(PIP dated January 24, 2023)

**Performance Improvement Plan (PIP) Guidelines**

**Please review prior to preparing PIP:**

- Consult with your Regional HR Partner prior to issuing a Performance Improvement Plan (PIP). Use this step-by-step process map for considering the full range of activities for PIPs with your HR Partner.
- A PIP can be an effective tool to monitor and measure performance behaviors, processes and work products that need improvement outside of Achieve Together check-in conversations.
- Inform the employee that the PIP is being issued to assist them in raising their performance levels to meet acceptable standards, expectations and accountabilities.
- Define the problem and the improvement that is required to meet performance standards.
- Identify the changes that must be met and by when (define due dates whenever possible) and how the outcome will be measured.
- Establish action plan, goals, resources (i.e. training to achieve desired outcome, if available) and timetables for meeting the standards.
- Maintain communication and evaluate whether the standards have been met.
- Involve the employee in resolution of the performance gaps. Coach the employee to commit to improvement. Make tangible and intangible resources available.
- The clearer the expectations, the easier it will be for you to manage/monitor the situation.
- PIPs are not "written warnings" and therefore are not disciplinary actions.
- The PIP is a living document that is updated on a regular basis by both the employee and the supervisor.
- It is recommended that you meet with the employee in a one-on-one meeting weekly to monitor progress and to maintain communication between the manager/supervisor and the employee.
- Written confirmation of a counseling session is not grievable.

**Achieve Together Note**:

- As part of the Achieve Together program, those who have an overall performance level of "needs attention," will begin a PIP (though the manager/supervisor will follow the same steps of consultation with their HR Partner).
- While those with an overall "needs attention" performance level as identified after the close of the merit cycle (April 1-March 31) through performance calibration activities at the unit level, PIPs can commence at any time during the merit cycle when performance gaps are not resolved following verbal counseling and expectation setting.

**Tips:**

- Give ongoing feedback to the employee and respond in writing whether or not there has been improvement on the subject of the counseling session.
- If an employee shares with you any personal difficulties they are experiencing, refer the employee to the Employee Assistance Program. (The EAP language is typically good to include).

**Exhibit "T"**
(PIP dated February 8, 2023)

| | | | responsibilities. Project plan also not updated, but as this was the first meeting of the task force, there may not be a lot to update. Expect the project plan to get more fleshed out as the task force engages in the work<br><br>Project 4 - International student programming delayed due to miscommunication among various parties. TW to meet with VP DEI to discuss her feedback and also clarify her role and expectations<br><br>Project 3 - progress made on contacting club leaders - 4 clubs total, 3 new. Discussed suggestions for improving outreach to club leaders and making it easier for them to schedule time to meet | | |
| 4 (~30d) | 3/22 | Tyrone Wise<br>Jamie Breen<br>Therese Madden | Project 4 - International student programming will not take place this term. Miscommunication issues delayed the execution, which means that we've missed the window for this term. Student leaders told TW that holding a session after spring break would not be effective<br><br>Project 1 - Task force team formed, have met, actions | x Needs Attention<br>☐ Well Done<br>☐ Stand Out | |

**Exhibit "U"**
(Email dated February 15, 2023)



**Tyrone Wise II MEd <tyronewise@berkeley.edu>**

---

## In support of Tyrone

Kristian Dawson <kristian.dawson@berkeley.edu>           Wed, Feb 15, 2023 at 8:00 AM
Cc: Tyrone Wise II MEd <tyronewise@berkeley.edu>

Good Morning!

As many of you are aware, our esteemed colleague Tyrone Wise is navigating a workplace environment that has mischaracterized and maligned his work and contributions to campus, and many of us have circulated an incredible and thorough letter from the Haas Anti-Racism Leadership Team with the request for others to read and consider Signing to Stand in Support as appropriate. I ask the same (and appreciate those who have already done so!) and want to include a few more details on Tyrone's contribution to the Black Staff & Faculty Organization as his colleague and counterpart in leadership.

I have had the pleasure of knowing Tyrone since 2019 when he joined the Black Staff & Faculty Organization's executive board as Vice Chair and I had recently rejoined the board as Communications Chair. Tyrone came to the position full of ideas, collaborations, and a spirit of teamwork ("Teamwork makes the dream work" is a popular and true saying of his) and his attitude energized the leadership team towards collaborations on campus and in the greater Bay-Area community in new and exciting ways. Cut to the pandemic, and Tyrone's leadership, collaboration, partnership-building, and care for the leadership team went into hyper-drive, as Tyrone was responsible for the MAJORITY of the programming from 2020-2022 (see an example attached). Tyrone never wavered in his solidarity to enhance the lives of Black staff and faculty at Berkeley with any resource he could find, all while navigating significant personal losses from covid and dealing with the ever-present threat of being Black in America (and Black at Berkeley). Now as our Past Chair, Tyrone continues to serve as a leader for our community and often brings people together with his positive energy, attitude of gratitude, and pursuit of the greater good. Tyrone has been recognized for "Building community one person at a time" (Berkeley News), "Building Community Through Conversation" (Center for Understanding in Conflict), and is featured in key research through the Black Lives at Cal initiative; Tyrone has left a clear and indelible impact on the Berkeley community, and I am a better leader because of Tyrone.

I enthusiastically and confidently endorse Tyrone Wise as a stellar community builder and energetic collaborator on Berkeley's campus. I thank you in advance for your support, curiosity, and solidarity of Tyrone in thought and action. Please review more details in the links and attachments, and I look forward to celebrating our collective efforts regarding Tyrone soon!

With gratitude,
Kristian
--
**Kristian Dawson**

Assistant Director, Outreach and Culture
Office of Undergraduate Advising: Landscape Arch & Urban Studies
College of Environmental Design
Schedule CED Undergraduate Virtual Advising Appointments Here

Chair, Black Staff & Faculty Organization
UC Berkeley

                                           **pronouns** | she-her
                                  pronounced "kris-chehn dAW-s-n"

---

**2 attachments**

📄 **In Support of Tyrone Wise.pdf**
46K

📄 **2022 BSFO - List of Accomplishments.pdf**
68K

To: Haas Leadership

It is important you know that we are on the brink of losing an individual who has contributed significant value to Haas and to the UC Berkeley campus and who is now being marginalized.

We bring this grievance forward because losing Tyrone Wise is not something any of us will take lightly.

We see that the person being marginalized is a Black man and an activist–at an institution that claims Diversity, Equity, Inclusion, Belonging, and Justice as a driving force for decision-making and action. We see that, in a case ostensibly surrounding performance, full trust is placed on the word of management over the word of the affected employee, without the benefit of differing perspectives to mitigate bias.

Losing Tyrone would mean losing someone who stands out in our community as a leader among leaders. Tyrone is not afraid to speak up for what is right and just, regardless of the personal consequences he may face as the agent for change.  He takes care of people- students, staff, colleagues, and the community by listening and sharing his wisdom, kindness, and expertise.

Not only are Tyrone's educational and career expertise extremely valuable to Haas and our community, but his way of sharing his lived experience bridges different perspectives. Tyrone was one of the founding facilitators for the Anti Racist Challenge (ARC) at Haas, and his continued commitment to the program has brought Haas staff together to engage, learn and discuss topics of DEIBJ. This initiative has been highlighted by senior leadership as the most notable commitment by Haas toward becoming an anti-racist institution. His work expands beyond the halls of Haas for lasting impact campus-wide, as he co-founded the Dismantling Racism group, chairs the Black Staff & Faculty Organization, and helped launch an Anti-Racism Challenge for the Berkeley Advancement Community.

Tyrone has been recognized by students as someone who cares deeply about student life and supporting students. Tyrone is not only well-regarded by colleagues, but well-liked and has strong working relationships with his cross-functional partners.

**We ask that:**

- Haas Leadership, specifically Courtney Chandler and Ann Harrison, evaluate the treatment of Tyrone against Haas and Berkeley's stated commitment to "an inclusive environment where everyone is treated fairly and has equal access to opportunities."
- Haas Leadership review the management actions and behaviors that resulted in this current situation and question the damaging narrative created by management about Tyrone's performance, including evaluating if other employees received similar treatment when there were performance related concerns.
- Haas Leadership examine the performance management system and how it disenfranchises staff of color, particularly Black staff members so that other staff members are not harmed in the future.

- Haas managers are held accountable for performance management actions and documentation that provide full context, are grounded in facts, and have been thoroughly checked for bias, prior to final sign-off on disputed performance reviews.
- Haas Leadership bring in an outside entity to manage the performance review process when a review is in dispute.
- Haas Leadership use this call to action as an opportunity to seek out meaningful anti-racism learning and to examine existing power structures that perpetuate bias at Haas and campus-wide.

It is clear to us that Haas is not living up to its stated values (appearing in every job posting) of: "creating a community that fosters equity of experience and opportunity and ensures that students, faculty, and staff of all backgrounds feel safe, welcome, and included. Our culture of openness, freedom, and belonging make it a special place for students, faculty, and staff."

In sending this letter, we honor UC Berkeley's commitment to becoming an anti-racist institution, one that values truth-telling that acknowledges entrenched barriers encoded in campus policies, rules, and expectations.

Haas has significant work to do to ensure that all voices are being heard and considered, especially when one of our Haas employees feels that they have been wrongly treated and managed because of racial biases. Tyrone's situation is not an isolated one, and we have an obligation to ensure that we are addressing these issues and having the difficult conversations.

We understand that dismantling systemic racism is a process, and it takes all of us. We have to be brave to ask the tough questions and challenge the status quo because we care deeply about Haas and take pride in being part of this institution. We hope this is an opportunity to learn and take actions that align with our values to move Haas towards the anti-racist institution it aspires to be.

In community,

Haas Anti-Racism Leadership Team

Sign Here to Stand in Support

**Exhibit "V"**
(Email Trail)



**Tyrone Wise II MEd <tyronewise@berkeley.edu>**

---

## Check-In

**Tyrone Wise II MEd** <tyronewise@berkeley.edu>                    Mon, Mar 13, 2023 at 2:46 PM
To: Therese Madden <theresemadden@berkeley.edu>
Cc: "Mr. Marco T Lindsey" <marco@haas.berkeley.edu>

I am happy to, again. I mentioned these points last week and was disregarded. That was why I wanted to reiterate these points again to you.

Tyrone
Associate Director of Student Life & Leadership Development
Haas School of Business
University of California Berkeley
tyronewise@berkeley.edu



*"Success is to be measured not so much by the position that one has reached in life, but by the obstacles which they have overcome while trying to succeed"*

*~ Booker T. Washington*



BerkeleyHaas

Question the Status Quo
Confidence Without Attitude
Students Always
Beyond Yourself

DEFINING LEADERSHIP PRINCIPLES



We recognize that Berkeley sits on the territory of Huichin, the ancestral and unceded land of the Chochenyo Ohlone, the successors of the historic and sovereign Verona Band of Alameda County. This land was and continues to be of great importance to the Ohlone people. We recognize that every member of the Berkeley community has, and continues to benefit from the use and occupation of this land, since the institution's founding in 1868. Consistent with our values of community and diversity, we have a responsibility to acknowledge and make visible the university's relationship to Native peoples. By offering this Land Acknowledgement, we affirm Indigenous sovereignty and will work to hold University of California Berkeley more accountable to the needs of American Indian and Indigenous peoples.

On Mon, Mar 13, 2023 at 2:40 PM Therese Madden <theresemadden@berkeley.edu> wrote:

Tyrone:

I know it is short notice, but are you willing to discuss these details with Jamie in our meeting at three? It is important that the two of you have dialogue about reasonable expectations - yours and hers. Your concerns are important to address...

More soon...

Therese

On Mon, Mar 13, 2023 at 2:12 PM Tyrone Wise II MEd <tyronewise@berkeley.edu> wrote:

Hello Therese,

I hope all is well. I wanted to check in regarding the current PIP process that I am required to complete. I feel this process is unfair and I am being held to a schedule that is unmanageable and built as a result of inaccurate information and defamation of my character and performance. This whole process has lacked accountability of leadership to 1.) understand the scope of work that is being required, and 2.) take account the depleted team staffing that limits bandwidth and availability.

From the start of this PIP the timeframes do not recognize the context and how manageable this work is. Even when I brought up the limited time schedule (in my first PIP meeting with Jamie), I am disregarded and my work is compared to other departments who do not

share the same mission and programming which minimizes my expertise. As mentioned previously, the leadership that made these arbitrary time schedules have never done this work (Jenn) and or have only worked in this department less than a year in a role (Sumayyah), to understand the full scope of the project.

From the start of the PIP (Feb 8th) we all met in Jenn's office to go over the expectations that were provided, and changes that needed to be amended that were false and or mischaracterized (and some still have not been changed). From that day I was given until Feb 15th to meet with VP International to discuss programming. I was given 7 days to complete this task, but in reality it was only 5 business days to which meetings were already scheduled and did not take into account student availability. Two days later, the PIP required me to form a committee (Task Force) and update the project plan that was created to include changes from a initial conversation on Feb 15th. An expectation that does not take into account the time to build relationships and trust (which is vital to team collaboration) along with ideation of an International Orientation programming that is being reimagined. I mentioned in my first PIP conversation with Jamie that in my ideation and programming conversation with Anupama (VP International) we were trying to figure out who needed to be in the room being that Anupama brought some programming from other B Schools that we were trying to benchmark and awaiting some insight from her friends.

On Feb 17th, I then was tasked with "holding" the first Task Force meeting on Feb 23rd, six days later. Which again, is a very tight window that is unrealistic especially when you factor, Feb 20th was a holiday, giving only three actual business days to complete this task (excluding weekends, Feb 18 & 19), and again there are standing meetings and existing work that I am required to complete as I am the only staffer on the Full Time MBA Team supporting 50+ clubs and student issues. Please keep in mind the fact that from the initial meeting on Feb 8th to Feb 27th the first PIP meeting, there were only 12 working days (including the 27th, and excluding weekends). I was out 2 of those days for mental health reasons due to the state of my work environment, overburden and helplessness I often feel, which totals 10 business days. While also being required to create and deliver an International Student Program three days later by March 3rd. A challenge that is presented in this expectation is, in order to provide a meaningful programming it takes thought and thorough planning to create through partnership with the VP International, a student who had to reschedule multiple meetings due to studying for finals and dealing with personal issues, which limits time. This is not including my responsibility of supporting the 15 clubs that I am required to meet during this time, the Student Organizational Handbook I am to be working on and complete, and the 30+ clubs I am required to provide support to, and answer questions. Being these are new club leaders who have assumed their roles in leadership (which has resulted from our inability to provide a new club leadership transition workshop that historically happens in February, due to staffing and transition challenges, among other issues). This is also not taking into consideration that I am also the only person who provides clubs support through the Corporate Sponsorship solicitations (finding and transferring funds from the UC Regents and Haas Finance Department), and the Case Competition funding support that our department provides which I also oversee (which have some major issues that I have not had the time to dedicate and rectify).

I have asked in my PIP meeting, how is this helping my performance? Honestly, all I have felt is stress and anxiety to meet these unmanageable expectations and deadlines. If anything it shows how our department is mismanaged and unaware of the scope of work that they are required for one person. These expectations have been required of one person for the 3 out of 4 years that I have been in this department. As mentioned to Courtney and Erika, I am at a point where I am resenting coming to work and having to be on a team that not only devalues my contribution but creates unrealistic expectations. All while creating a standard that I am held accountable to, without any recognition of the scope of work and actual time frames that are given to complete. I feel as if I am being set up to fail. How are these timelines not looked at and vetted before being assigned? Especially in a process that is meant to increase my performance. Thank you for your time and please let me know if you have any resolutions that come to mind. I look forward to hearing from you soon.

All the best,

Tyrone Wise
Associate Director of Student Life & Leadership Development
Haas School of Business
University of California Berkeley
tyronewise@berkeley.edu

 Hear my name

*"Success is to be measured not so much by the position that one has reached in life, but by the obstacles which they have overcome while trying to succeed"*

*~ Booker T. Washington*



Berkeley**Haas**

Question the Status Quo
Confidence Without Attitude
Students Always
Beyond Yourself

DEFINING LEADERSHIP PRINCIPLES

We recognize that Berkeley sits on the territory of Huichin, the ancestral and unceded land of the Chochenyo Ohlone, the successors of the historic and sovereign Verona Band of Alameda County. This land was and continues to be of great importance to the Ohlone people. We recognize that every member of the Berkeley community has, and continues to benefit from the use and occupation of this land, since the institution's founding in 1868. Consistent with our values of community and diversity, we have a responsibility to acknowledge and make visible the university's relationship to Native peoples. By offering this Land Acknowledgement, we affirm Indigenous sovereignty and will work to hold University of California Berkeley more accountable to the needs of American Indian and Indigenous peoples.



--
**Therese Madden**
**Assistant Dean of Human Resources and Administration**

**Berkeley Haas**

**Question the Status Quo**
**Confidence Without Attitude**
**Students Always**
**Beyond Yourself**

**DEFINING LEADERSHIP PRINCIPLES**

**Exhibit "W"**
(University Report)



# Staff Ombuds Office Biennial Report

## 2020 - 2022

Sara Thacker, Director & Ombudsperson
Julia Horvath, Associate Ombudsperson
Shatika Ricketts, Assistant Ombudsperson

# Content

- Message from the Director

- Ombuds Services

- Cost of Unaddressed Conflict

- Staff Ombuds Office Utilization

- Visitor Concerns & Demographics

- Top Visitor Concerns Explored

- Systemic Recommendations

- Progress on Prior Recommendations

Cover photo credit:
Neil Freese/UC Berkeley

# MESSAGE FROM THE DIRECTOR



Looking back at the past two years, it has been incredible to reflect on both the enormous societal and organizational changes Berkeley staff have endured throughout the pandemic.  To ensure the health and safety of the campus community, the University temporarily transitioned to a virtual workplace, established COVID protocols, set vaccine requirements, and provided special COVID leave for all Berkeley employees.  Staff continued to experience high levels of stress and anxiety as they worried about Covid transmission, especially high-risk populations and people of color who saw a disparate impact in their communities.

In addition, many employees faced unprecedented workload challenges as they supported this historic transition to a virtual environment, covered vacancies, and juggled parenting responsibilities for children whose schools or daycares had closed.  As Berkeley staff rose to meet these extraordinary challenges, it provided the opportunity for the University to reexamine the way we work.

The Staff Ombuds Office Biennial Report gives voice to employee concerns and provides recommendations for systemic change that promote Diversity, Equity, Inclusion, Belonging and Justice (DEIBJ) in the workplace.  Berkeley's commitment to social justice is one that employees look for in their own experience as well.  Our report highlights issues that greatly impact employees who may feel marginalized or uncomfortable speaking up themselves.  By analyzing the challenges these employees experience, we identify systemic solutions to enhance the lives of all Berkeley employees.

Sara Thacker
Director & Ombudsperson
Staff Ombuds Office
University of California, Berkeley

**STAFF OMBUDS OFFICE**

# Services

 Conflict Coaching

 Mediation

 Group Facilitation

 Resource Referrals

 Systemic Analysis



CONFIDENTIAL

INFORMAL

IMPARTIAL

INDEPENDENT



*Ombuds help empower individuals and organizations to overcome disputes, conflicts and barriers that stand in the way of reaching their full potential.*

| **International Ombuds Association**

4

**STAFF OMBUDS OFFICE**

# Cost Of Unaddressed Conflict

The Staff Ombuds Office asked employees who sought assistance how much time they spent handling their issue. Two hundred eight-five employees who responded said their workplace conflict or problem took significant time. This time, which is often unaccounted for, could include talking with a supervisor, HR, colleagues, friends, or family; researching options and information; or even worrying about the situation (n=285).

## Conflict takes up valuable time

**51%**
couple of hours a week


**14%**
one day a week


**12%**
couple of days a week


**24%**
more than half of the week


## Reach out early for support

**18%** less than month

**45%** less than a year

**34%** 1-5 years

**9%** over 5 years

1 in 5 employees reach out for assistance within a month, however many more wait several months or even years to contact the staff Ombuds Office for support (n=296).

Because 93% of visitors said they were better able to handle their issue following the meeting with an Ombudsperson, reaching out early is encouraged.

## Conflict affects many



In **69%** of the cases, other employees were affected by the conflict situation (n=334).



*31% visitor only*

*29% 1-3 employees*

*19% 4-6 other employees*

*9% 7-10 other employees*

*12% 10 or more employees*



Unaddressed conflict has significant costs for employees and the organization. When visitors reach out early, the resolution of their concern may be faster, more options may be available, and less people may be impacted.

# STAFF OMBUDS OFFICE
# Utilization



**470**
Visitors Served

**61%**
survey response rate

**100%**
were comfortable discussing their problem and were treated with respect

**98%**
would return to the Ombuds Office or refer others

**976**
Appointments

**97%**
received help to clearly identify and evaluate options

**9**
Mediations

**93%**
were better able to handle their issues

6

## STAFF OMBUDS OFFICE
# Visitor Concerns

Between July 1, 2020 - June 30, 2022, the Staff Ombuds Office collected data from 470 employees who used its services. For the first time, the Staff Ombuds Office aligned its data collection categories with the Chronicle of Higher Education's Great Colleges to Work For survey. This survey helps institutions identify areas of significance for employee morale and workplace equity.



| Category | Percentage |
|---|---|
| Diversity, Equity, Inclusion, Belonging | 69% |
| Management Effectiveness | 48% |
| Work-Life Balance | 34% |
| Work Styles | 26% |
| Career Progression & Development | 23% |
| Compensation & Benefits | 18% |
| Job Security | 18% |
| Confidence In Senior Leadership | 13% |
| Performance Issues | 12% |
| Facilities & Workplace Safety | 11% |
| Collaborative Governance | 10% |
| Ethics | 9% |

*"I am extraordinarily grateful for our Staff Ombudsperson who at this time has helped me consider, strategize, and problem solve a variety of issues over many years. Each time I have come to the Ombudsperson, I leave the conversation feeling empowered, heard, clear minded and more equipped to manage my concerns in a thoughtful and methodical way."*

~ Staff Ombuds Office Visitor

*"I greatly appreciate the listening approach and positive support for resolving differences."*

~ Staff Ombuds Office Visitor

## STAFF OMBUDS OFFICE
# Demographics

## Ethnicities *

**77%**
of African American/Black visitors expressed concerns about **DEIB,** which is 8% higher than the average.

**44%**
of Asian visitors reported **work-life balance**, which is 10% higher than the average.



— UCB Staff Ombuds Office    — UCB Campus Average (staff and non-senate academics)

**100%**
of Native American and Native Alaskan visitors reported **DEIB** as a concern.

**27%**
of both LatinX/ChicanX/Hispanic visitors and Black/African American visitors expressed concerns about **career progression**, which is 4% higher than the average.

**Native American and Native Alaskan Employee Top Concerns**

- DEIB
- Management Effectiveness
- Facilities & Workplace Safety
- Performance Issues, Ethics, Compensation & Benefits

**Middle Eastern and North African Employee Top Concerns**

- DEIB
- Management Effectiveness
- Work Styes
- Career Development and Work-Life Balance

8

\* *Staff Ombuds Office reports all categories identified by employees.  UCB uses federal ethnicity methodology that reports one category only.*

# STAFF OMBUDS OFFICE



- UCB Staff Ombuds Office
- UCB Campus Average (staff and non-senate academics)

## Generations

### Baby Boomers
Unlike other generations, Baby Boomer concerns about **facilities and workplace safety**, including ergonomics and accommodations, made the top 5 list of concerns.

### Millenials
Lack of **work-life balance** was much more of a concern for Millenials (42%), which is 9% higher than the average for other generations.

## Gender

### Nonbinary
For nonbinary visitors, the top 5 issues included: DEIB, management effectiveness, work-life balance, career development, and work styles.

### Transgender
Transgender visitors constituted less than 1% of employees served, which mirrors campus benchmarks. In order to preserve confidentiality, these issues are not reported separately. Individuals who identified as Trans-Women or Trans-Men are also included in binary gender categories below.

### Women
37% of women raised concerns about a lack of **work-life balance** compared to 25% of men.

### Men
Conflicts rooted by **differences in work styles** ranked the 3rd most reported issues for men. It ranked 5th place for women.



- UCB Staff Ombuds Office
- UCB Campus Average (staff and non-senate academics)



- UCB Staff Ombuds Office
- UCB Campus Average (staff and non-senate academics)

## Sexual Orientation

### LGBQ+
32% of LGBQ+ visitors raised issues about a lack of **collaborative governance** compared to only 12% of heterosexual visitors.
31% of LGBQ+ visitors expressed concerns about their **career progression** while 23% heterosexual visitors did.

### Heterosexual
14% of heterosexual visitors had concerns about **facilities and workplace safety** versus 3% of LGBQ+ visitors.

9

**STAFF OMBUDS OFFICE**

# Top 3 Visitor Concerns

## Diversity, Inclusion, Equity, Belonging

- Demographic Diversity
- Respect and Treatment
- Discrimination
- Trust
- Morale
- ⭐ Pay Equity

## Management Effectiveness

- Accountability
- Change Management
- Cultural Competency
- Micromanagement
  Role Clarity
- ⭐ Performance Management
- Team Conflict Management
- Technical and Substantive Knowledge

## Work-Life Balance

- Workload
- Flexible Work Arrangements
- Excessive Stress

⭐ Read more about these workplace issues and Systemic Recommendations on pp. 17-22

## STAFF OMBUDS OFFICE
# DEIB & Management Effectiveness

The Staff Ombuds Office is a safe space for both employees and supervisors to raise, address and overcome barriers to management effectiveness.

While the landscape for supervisors and employees has shifted during the pandemic, management continues to play a crucial role in promoting employee engagement and job satisfaction and building a sense of inclusion and belonging.

*78% of the visitors who raised management effectiveness also raised DEIB concerns.*

The Ombuds Office is uniquely positioned through the International Ombuds Association's Standards of Practice and Code of Ethics to provide additional insight and context to the barriers employees face to effective collaboration and promoting DEIB.

The data presented in this report serves as information to advance the University's efforts to develop its managerial pool and promote DEIB.



*48% of all cases involved concerns about managerial and supervisory effectiveness.*

One may assume that management effectiveness was more of a concern for individual contributors than supervisors.

In fact, approximately half of all supervisors and half of all individual contributors raised issues of management effectiveness.

In cases involving evaluative relationships, approximately half of the visitors in supervisory positions raised concerns regarding their own supervisor and half raised concerns regarding people they supervise.

*"The Ombudsperson has been tremendously supportive and has helped me expand my vocabulary and understanding of how campus functions, including how I can more effectively communicate with my coworkers and my supervisor."*

*~Anonymous Visitor*

*"The Staff Ombuds Office is a great resource!! Adding humanity and kindness to what can seem an indifferent work place."*
        *~ Staff Ombuds Office Visitor*



# STAFF OMBUDS OFFICE

## Respect/Treatment

63% of visitors to the Staff Ombuds Office expressed concerns about the lack of respect in the workplace.



Concern about workplace bullying significantly declined during the pandemic. Pre-pandemic 20% of cases included workplace bullying as an issue, between 2020-2022 that number decreased to 13%.




35% of Black / African American visitors reported concerns about discrimination which is higher than the average (22%) for other groups.

Some Black, Indigenous and People of Color visitors expressed an appreciation for remote work, because they experienced less microaggressions working virtually.

At the same time, some full-time remote employees, especially new employees, struggled with feeling a sense of inclusion and belonging.



Disrespectful treatment and a lack of regard to differences remains an igniting factor in interpersonal workplace conflict.

## Accountability

Many visitors talked about their supervisor's unwillingness or inability to hold another team member accountable for their lack of performance and/or disrespectful, exclusionary conduct.



Employees often raised concerns about management's silence when inappropriate comments and mircoaggressions are being made in the workplace or when other employees don't deliver on tasks.



Employees who attempted unsuccessfully to address such concerns with supervisors often felt gaslit or racelit, which is a form of gaslighting that denies the presence of racial bias.

In several cases supervisors expressed a lack of empowerment and technical knowledge on how to hold an employee accountable.



When employees observe inequality in performance expectations or disrespectful behavior is left unaddressed, morale and engagement significantly declines, directly impacting employees' sense of fairness and equity in the workplace.

*"The framing of what I'm experiencing, the language offered to effectively communicate and the feeling of having someone support me in responding was a game changer."*

~ Staff Ombuds Office Visitor

12

# STAFF OMBUDS OFFICE

## Role Clarity

Lack of role clarity often resulted in visitors taking on duties outside of their position and exacerbated conflicts over the appropriateness of tasks or assignments.



22% of the visitors said they don't have an up-to-date job description that accurately reflects their job duties.



Visitors shared concerns about a lack of clarity over who is responsible for taking on parts of the work of a vacant position.



Employees often feel disempowered to advocate for sustainable and fair workload when they don't have an updated job description.

## Change Management

Concerns about change management centered around lack of transparency, communication, and ability to provide input prior to organizational change.



In several cases employees expressed that they were not provided with a rationale behind a decision or change. In many situations employees disagreed with the rationale regarding remote work, especially when a lack of consistency was observed between how this change was implemented in other departments.



Employees were concerned about finding out new information from co-workers instead of management, which resulted in additional stress and speculation between co-workers.



Many employees expressed that the transparency in decision-making and timely communication regarding changes makes decisions feel overall more fair.



*"Ombuds office became an invaluable workplace resource for me. I am learning so much each time we communicate. When I hear a colleague struggles at work I always share my experience with the ombuds office and encourage them to give them a call. I believe it is an incredible resource that improves our collectivity and work life immensely."*

~ Staff Ombuds Office Visitor

13

# STAFF OMBUDS OFFICE

## Micromanagement

Managing remote employees gives new opportunities as well as challenges in the workplace.  Some concerns about micromanagement were linked to new remote work environments.



Employees expressed concerns about requests for frequent updates, discouragement of independent communication with campus partners, dictation of how tasks should be performed.



Supervisors seeking assistance to overcome difficulties with a member of their team expressed that they may resort to micromanaging behavior when they exhausted other methods to motivate an employee to perform.



Managers felt that micromanaging their team added extra work on their plate.

Micromanagement for many created an environment of distrust, leading to a decline in job satisfaction for employees.

## Trust

Visitors expressed concerns about a lack of trust in supervisors, members of their teams, as well as supervisees.  Low levels of trust involved credibility, reliability, and psychological safety.



55% of Black/African American Visitors expressed concerns about lack of trust, which is 18% higher than the average for all other ethnic groups.



Psychological safety or the ability to share ones thoughts or feelings without fear, was present in 72% of all cases involving low levels of trust.



Research of teams shows that psychological safety is critical to fostering inclusion and innovation.

*"The Ombudsperson's excellent ability to untangle situations without judgement and facilitate communication are gifts to our community. Thank you!"*

~ Staff Ombuds Office Visitor

14

**STAFF OMBUDS OFFICE**

## Demographic Diversity

Employees who worked in areas with low demographic diversity, especially racial diversity, often felt excluded.



19% of Black / African American visitors raised concerns about a lack of demographic diversity in the workplace compared to the average (11%).





Race, gender and age are the primary characteristics that visitors expressed concerns about a lack of diversity in their workplace.

In several cases employees expressed a disappointment in not seeing their identities represented in University leadership.



Lack of diversity have numerous affects in the workplace including decreasing employees' sense of belonging, their willingness to speak up and their contribution to innovative ideas.

## Cultural Competency

Employees look to campus leaders, managers, and supervisors to feel included and to have a sense of belonging in the workplace. Some visitors expressed concerns about their supervisor's lack of cultural competency.




In some cases concerns were raised about supervisors not being aware of the racial history of the United States, not following current world or national news, and not being aware of power dynamics and means of oppression.



Many supervisors expressed a commitment to DEIB. At the same time many felt inadequate and uncertain on how to demonstrate cultural competency, and make their employees feel more heard, seen and included.



Lack of cultural competency is often a privilege people have. Learning how to speak up, and offer support is an essential skill for managers to promote DEIB in the workplace.

*"I am telling everyone I know to use the ombuds services, especially around racism and bias in the office. There is so much."*
~ Staff Ombuds Office Visitor

**STAFF OMBUDS OFFICE**

# Work-Life Balance

## Workload

Supervisors and supervisees alike struggled with excessive workload demands. Employees who reached out to the Staff Ombuds Office regarding their workload (19%) looked for ways to create a more manageable and equitable workloads.



Women, Asian, and Millenial visitors were overrepresented in concerns about workload.



Supervisors struggled to hold boundaries around workload when they were not provided with resources to hire, resulting in situations where employees were doing much more with much less.



Employees shared that when staff shortages occur and when management approaches them to take on extra work and responsibilities, they don't feel empowered to say no or to ask for additional help or compensation.



High performing employees felt they should not sacrifice quality or service when instructed to do less.

Employees in these situations often report excessive levels of stress and burnout. Hard working and high potential employees decide to leave their position or the organization.

## Flexible Work Arrangements

Flexible work arrangements remain a key factor for many in remaining in their jobs, achieving work-life balance and pursuing equity and belonging in the workplace.



Working parents, particularly women shared that they have struggled during the pandemic balancing work and caregiving. In these cases, access to flexibility was a deciding factor between being able to remain employed and leaving the workforce.



Full-time remote employees struggled with establishing boundraise between work-life and home-life, which often resulted in feelings of burnout.



The Staff Ombuds Office heard many concerns about supervisors' lack of understanding the difference between flexible work arrangement (FWA) and reasonable accommodation.



Management's lack of knowledge regarding to policies might limit employees options to promote a healty work-life balance.

16

**STAFF OMBUDS OFFICE**
# Systemic Recommendations

The Staff Ombuds Office provides a safe, confidential place for employees to discover problem-solving strategies to address workplace problems. In addition to supporting individual employees, the Staff Ombuds Office analyzes each situation to determine whether the source of the conflict may be located at least in part in any organizational policies, practices, structures and/or culture.

As part of this systemic issue analysis work, the Staff Ombuds Office provides recommendations to relevant campus stakeholders and leaders for consideration. These systemic recommendations advance diversity, equity, inclusion, and belonging for all Berkeley staff and are vital in achieving Berkeley's strategic plan -- to provide a healthy campus climate that fosters equity of experience and a place where all members of the campus community feel safe, welcomed, and included.

It is important to note that the recommendations provided by the Staff Ombuds Office are a starting point and we encourage other campus resources, staff organizations and leaders to identify systemic solutions that address the root cause of workplace problems that often have a disparate impact on employees who are marginalized, disempowered, or vulnerable.



Problem Awareness



Root Cause Analysis



Systemic Recommendations



Organizational Impact

## STAFF OMBUDS OFFICE

# Advancing DEIBJ

The national reckoning for racial justice after the killing of Breonna Taylor and George Floyd in March 2020 as well as continued systemic racism and violence targeting communities of color prompted many organizations to expand efforts to promote Diversity, Equity, Inclusion, Belonging and Justice (DEIBJ).

During the past two fiscal years, many UC Berkeley schools and departments created or extended resources to working groups, task forces, committees, or sub-committees to improve DEIBJ for staff, faculty, and/or students. The Staff Ombuds Office heard from many employees who served to support DEIBJ initiatives within these groups.  In analyzing its data, the Staff Ombuds Office identified several common concerns from these employees.

**Expectation to Serve.**  BIPOC (Black, Indigenous, People of Color) staff members are often asked to serve and felt that they are expected to serve on these DEIBJ initiatives.

**Recognition.**  While staff members, especially BIPOC staff, bear the burden of this DEIBJ work and put in extra hours, they often felt their contributions go unrecognized and are not valued as much as other substantive work.  This work also takes a significant emotional toll on BIPOC employees who not only experience racism, but are also tasked with combatting racism in our campus communities.

**Selection Processes.**  Selection processes for some DEIBJ committees or groups are non-existent, inconsistent, and/or do not use substantive criteria.

**Group Structures.**  DEIBJ committees or groups do not include management and/or group members do not have enough structural power to implement change.  While members of these committees and groups were responsible for improving DEIBJ, they lacked the authority to be effective.

**Management Accountability.**  Management failed to create implementation plans or respond to DEIBJ recommendations and/or departmental climate survey concerns.

**Inclusion of Staff Issues.**  Some DEIBJ committees or groups focused only on DEIBJ for students and faculty.  Because staff are an important part of the campus community, members felt that staff DEIBJ issues should also be considered and prioritized.

**Coordination of DEIBJ Work.**  Many employees who worked on DEIBJ efforts noted that there was a lack of coordination across campus of DEIBJ work.  While many staff members worked on similar initiatives, they were not able to easily utilize or leverage the work of other DEIBJ subject matter experts.

**DEIBJ Education and Awareness.**  Staff members often expressed concern that there was a lack of DEIB education and awareness among employees, including management and faculty involved in these initiatives.  Some employees felt there was a lack of understanding of intersectionality (how inequities based on overlapping identities contribute to social structures of oppression).

The Staff Ombuds Office recognizes that these experiences are not representative of all employees who engage in the extraordinary work to advance DEIBJ throughout our campus communities.  It highlights these concerns as opportunities for growth to increase engagement and support the structures that advance campus DEIBJ.  In that spirit, the Staff Ombuds Office provides the following systemic recommendations for consideration by campus leaders and stakeholders:



Create an **honorarium program** to recognize staff who significantly contribute to DEIBJ initiatives outside of their regular job duties.

Create **best practices for selection processes** for DEIBJ groups and committees, including objective criteria, sample questions, and guidance for nomination processes.

Create **best practices for DEIBJ group structures**, including group membership, decision-making, and management accountability.

Ensure leaders create **DEIBJ performance goals** to implement the initiatives and action plans developed.

Include **staff DEIBJ issues** in the scope of DEIBJ committee work.

Select a **centralized campus framework** for DEIBJ that can be adapted and tailored at the department level.

Collect and **publish a centralized list** of DEIB committees, councils, working groups, and tasks forces, including points of contact.

Create a **shared drive** to allow for easier exchange of DEIBJ educational materials and work products across campus.

Create **training for all DEIBJ committee or group participants** and/or require DEIBJ training as part of the criteria for participating in DEIBJ groups.

## STAFF OMBUDS OFFICE
# Advancing Performance Management

During the past two fiscal years, the campus rolled out the new Achieve Together performance management program, which requires supervisors to check-in with their employees three times per year about their performance and document these conversations in an electronic database.  Developed by People & Culture, this program addresses many problems employees previously experienced by providing ongoing feedback; ensuring that the appropriate supervisor engages in the performance management process even when they are no longer in the role at the end of the fiscal year; providing an opportunity to correct misunderstandings and obtain clarity; creating dynamic goals that change with business needs; and establishing performance criteria beyond Goal Achievement. See <u>2018-2020 Staff Ombuds Office Biennial Report</u>, Progress on Prior Recommendations, pp. 13-14.

According to a September 2021, Achieve Together campus survey, in response to the question "As a direct report, I was satisfied with my overall Achieve Together experience in the prior year.":

- 16% percent of employees strongly agreed
- 46% somewhat agreed
- 24% somewhat disagreed
- 14% strongly disagreed

These strong survey responses from 1,625 employees (a 30% survey response rate) demonstrate general satisfaction with the Achieve Together process.

The Staff Ombuds Office recognizes the significant advancements made with Achieve Together.  At the same time, new challenges that have emerged in the performance management process.  Through its casework, meetings with staff organizations, administrative groups, and campus leaders, the Staff Ombuds Office has heard extensively from staff members who expressed the following concerns:

**Opportunities for Growth**
The six Achieve Together (AT) check-in questions do not include a question about opportunities for growth or improvement.  Many supervisors felt that including a question about these opportunities could help support them in providing constructive feedback.  Because the AT questions are directed to the employee to provide input, supervisor feedback about employee performance was not always shared during check-ins.  As a result, end-of-the-year rating came as a surprise for some employees, especially employees who had anticipated receiving the highest ratings.

**Achievement Criteria**
Employees did not understand how two AT check-in questions related to the Achieve Together Criteria.  For example: (1) "What do you like best about your work?," did not seem to elicit answers that addressed Goal Accomplishment.  (2) "In what ways does your work connect to our overall strategy and/or mission?," did not seem to elicit answers that addressed Job Mastery.

**Disparate Focus on Goals**
The Achieve Together form is not structured in a way that aligns with the merit/calibration process that includes evaluation of five Achievement Criteria (Collaboration, Goal Accomplishment, Inclusion & Belonging, Innovation, & Job Mastery).  Half of the Achieve Together online check-in form is for comments on Goal Accomplishment, which constitutes only 20% of the overall annual rating.

**Supervisor Support**
An important part of the Achieve Together check-in is for supervisors to ask their employees "What can I do to better support your success?"  While this question is extremely helpful for many employees, it posed problems for others.  Visitors often expressed concerns that supervisors did not follow through on the feedback provided and that mechanisms did not exist in the Achieve Together process that would ensure this feedback would be addressed.

**Evaluation of Supervisor Performance.**
Visitors often shared that it was difficult for higher level managers to discover when a supervisor was failing to perform or adhere to the Achieve Together criteria.  The Achieve Together process made it difficult for employees to have performance issues of their supervisor addressed since no mechanism exists for this feedback to be received.

**Documentation.**
One of the greatest sources of conflict was confusion about the Conversation Notes section of the Achieve Together form.  In this section of the form, both supervisors and employees have a separate space to document the conversation that took place.  When a supervisor either failed to accurately document the conversation or chose to include information that was not shared during the check-in conversation, this eroded trust and became a source of tension or conflict that did not previously exist.

19

# STAFF OMBUDS OFFICE

**No Recourse for Nonadherence.** Employees felt the was no recourse if their supervisor did not adhere to the Achieve Together process by asking the six AT check-in questions or accurately documenting the conversation.

**Rating Scale.**
The Staff Ombuds Office heard many more complaints from high performing employees about the new performance management system than from low performing employees. High performing employees expressed great dissatisfaction with the new ratings scale that changed the prior 1-5 point scale of Unsatisfactory, Needs Improvement, Meets Expectations, Exceeds Expectations, Exceptional to the new 1-3 point scale of Needs Improvement, Well Done, and Stand Out. Many high performing employees who previously "Exceeded Expectations" received "Well Done" ratings, which lowered their morale and engagement. They felt that the new "Well Done" rating category did not provide a way to recognize their achievements. Interestingly, the performance of these employees did not change; however, they felt that their performance was viewed as average and not as valued due to the new ratings scale that eliminated the "Exceeds Expectations" category.

**Rating Disclosure.**
Because ratings are not required to be disclosed during the three Achieve Together check-ins, many high performing employees had expected to receive "Stand Out" ratings and were surprised to receive "Well Done" at the end of the year.

**Signatures.** Some employees expressed concerns that their supervisors had added or edited written notes and comments in the Achieve Together after the employee had finalized their portion of the review. As a result, employees did not have an opportunity to address these supervisor remarks in the Achieve Together form. In the previous performance management system, employees signed after supervisor comments were finalized so they could acknowledge that they had read the review and could provide a rebuttal or addendum as needed.

**Time.** Covering all six Achieve Together questions in 30 minutes or even an hour was challenging for both supervisors and supervisees. Many employees, especially employees struggling with workload or supervisors who had numerous direct reports, felt that preparing for and documenting three conversations took an excessive amount of time. While the tone of the Achieve Together process was to check in with employees to help support and coach them for success, many employees experienced the process as formal and focused on documentation.

In analyzing the root cause of workplace conflict, the Staff Ombuds Office believes that many of the above concerns could be prevented or addressed through structural changes to the Achieve Together form. In brainstorming possible systemic solutions, the Staff Ombuds Office provides the following recommendations for consideration:



- **Include a growth mindset question** that supports supervisors in providing feedback on opportunities for performance improvement.

- Revise questions and structure the form to **directly relate to the Achievement Criteria**.

- Structure the form to **provide equal weight to all five Achievement Criteria**.

- **Eliminate the double documentation** of the Achieve Together conversation by both supervisors and supervisees. Give supervisees the responsibility of documenting their answers to the five Achieve Together questions as a self-assessment. Feedback from supervisors can be included in the Supervisor Comments section of the form.

- **Provide managers with access to their direct reports' Achieve Together form of their supervisees.** This will allow managers to understand how supervisors who report to them can better support employees and illuminate opportunities for supervisory growth and development.

- **Add the ability for employees to comment on supervisor performance**, including performance management. With this feedback, managers will have more information to better assess supervisory skills.

- **Increase the ratings point scale** to allow more gradience for achievement.

- **Add ratings boxes for all check-in conversations** so employees know where they stand in assessing their performance throughout the year.

- **Modify the signature approval process** so that supervisors must approve and finalize their portion of the review first before going to employees for approval and finalization.

## STAFF OMBUDS OFFICE
# Advancing Pay Equity



In its <u>last report</u>, the Staff Ombuds Office provided several systemic recommendations to address pay inequities.  Since its publication in 2020, issues of pay equity have only exacerbated due to the rising cost of housing and inflation over the past two years.  For some staff, pay inequity at Berkeley was so severe that they needed to take on second jobs in order to support themselves.  Some staff also believed long-term managers and faculty were out of touch with the cost of living, especially the cost of housing in the Bay area. According to the Housing and Urban Development Office of Policy Development and Research, a salary of $106,000 is the low-income limit for a family of 4 in Alameda County.

Issued by UC President Drake, the 4.5% salary increase for policy-covered staff at all UC campuses effective July 1, 2022 was a welcomed reprieve from these escalating costs. Unfortunately, the Consumer Price Index shows that inflation over the past year for the San Francisco-Oakland area rose 5.7%, taking away any real salary gains for staff.  While the obvious systemic solution is to provide more resources to correct pay inequities, the Staff Ombuds Office has identified several process and policy issues that create barriers for staff to achieve pay equity.

### Exclusion of Staff in the Compensation Process

Outside of the annual merit or across the board salary increases, staff typically increase their compensation through (1) an equity increase or (2) a reclassification of their current position to a higher level with a corresponding increase in pay.  Employees who came to the Staff Ombuds Office regarding issues of pay equity often felt they did not receive a fair or comprehensive analysis because they were excluded from the process.

According to Berkeley's salary placement guidelines, an employee's placement in the first, second, third, or fourth quartile is dependent upon their level of experience.  This experience should include an employee's entire work history.  Many employees reported that they did not have the opportunity to provide their resume or share information about their entire work experience, which would help inform the salary analysis and result in a higher salary recommendation.

In addition, employees seeking reclassifications of their positions also reported they were excluded from the process.  Employees were not contacted by Compensation to confirm the duties of their position and felt significant duties were not included by managers who had submitted the job descriptions.  Under Compensation's Reclassification Process, Compensation Consultants carefully review the materials submitted and may even contact campus experts in the field to obtain their perspective and assessment of the position; however, there is no requirement to speak to the employee who currently holds the position impacted by the review.  Employees felt this exclusion was not fair and did not give them an opportunity to fully participate and inform the process, a key component of due process.

### Stipend Processes that Compensates Employees for Additional Duties

Staff shortages and the resulting extra workload during the pandemic, coupled with the difficulty to hire as part of the "great resignation" left many employees in the position of having to take on a large volume of additional work without any additional compensation.  Under PPSM 30, employees can only receive a stipend for temporarily assigned duties if that work is considered higher-level work (i.e. duties of a position in a higher salary grade).  If the temporarily assigned work covers duties that are in the same or lower salary grade, employees are ineligible for a stipend.  Many employees expressed that these stipend policies were inequitable and felt exploited when they were assigned the workload of a colleague who had departed.  Employees whose work schedules were overloaded with lower salary grade duties also expressed a loss of morale because they did not have enough time to do work in their salary grade for which they were hired and were passionate about.

In order to address these inequities, the Staff Ombuds Office recommends that restrictions limiting stipends to higher-level work and 15% cap be removed.  Instead, the Staff Ombuds Office encourages the University to adopt a more equitable policy that provides stipends for significant additional workload that rewards the extraordinary contributions of staff.

21

# STAFF OMBUDS OFFICE

**Excessive Process Delays and Retroactive Pay**
Employees reported that they experienced significant delays in receiving reclassifications, sometimes up to a year or more.  In addition, many employees did not know they could request retroactive pay.  Approval for retroactive pay seem to vary significantly from department to department and delays in approving reclassifications only exacerbated existing inequities.

It is important to note that an employee starts to count the time that it takes for a reclassification to be approved from the time they ask their supervisor until the time it is processed. The Compensation unit does not start to count process time until it has received all materials it needs from management to conduct the review.  This results in a very different perception between employees and the University of processing time.

**Tenure in Title Requirement**
If employees have been performing higher level duties above their classification for years, once reclassified, their pay is based on the amount of years of "tenure in title."  As a result, this experience is not counted towards establishing their salary in the next highest grade.  Furthermore, it is unclear how "tenure in title" impacts salary placement for new employees who have not held the same title in the Berkeley classification system, but have substantial experience in the skills needed to perform the job for which they were hired.

**Exclusion of Direct Supervisors in the Compensation Process**
While complaints of exclusion of direct supervisors from the Compensation process was rare, the Staff Ombuds Office was surprised to hear of instances where direct supervisors were excluded from participating in the process for salary increases for staff they supervised.  These supervisors had the most knowledge and information about expertise and job duties of their staff yet higher-level management was consulted by Compensation instead.

**Consistent Application of the Compensation Process**
Throughout the years, the Staff Ombuds Office has heard managers and employees describe very different ways in which they have engaged in the Compensation process and various levels of transparency.  Inclusion and transparency in these processes often hinges on an employee's manager rather than on established guidelines.  To advance Berkeley's strategic plan to provide a campus climate that fosters equity of experience, the Staff Ombuds Office recommends that protocols be established to ensure that employees are included in the initial request for a salary review, kept apprised of the status, and have access to the salary analysis provided to management.

The issue of pay equity is not new.  Following is a summary of the systemic recommendations the Staff Ombuds Office has provided throughout the years, including fiscal years 2020-2022.

## 2018-2020

- Promote Equal Pay Day
- Increase Awareness of Unconscious Bias in Salary Negotiations
- Educate Managers & Publicize Enforcement Mechanisms regarding Laws and Policies that Support Pay Equity
- Create a Transparent Review Process



## 2012-2014

- Create an Equity Review Program that Allows Employees to Directly Petition the Compensation Unit (or Alternatively a New Equity Review Board).
- Allow Employees to Directly Consult with the Compensation Unit regarding Pay Equity.

## 2020-2022 NEW

- Include Employee Engagement and Participation as a Necessary Step in the Compensation Review Process
- Require Retroactive Pay for Reclassifications to the Date Employees Submitted a Request to Management
- Ensure Employees' Actual Experience Not Just "Tenure in Title" is Considered in Salary Placement
- Ensure Direct Supervisors Are Consulted in the Compensation Review Process
- Allow Stipends for Significant Additional Workload: Eliminate 15% Cap and Restrictions that Provide Stipends Only for Higher Level Work
- Establish Communication Protocols to Increase Transparency and Foster Equity of Experience in the Compensation Process

## STAFF OMBUDS OFFICE

# Progress on Prior Recommendations

**Office for Civil Rights & Integrated Conflict Management Systems**

Beginning in 2020, the Office for Prevention of Harassment and Discrimination (OPHD) began handling all staff complaints of discrimination for all protected classes. This new structure provides a more streamlined approach where staff now have a single point of contact for all discrimination complaints and helps to provide a conflict management system that supports diversity and the various intersectional identities of employees.

Previously, both OPHD and Central Human Resources handled investigations of staff discrimination complaints. OPHD handled sexual harassment and discrimination on the basis of sex; while Central Human Resources handled discrimination based on all other protected classes.

The new structure adopted in 2020 advances prior Staff Ombuds Office systemic recommendations to provide more integrated conflict management systems. See 2010-2012 Staff Ombuds Office Biennial Report. The Staff Ombuds Office looks forward to additional organizational changes that promote integration and more streamlined systems.



**Opportunity to Leverage Berkeley Resources**

In its last report, the Staff Ombuds Office recommended that Berkeley faculty and academic units that promote Diversity, Equity, & Inclusion worldwide, bring this expertise to the Berkeley workforce. One example of such an effort was the partnership between central Human Resources and the Center for Equity, Gender, and Leadership (EGAL) in the Haas School of Business to create the People & Culture Inclusive Leadership Academy.

**UC Systemwide Abusive Conduct Policy**

Effective January 1, 2023, the University of California Office of the President issued the Abusive Conduct in the Workplace policy, which applies to all UC employees, including 227,000 faculty and staff across this UC system. "I ask that locations join me in committing to the prevention of abusive conduct in the workplace by expanding the competency of University employees (staff, academic, and student employees) and leaders at all levels to recognize, address, and discipline violations of this Policy in an equitable manner that acknowledges that each individual in our community has the right to work in a respectful environment," wrote UC President Michael Drake in the policy's issuance letter.

The Staff Ombuds Office has been a long-time advocate for systemic change and policies to address workplace bullying. In 2010, the Staff Ombuds Office became the first office in the UC system to propose adoption of a bullying prevention policy. See 2008-2010 and 2010-2012 Staff Ombuds Office Biennial Reports. In 2016, Berkeley became the first campus in the UC system to issue a Workplace Bullying Prevention Policy for staff. Since that time, other UC campuses have adopted abusive conduct or workplace bullying prevention policies of their own, including UC Merced (2019); UC San Francisco (2019); UC Riverside (2021); UC Davis (2021). Passage of this policy is a historic moment for the University of California and confirms systemwide commitment to ensuring that abusive conduct is not tolerated in the workplace.



# STAFF OMBUDS OFFICE

https://staffombuds.berkeley.edu/

(510) 642-7823